1  Rob Bonta
   Attorney General of California
2  Jeffrey T. Fisher
   Supervising Deputy Attorney General
3  Zewugeberhan Desta
   Deputy Attorney General
4  State Bar No. 271740
     1515 Clay Street, 20th Floor
5    P.O. Box 70550
     Oakland, CA  94612-0550
6    Telephone:  (510) 879-0263
     Fax:  (510) 622-2270
7    E-mail:  Zewugeberhan.Desta@doj.ca.gov
   *Attorneys for Defendants*
8  *Allison, Broomfield, and Clark*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                      SAN JOSE DIVISION

12

13  | | |
    |---|---|
    | **MICHAEL V. NICKERSON,** | No. 5:20-cv-06326-EJD (PR) |

14  | Plaintiff, | **DEFENDANTS' NOTICE OF MOTION** |

15  | | **AND MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT** |
    | v. | **(EXHAUSTION); MEMORANDUM OF** |

16  | | **POINTS AND AUTHORITIES** |

17  | **RON BROOMFIELD, et al.,** | |

18  | Defendants. | Judge:    The Honorable Edward J. Davila |
    | | Trial Date:    Not Set |

19  | | Action Filed:  September 9, 2020 |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

Notice of Motion and Motion ...................................................................................................... 1

Memorandum of points and authorities ...................................................................................... 1

Introduction ................................................................................................................................ 1

Plaintiff's Allegations and Claims .............................................................................................. 1

Relevant Judicially Noticeable Facts ......................................................................................... 2

    I.    CDCR's Health Care System Is in Federal Receivership. ................................... 2

    II.    Summary of CDCR's COVID-19 Response and the Transfer of Inmates from CIM to San Quentin. ........................................................................................ 2

    III.    The Public Readiness and Emergency Preparedness (PREP) Act Provides Immunity During Public Health Emergencies. ................................................... 5

    IV.    Exhaustion of Administrative Remedies. ............................................................ 6

        A.    The California Inmate-Grievance Process ............................................... 6

        B.    Nickerson Identified One Grievances Regarding His Claims. .................. 7

        C.    Nickerson's Grievance Number 08563. .................................................. 7

Legal Standard ............................................................................................................................ 8

    I.    Legal Standard For Motion to Dismiss. .............................................................. 8

    II.    Legal Standard For Summary Judgment Based on Exhaustion. ........................... 8

Argument ................................................................................................................................... 9

    I.    Defendants Are Entitled to Summary Judgment Because Nickerson Failed to Exhaust His Claims Against Them. ..................................................................... 9

    II.    Defendants Are Entitled to Qualified Immunity. ............................................... 10

    III.    Defendants Are Also Entitled to Immunity Under the PREP Act. ...................... 15

        A.    Defendants, as Program Planners, Are "Covered Persons." ................... 15

        B.    Plaintiffs' Alleged Loss Arises Out of the Administration of Covered Countermeasures. ................................................................... 16

        C.    If Defendants Are Not Immune, This Court Lacks Jurisdiction. .............. 17

    IV.    Nickerson's Allegations Fail to State a Claim for Deliberate Indifference to His Safety. ...................................................................................................... 17

Conclusion ................................................................................................................................ 20

i

Defs.' Not. of Mot. and Mot. to Dismiss and for Summ. J. (5:20-cv-06326-EJD (PR))

# TABLE OF AUTHORITIES

**Page**

CASES

*Adam Lane ADC 155843 v. William Straughn, et al.*
No. 4:20-cv-01067-BRW-JTK, 2021 WL 5240179 (E.D. Ark. Oct. 13, 2021) ...................... 14

*Albino v. Baca*
747 F.3d 1162 (9th Cir. 2014) ........................................................................................ 8, 9

*Allen v. Sakai*
48 F.3d 1082 (9th Cir. 1994) ........................................................................................ 17

*Ashcroft v. Iqbal*
556 U.S. at 675-684 ........................................................................................................ 11

*Cooper v. Allison*
No. 20-cv-09415 BLF, 2021 U.S. Dist. LEXIS 83474 (N.D. Cal. Apr. 28,
2021) ................................................................................................................................ 20

*District of Columbia v. Wesby*
138 S. Ct. 577 (2018) ................................................................................................ 10, 11

*Emmons v. City of Escondido*
921 F.3d 1172 (9th Cir. 2019) ........................................................................................ 11

*Farmer v. Brennan*
511 U.S. 825 (1994) ............................................................................................ 17, 18, 19

*Fields v. CDCR*
No. 2:21-cv-0548-EFB, 2021 U.S. Dist. LEXIS 67830 (E.D. Cal. Apr. 7, 2021) ................. 20

*Freemen v. United States*
No. 2:20-13341-KM, 2021 WL 4129479 (D.N.J. Sept. 9, 2021) ........................................ 14

*Garcia v. Los Angeles County*
No. 2:20-cv-08528-JVS-KES, 2021 WL 4497213 (C.D. Cal. July 7, 2021) ......................... 14

*Garcia v. Welltower OpCo Grp. LLC*
522 F. Supp. 3d 734 (C.D. Cal. Feb. 10, 2021.) ............................................................ 5, 15, 17

*George v. Diaz*
No. 20-cv-03244-SI, 2020 U.S. Dist. LEXIS 153581 (N.D. Cal. Aug. 24,
2020) ................................................................................................................................ 19

*Hallett v Morgan*
296 F.3d 732 (9th Cir. 2002) ........................................................................................ 18

1

2

# TABLE OF AUTHORITIES
### (continued)

Page

3

4

*Hamby v. Hammond*
821 F.3d 1085 (9th Cir. 2016) ...................................................................................... 11, 15

5

*Hines v. Youseff*
914 F.3d 1218 (9th Cir. 2019) ................................................................................. 2, 12, 13

6

7

*Hope v. Warden, York City Prison*
972 F.3d 310 (3rd Cir. 2020) ................................................................................................ 15

8

*Hoptowit v. Ray*
682 F.2d 1237 (9th Cir. 1982) .............................................................................................. 18

9

10

*Hudson v. McMillian*
503 U.S. 1 (1992) ................................................................................................................... 18

11

12

*Huizar v. Carey*
273 F.3d 1220 (9th Cir. 2001) .............................................................................................. 10

13

14

*Hydrick v. Hunter*
669 F.3d 937 (9th Cir. 2012) ................................................................................................ 11

15

*Jones v. Bock*
549 U.S. 199 (2007) ............................................................................................................ 8, 9

16

17

*Jones v. Lay*
4:20-cv-1325-BRW-BD, 2021 WL 687342 (E.D. Ark. Jan, 25, 2021) ................................ 14

18

19

*Kesling v. Tewalt*
476 F. Supp. 3d 1077 (D. Idaho Aug. 4, 2020) .................................................................... 14

20

*Lee v. City of Los Angeles*
250 F.3d 668 (9th Cir. 2001) .................................................................................................. 8

21

22

*LeMaire v. Maass*
12 F.3d 1444 (9th Cir. 1993) ................................................................................................ 19

23

24

*McKinney v. Carey*
311 F.3d 1198 (9th Cir. 2002) ............................................................................................ 8, 9

25

*Messerchmidt v. Millender*
565 U.S. 535 (2012) .............................................................................................................. 11

26

27

*Morales v. Fry*
873 F.3d 817 (9th Cir. 2017) ................................................................................................ 11

28

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Pearson v. Callahan*
    555 U.S. 223 (2009) ..................................................................................... 11

4

5

*Plata v. Davis*
    N.D. Cal. No. 01-cv-01351 ................................................................. *passim*

6

*Plata v. Newsom*
    01-CV-01351-JST (N.D. Cal. 2001) ............................................................. 3

7

8

*Plata v. Newsom*
    445 F. Supp. 3d 557 (N.D. Cal. Apr. 17, 2020.) ................................. *passim*

9

*Plata v. Schwarzenegger*
    603 F.3d 1088 (9th Cir. 2010) ....................................................................... 2

10

11

*Rhodes v. Chapman*
    452 U.S. 337 (1981) ..................................................................................... 18

12

13

*Rico v. Ducart*
    980 F.3d 1292 (9th Cir. 2020) .................................................................12, 13

14

*Robinson v. Broomfield*
    No. 21-cv-00972-RMI, 2021 U.S. Dist. LEXIS 61148 (N.D. Cal. Mar. 30,
    2021) ............................................................................................................. 20

15

16

17

*Saucier v. Katz*
    533 U.S. 194 (2001) .................................................................................10, 12

18

*Somers v. Apple, Inc.*
    729 F.3d 953 (9th Cir. 2013) ......................................................................... 8

19

20

*Sorrels v, McKee*
    290 F.3d at 971. ........................................................................................... 14

21

22

*Swain v. Junior*
    961 F.3d 1276 (11th Cir. 2020) ................................................................... 13

23

*Toguchi v. Chung*
    391 F.3d 1051 (9th Cir. 2004) ..................................................................... 18

24

25

*Vaden v. Summerhill*
    449 F.3d 1047 (9th Cir. 2006) ....................................................................... 9

26

27

*Wilson v. Seiter*
    501 U.S. 294 (1991) ..................................................................................... 19

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Wilson v. Williams*
  961 F.3d 829 (6th Cir. 2020) ............................................................... 13

*Woodford v. Ngo*
  548 U.S. 81 (2006)................................................................................. 9

*Young v. Bonner*
  No. 2:20-cv-02614-TLP, 2021 WL 4699089 (W.D. Tenn. Oct. 7, 2021) ............................ 14

**STATUTES**

42 United States Code
  § 247d-6(e) ...................................................................................... 17
  § 247d-6d(i)(2)(B) ............................................................................. 15
  § 247d-6d(a)(1) & (b) ....................................................................... 5, 15
  § 247d-6d, *et seq.* .............................................................................. 1

California Code of Regulations, Title 15
  § 3481(a) (2020) .............................................................................. 6, 9
  §§ 3481(a)–(b) ..................................................................................... 6
  §§ 3482(b)–(d) ..................................................................................... 6
  §§ 3483(i) ...................................................................................... 7, 10
  § 3483(m)(2) ........................................................................................ 6
  §§ 3483(m), 3485 ................................................................................. 6

Coronavirus Aid, Relief and Economic Security Act § 3103, Pub. L. No. 116-136
  (March 27, 2020) ................................................................................ 16

Prison Litigation Reform Act, 42 U.S.C. § 1997e (a) .................................. 1, 6, 8, 9

Public Readiness and Emergency Preparedness Act ......................................... *passim*

**CONSTITUTIONAL PROVISIONS**

United States Constitution
  Eighth Amendment ............................................................................. *passim*

**COURT RULES**

Federal Rules of Civil Procedure
  Rule 12(b)(6) ................................................................................. 1, 8
  Rule 56(c) ......................................................................................... 8

Federal Rules of Evidence, Rule 201(b) ..................................................... 8

v

Defs.' Not. of Mot. and Mot. to Dismiss and for Summ. J. (5:20-cv-06326-EJD (PR))

# TABLE OF AUTHORITIES
### (continued)

**Page**

**OTHER AUTHORITIES**

85 Code of Federal Regulations
    15198-01 ............................................................................................................ 6, 16
    15201 ................................................................................................................. 16
    15202 ................................................................................................................. 16
    79191 ................................................................................................................... 6
    79197 ................................................................................................................. 16
    79198 ................................................................................................................. 17

86 Code of Federal Regulations, 14462 ........................................................................ 6

vi

1

## NOTICE OF MOTION AND MOTION

2

TO PLAINTIFF MICHAEL V. NICKERSON, PRO SE:

3

PLEASE TAKE NOTICE that under Rule 56 of the Federal Rules of Civil Procedure,

4

Defendants Allison, Broomfield, and Clark (Defendants) move this Court for summary judgment

5

on the grounds that Plaintiff failed to exhaust available administrative remedies before filing suit,

6

as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e (a).

7

PLEASE TAKE FURTHER NOTICE that Defendants also move to dismiss this action

8

under Rule 12(b)(6) because: (1) Defendants are entitled to qualified immunity; (2) Defendants

9

are immune under the PREP Act; and (3) the Complaint fails to allege any cognizable Section

10

1983 claim.

11

This motion is based on this notice; the following memorandum of points and authorities;

12

the accompanying *Rand* notice, exhibits, and declarations of witnesses; the request for judicial

13

notice; all papers on file in this action; and any other matters properly before the Court.

14

## MEMORANDUM OF POINTS AND AUTHORITIES

15

### INTRODUCTION

16

Plaintiff Michael V. Nickerson, a state prisoner housed at San Quentin State Prison, brings

17

this action against Defendants Allison, Broomfield, and Clark. Plaintiff alleges that Defendants

18

violated his Eighth Amendment rights when other inmates were transferred from CIM to San

19

Quentin on May 30, 2020, allegedly causing him to contract COVID-19.

20

The Court should dismiss this action for four reasons: (1) Nickerson did not exhaust his

21

administrative remedies prior to filing this lawsuit; (2) Defendants are entitled to qualified

22

immunity; (3) Defendants are immune under the Public Readiness and Emergency Preparedness

23

(PREP) Act, 42 U.S.C. § 247d-6d, *et seq.*; and (4) the operative complaint fails to state a claim

24

for deliberate indifference to safety.

25

### PLAINTIFF'S ALLEGATIONS AND CLAIMS

26

Plaintiff Nickerson alleges that Defendants violated his Eighth Amendment rights by being

27

deliberately indifferent to unsafe conditions at San Quentin. Specifically, Nickerson alleges that

28

on May 31, 2020, Defendants improperly transferred 121 inmates from CIM to San Quentin.

1

(ECF No. 9 at 3.) Nickerson states that some of these transferred inmates were known to be positive for COVID by both prisoners and medical staff. (*Id*.) Nickerson also alleged that Defendants "were aware of the dangers and San Quentin being inadequate to keep inmates safe due to old unventilated buildings, no PPE and room for social distance, no testing protocols in place, and overcrowding." (*Id*.) Nickerson further alleges that "prison officials did not act until inmates started dying," and that his requests for "PPE" and release from prison were denied. (*Id*. at 4.) Nickerson alleges that he eventually tested positive for COVID after experiencing headaches, problems breathing and sleeping, sore joints, and swollen legs. (*Id*.)

**RELEVANT JUDICIALLY NOTICEABLE FACTS**

**I.      CDCR'S HEALTH CARE SYSTEM IS IN FEDERAL RECEIVERSHIP.**

In 2006, the court in *Plata v. Davis*, N.D. Cal. No. 01-cv-01351, appointed a federal Receiver, and conferred on the Receiver "all the powers vested by law in the Secretary of the [CDCR] as they relate to the administration, control, management, operation, and financing of the California prison medical health care system," and suspended CDCR's exercise of those powers. *Hines v. Youseff*, 914 F.3d 1218, 1223 (9th Cir. 2019); *see also Plata v. Schwarzenegger*, 603 F.3d 1088 (9th Cir. 2010); (Defs.' Req. Judicial Notice (RJN), Ex. A). Therefore, since 2006, state officials have made decisions about prison medical care while under the supervision of the federal Receiver, who was appointed to ensure compliance with the Eighth Amendment. *Id.*

**II.     SUMMARY OF CDCR'S COVID-19 RESPONSE AND THE TRANSFER OF INMATES FROM CIM TO SAN QUENTIN.**

CDCR began its COVID-19 policy development in late February 2020, when it became apparent that the virus had spread into the United States and could pose a risk to CDCR inmates. *Plata v. Newsom*, 445 F. Supp. 3d 557, 562 (N.D. Cal. Apr. 17, 2020.). The *Plata* Receiver and CDCR implemented several measures intended to mitigate the risks associated with COVID-19 within the prisons, including reducing the inmate population, transferring inmates out of dormitory housing to less crowded spaces, restricting movement, eliminating mixing of inmates from different housing units, canceling visitation, distributing informational materials to inmates, ordering additional hand sanitizing stations, and placing six-foot markers in communal areas.

2

1    *Plata*, 445 F. Supp. 3d at 562, 567. CDCR also activated "a centrally-located command center

2    where CDCR and the Receiver's experts monitor information, prepare for known and unknown

3    events, and exchange information centrally" to quickly make decisions and provide guidance. *Id.*

4    As the pandemic evolved, CDCR also suspended transfers between facilities and screened all

5    individuals entering prisons for known COVID-19 symptoms. *Id.*

6        Additionally, on April 10, 2020, the Receiver issued "Guidelines for Achieving and

7    Maintaining Social Distancing in California Prisons." *Plata*, 445 F. Supp. 3d at 565; (RJN Ex. C).

8    The guidelines required that inter-institution transfers be approved by the "Health Care Placement

9    Oversight Program (HCPOP) in consultation with the CCHCS[1] public health team" because such

10   transfers "risk carrying the virus from one institution to another." *Plata*, 445 F. Supp. 3d 557,

11   565; (RJN Ex. C). Two days later, the Receiver issued a supplemental memo clarifying that his

12   April 10 directive was not intended "to affect any inter-institution transfers that are to address

13   either medical, mental health, or dental treatment needs that are not available at the sending

14   institution, such as to provide a higher level of care or to reduce or prevent morbidity or mortality,

15   or a safety or security issue that cannot be managed by the sending institution." *Plata*, 445 F.

16   Supp. 3d at 565; (RJN Ex. D). Under these guidelines, hundreds of inmates were moved out of

17   dormitory housing to available spaces in other prisons to achieve greater physical distancing.

18   *Plata*, 445 F. Supp. 3d at 563. Furthermore, by mid-April 2020, California's Prison Industry

19   Authority was producing cloth barrier masks for inmates and staff at a rate of approximately

20   22,000 per day. *Plata*, 445 F. Supp. 3d 567.

21       Throughout all of this, the *Plata* court monitored CDCR's COVID-19 response at frequent

22   Case Management Conferences. *See generally Plata v. Newsom,* 01-CV-01351-JST (N.D. Cal.

23   2001); *Plata*, 445 F. Supp. 3d at 569.

24       Despite CDCR's efforts, the first inmate tested positive for COVID-19 on March 20, 2020.

25   (RJN, Ex. E at 58-59.) CIM was the first CDCR institution to experience a large outbreak. (RJN,

26   Ex. F at 11-12.) CIM's outbreak posed significant risks to the inmate population there because

27

28   _____

        [1] The Receiver heads CCHCS. *See* https://cchcs.ca.gov/wp-content/uploads/sites/60/NR/execOrgchart.pdf
     (last visited on December 22, 2021.)

1    most, if not all, of CIM inmates were housed in dormitories. (*Id.*) According to the *Plata*

2    Plaintiffs, "[c]rowded indoor rooms, such as dormitories with poor ventilation, are prime

3    environments for the spread of the infection," which in early- to mid-2020 they believed "spread

4    through droplet transmission." (RJN, Ex. I at 2.) At that time, it "was not yet clear that the virus

5    could survive and spread in an aerosolized form." (RJN, Ex. F at 12.) Initially, the outbreak at

6    CIM remained confined to a few dorm facilities, and the *Plata* court believed CDCR's strategy of

7    sheltering inmates in place at CIM was working. *Plata*, 445 F. Supp. 3d at 563. But the *Plata*

8    plaintiffs still demanded to transfer more inmates out of dorm settings. *Id.*

9         Then, the outbreak spread to "a previously unaffected dorm housing a large number of

10    older, COVID-19 high-risk patients." (RJN, Ex. F at 12.) The question facing the Receiver at that

11    point was **"whether to leave those patients where they were—even though they were at an**

12    **increasing risk of contracting COVID-19—or to transfer those patients to a safer**

13    **institution."** (*Id.* (emphasis added).) The *Plata* plaintiffs demanded that CDCR transfer these

14    inmates out of CIM. (RJN Ex. G at 4, 10; Ex. H at 10–11, 14; and Ex. I at 2–3.)

15         On May 23, 2020, faced with a growing outbreak that had spread to every housing unit at

16    CIM, and pressure from the *Plata* plaintiffs, "the Receiver, in consultation with the Secretary,

17    directed that high-risk inmates at CIM who test negative for COVID-19 be transferred to facilities

18    in institutions that remained COVID-19 free." (RJN, Ex. E at 60:11-61:16, Ex. I.) The decision

19    "involved a balancing of the growing risks to the CIM patients against the risks of any large scale

20    transfer." (RJN, Ex. E at 59.) The Receiver "notified CDCR that 691 high-risk inmates at CIM

21    tested negative for COVID-19 and should be transferred out." (RJN, Ex. I at 14.) At the time,

22    CCHS's protocols for inmate transfers stated: "COVID screen and test if patient is to transfer.

23    May transfer if COVID screen and test negative." (RJN, Ex. F at 12.) But the protocol did not

24    specify how soon inmates needed to be tested before a transfer. (*See id.*) That was consistent with

25    guidance from the U.S. Centers for Disease Control and Prevention, which likewise had no pre-

26    transfer testing timeline. (RJN, Exs. B, N.) The Centers recommended "perform[ing] verbal

27    screening and a temperature check" in case of necessary inmate transfers. (*Id.*) But the Centers'

28

1    guidance did not recommend testing immediately before a transfer, nor did it recommend that the

2    verbal or temperature screening occur within a set period of time before the transfer. (*Id.*)

3        Accordingly, 122 medically-vulnerable inmates were transferred from CIM to San Quentin

4    on May 30, 2020. (ECF No. 30 at 7.) All of the inmates had a negative COVID-19 test, but

5    "many of the inmates who were transferred from CIM had tests that were two, three, and even

6    four weeks old" because, as noted above, the existing protocols did not require testing within a

7    specific amount of time. (RJN, Ex. F at 13, Ex. E at 60, Ex. J at 9, n.5.)

8        Because of the emergent outbreak, CCHCS also approved an increase in the number of

9    inmates who could be put in each bus for this transfer. (RJN, Ex. L (OIG Report)). Though each

10   bus could accommodate up to 38 inmates, to improve social distancing, CDCR had limited the

11   number of inmates per bus to 19. (*Id.* at 38-39.) For this transfer, however, CCHCS approved

12   increasing that number to 25 (still only 65% capacity), so long as the CIM inmates were from the

13   same dorm and tested negative for COVID-19 before the transfer. (*Id.*) CCHCS's guidance from

14   May 22, 2020, also did not require protective quarantine for inmates awaiting test results before

15   or after the transfer. (*Id.* at 34.)

16       About a week after the transfer of the 122 inmates from CIM to San Quentin, the Receiver

17   issued a new "testing and transfer strategy" dictating that "a patient should not transfer if the date

18   of their negative test was seven or more days prior to the date of transfer. (RJN Ex. K at 11-14.)

19   **III.    THE PUBLIC READINESS AND EMERGENCY PREPAREDNESS (PREP) ACT PROVIDES
             IMMUNITY DURING PUBLIC HEALTH EMERGENCIES.**

20

21       Fifteen years before COVID-19 emerged, Congress enacted the PREP Act. Under the PREP

22   Act, the Secretary of the U.S. Department of Health and Human Services (HHS) may issue a

23   Declaration in response to a public health emergency, which immunizes certain individuals and

24   entities from suit under federal and state law for all claims of loss "caused by, arising out of,

25   relating to, or resulting from" the administration of a "covered countermeasure" during the public

26   health emergency. 42 U.S.C. § 247d-6d(a)(1) & (b); *see also Garcia v. Welltower OpCo Grp.

27   LLC*, 522 F. Supp. 3d 734 (C.D. Cal. Feb. 10, 2021.).

28

In March 2020, the HHS Secretary issued a declaration invoking this broad immunity for covered persons tasked with the administration of COVID-19 screening and testing, PPE, mechanical ventilation, and other countermeasures necessary to treat and mitigate the spread of COVID-19. *See Decl. Under the PREP Act for Medical Countermeasures Against COVID-19,* 85 Fed. Reg. 15198-01. The HHS Secretary has since amended the Declaration seven times, and the HHS's Office of General Counsel has issued advisory opinions, elaborating on the PREP Act's immunity to program planners who must make managerial and operational decisions about the use of COVID-19 countermeasures. *See* 85 Fed. Reg. 79191; 86 Fed. Reg. 14462; (RJN Ex. M).

## IV.    EXHAUSTION OF ADMINISTRATIVE REMEDIES.

### A.    The California Inmate-Grievance Process.

Under title 15, section 3481(a), of the California Code of Regulations, an inmate may appeal any departmental decision, action, condition, or policy that has a material adverse effect on the inmate's health, safety, or welfare. Cal. Code Regs., tit. 15 § 3481(a) (2020); (Decl. Bell Supp. Defs.' Mot. Summ. J. (Bell Decl.) ¶ 4.) To initiate the grievance process, an inmate must submit an Inmate/Parolee Appeal Form, commonly known as a 602 inmate grievance, within thirty calendar days of the event or decision being appealed. Cal. Code Regs., tit. 15, §§ 3482(b)–(d). In the original CDCR Form 602, the inmate must specify each claim and the relief requested, and name all involved staff members and describe their alleged conduct. *Id.* at § 3482(c)(2).

The grievance process in 2020—the timeframe relevant to Nickerson's complaint—consisted of two levels of review: (1) the institutional-level review conducted by the Institutional Office of Grievances (no officer ranking lower than a Chief Deputy Warden); and (2) the director's-level review conducted by the Office of Appeals in Sacramento, California (no officer ranking lower than the Associate Director of Appeals). Cal. Code Regs. tit. 15, §§ 3481(a)–(b). (Bell Decl. ¶ 5.) A substantive decision by the Office of Appeal exhausts all available administrative remedies. Cal. Code Regs. tit. 15, §§ 3483(m), 3485. (Bell Decl. ¶ 6.) A grievance that is not pursued through the final level of review does not exhaust administrative remedies, *id.* § 3486(m), unless the issue under appeal was fully resolved at a lower level of review, *id.* § 3483(m)(2). (Bell Decl. ¶ 6.)

6

**B.    Nickerson Identified One Grievances Regarding His Claims.**

Nickerson alleges that he submitted inmate grievance log number 08563 regarding his claims, but the grievance was "never answered by the Office of Appeals." (Pl.'s Am. Compl., ECF 9, at 1–2.) Nickerson contends that he did not finish the exhaustion process because of "staff not answering appeals in a timely fashion." (*Id.* at 2.) In his original complaint, Nickerson stated that he submitted grievances log number 08563, on June 25, 2020, and he was notified by the Office of Grievances that he would be given a response by August 25, 2020. (ECF No. 1 at 1, 4.) Nickerson insists that, under the prison's regulations, his grievance should have been responded to within 30 working days; and, based on that assumption, Nickerson surmised that the grievance process was unavailable to him. (*Id.*) Nickerson is incorrect. Under the regulations, the Office of Grievances has 60 calendar days, after receipt of the grievance, to provide written response. *See* Cal. Code Regs. tit. 15, §§ 3483(i).

**C.    Nickerson's Grievance Number 08563.**

Nickerson submitted grievance number 08563 for institutional-level review on June 25, 2020. (Bell Decl. ¶ 19.) In this grievance, Nickerson complained that his health and safety was endangered because of the transfer of inmates from CIM to San Quentin, and also because of the lack of social distancing, lack of protective equipment, and lack of programming. (Bell Decl. ¶ 19, Ex. C.) He also complained that "the mere fact [he was] being held in a confined space in a national pandemic with communal feeding [was] harm caused by CDCR." (*Id.*) Nickerson further complained that inmates who tested positive for COVID-19 were sent to administrative segregation, rather than being sent to the hospital or given other care. (*Id.*) For relief, Nickerson requested "to be given adequate protective gear . . ., some form of outside recreation, a reduction of the population to adequately social distance, a better way of handling those who test positive, or have high temperature, and a release from the prison industrial complex." (*Id.*)

The same day, on June 25, 2020, the Office of Grievances at San Quentin sent Nickerson a letter acknowledging receipt of his grievance. (ECF No. 1 at 4; Bell Decl. ¶ 19.) In the letter, Nickerson was advised that the Office of Grievances will complete its review of the grievance no later than August 25, 2020. (*Id.*) On August 20, 2020, the Office of Grievances at San Quentin

7

1   disapproved the grievance. (Bell Decl. ¶ 19, Ex. C.) On August 21, 2020, the Office of

2   Grievances' decision was sent to Nickerson, and Nickerson was advised that he may appeal the

3   decision to the Office of Appeals, if dissatisfied. (*Id.*) Nickerson did not appeal the Office of

4   Grievances' decision to the final level of review. (ECF No. 9 at 2; Moseley Decl. ¶¶ 7–10.)

5   Instead, he filed this lawsuit.

6                            **LEGAL STANDARD**

7   **I.   LEGAL STANDARD FOR MOTION TO DISMISS.**

8          Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for failure to

9   state a claim where: (1) the plaintiff fails to state a cognizable legal theory, or (2) the plaintiff

10  alleges insufficient facts under a cognizable legal theory. *Somers v. Apple, Inc.*, 729 F.3d 953,

11  959 (9th Cir. 2013). In ruling on a Rule 12(b)(6) motion, a court's review is limited to the

12  contents of the complaint, including documents attached to the complaint, or documents the

13  complaint necessarily relies on and whose authenticity is not contested. *Lee v. City of Los*

14  *Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). In addition, the court may take judicial notice of facts

15  that are not subject to reasonable to dispute. *Id.* at 688–689 (discussing Fed. R. Evid. 201(b)).

16  **II.  LEGAL STANDARD FOR SUMMARY JUDGMENT BASED ON EXHAUSTION.**

17         Summary judgment is appropriate "where there is no genuine issue as to any material fact,

18  and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The PLRA

19  requires inmates to exhaust available administrative remedies before filing § 1983 lawsuits. 42

20  U.S.C. § 1997e(a). Unexhausted claims cannot be considered and must be dismissed. *McKinney*

21  *v. Carey*, 311 F.3d 1198, 1200 (9th Cir. 2002) (per curiam); *Jones v. Bock*, 549 U.S. 199, 219-20

22  (2007). The exhaustion defense may be brought in a motion for summary judgment, and should

23  be decided before reaching the merits of an inmate's claim. *Albino v. Baca*, 747 F.3d 1162, 1168,

24  1170 (9th Cir. 2014) (en banc). Defendants bear the burden of demonstrating that there was an

25  available administrative remedy that the inmate did not exhaust. *Id.* at 1172. The plaintiff then has

26  the burden of producing evidence showing that there is something in his particular case that made

27  administrative remedies unavailable to him. *Id.* (citations omitted). If undisputed evidence shows

28  a failure to exhaust, defendants are entitled to summary judgment. *Id.* at 1166. If the motion for

                                             8

1  summary judgment is denied because of disputed factual questions relevant to exhaustion, then an

2  *Albino* hearing should be held so that a judge can resolve those questions. *Id.* at 1170–71.

3  **ARGUMENT**

4  **I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE NICKERSON**

5  **FAILED TO EXHAUST HIS CLAIMS AGAINST THEM.**

6  Inmates are required to exhaust available administrative remedies before filing lawsuits

7  regarding prison conditions, 42 U.S.C. § 1997e(a), and they must do so in accordance with the

8  prison's grievance requirements, *Jones v. Bock*, 549 U.S. 199, 220 (2007). Proper exhaustion

9  requires "using all steps that the agency holds out, and doing so properly." *Woodford v. Ngo*, 548

10  U.S. 81, 90 (2006). And, as discussed above, pp. 6–7, *supra*, the state provides its prisoners with

11  the right to administratively grieve any departmental decision, action, condition, or policy that has

12  an adverse effect on their welfare. Cal. Code Regs. tit. 15, § 3481(a) (eff. June 1, 2020).

13  It is also required that exhaustion be complete before filing suit: "No action shall be

14  brought with respect to prison conditions under section 1983 of this title, or any other Federal law

15  . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). And

16  a complaint is "brought" when the prisoner submits it to the court, at which time a prisoner must

17  have exhausted administrative remedies. *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir.

18  2006). A prisoner cannot exhaust *pendente lite*, or during the pendency of the litigation.

19  *McKinney v. Carey*, 311 F.3d 1198, 1201 (9th Cir. 2002) (affirming dismissal of action for failure

20  to exhaust when prisoner is in the process of exhausting administrative remedies when the

21  dismissal motion was filed); *see also Vaden*, 449 F.3d at 1051 ("Because [plaintiff] did not

22  exhaust his administrative remedies prior to sending his complaint to the district court, the district

23  court must dismiss his suit without prejudice.").

24  Here, Nickerson submitted only one inmate grievance (number 08563) that mentioned or

25  complained about the transfer of COVID-positive inmates from CIM to San Quentin and the lack

26  of social distancing, protective equipment, and programs. (ECF No. 1 at 4; ECF No. 9 at 3; Bell

27  Decl. ¶ 19.) But this grievance does not exhaust Nickerson's administrative remedies because it

28  was not presented to the final level of review. (Bell Decl. ¶ 19; Moseley Decl. ¶ 7–10.) Nickerson

9

1   concedes that this grievance was not exhausted through the final level of review, but he contends

2   that the grievance process was unavailable to him because he did not receive a response to his

3   grievance within 30 working days. (ECF No. 1 at 1; ECF No. 9 at 2.) Specifically, Nickerson

4   states that he "did not go to the last levels due to staff not answering appeals in a timely fashion."

5   (ECF No. 9 at 2.) Nickerson asserts that the institutional-level review to his grievance should

6   have been completed within "30 working days." (ECF No. 1 at 1.)

7        But, as discussed above, Nickerson is incorrect. The relevant regulations provide that the

8   Office of Grievances has 60 calendar days from receipt of a grievance to respond. Cal. Code

9   Regs. tit. 15, §§ 3483(i). Nickerson submitted grievance number 08563 for institutional level

10  review on June 25, 2020. (Bell Decl. ¶ 19.) The same day, the Office of Grievances sent

11  Nickerson a letter acknowledging receipt of the grievance and advising Nickerson that the review

12  of his grievance will be completed no later than August 25, 2020. (ECF No. 1 at 4; Bell Decl. ¶

13  19.) On August 20, 2020, the Office of Grievances at San Quentin disapproved the grievance, and

14  the decision was sent to Nickerson the next day. (Bell Decl. ¶ 19, Ex. C.) Nickerson was also

15  advised that he may appeal the decision to the Office of Appeals, if dissatisfied. (*Id.*) Nickerson,

16  however, abandoned the grievance process and submitted his complaint in this action on August

17  25, 2020, the date that the Office of Grievances stated it would respond to his grievance. (ECF

18  No. 1 at 3, 7); *cf. Huizar v. Carey*, 273 F.3d 1220, 1223 (9th Cir. 2001). Therefore, Defendants

19  are entitled to judgment as a matter of law because it is undisputed that grievance number 08563

20  was timely processed by Office of Grievances at San Quentin, and Nickerson abandoned the

21  grievance and did not exhaust it through the final level of review.

22  **II. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

23       Even if Nickerson had properly exhausted his claims, however, qualified immunity would

24  bar them. Qualified immunity shields government officials from damages liability unless: (1) they

25  violate a federal statutory or constitutional right; and (2) that right was "clearly established" at the

26  time of the challenged conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). The

27  first prong of the qualified-immunity inquiry is whether a constitutional right would have been

28  violated on the facts alleged. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A determination in the

10

1    defendants' favor on either question establishes immunity. *Pearson v. Callahan*, 555 U.S. 223,

2    236 (2009). Courts may decide which prong of the analysis to address first, *Pearson*, 555 U.S. at

3    236–39, but are encouraged to begin with the second prong because it can be determined as a

4    matter of law early in a case, *see Morales v. Fry*, 873 F.3d 817, 822–23 (9th Cir. 2017).

5        A right is "clearly established" only if the law is so clear that, under the particular

6    circumstances the official faced, "every 'reasonable official would understand that what he is

7    doing' is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741

8    (2011)); *see Morales*, 873 F.3d at 823 (emphasizing "every" reasonable official—not just "a"

9    reasonable official—would understand the conduct was unlawful). To conduct this analysis, a

10   court first defines the circumstances with which the defendants were confronted, then analyzes

11   existing case law to determine whether controlling authority—or a robust consensus of persuasive

12   authority—found a constitutional violation "under similar circumstances." *Wesby*, 138 S. Ct. at

13   590–91. Qualified immunity thus "gives government officials breathing room to make reasonable

14   but mistaken judgments" and "protects all but the plainly incompetent or those who knowingly

15   violate the law." *Messerchmidt v. Millender*, 565 U.S. 535, 546-47 (2012).

16       The plaintiff "bears the burden of showing that the right at issue was clearly established."

17   *Emmons v. City of Escondido*, 921 F.3d 1172, 1184 (9th Cir. 2019). The Ninth Circuit describes

18   this inquiry as "highly contextualized" and "fact-intensive." *Hamby v. Hammond*, 821 F.3d 1085,

19   1091 (9th Cir. 2016). Of course, "a plaintiff need not find a case with identical facts in order to

20   survive a defense of qualified immunity; …, one can imagine a situation where the officials'

21   conduct is so egregious that no one would defend it, even if there were no prior holding directly

22   on point." *Id.* at 1095. "But it should be equally obvious that the farther afield existing precedent

23   lies from the case under review, the more likely it will be that the officials' acts will fall within

24   the vast zone of conduct that is perhaps regrettable but is at least arguably constitutional." *Id.*

25       Here, Defendants are entitled to qualified immunity under *Saucier*'s first prong because

26   Nickerson has not pled facts that, if true, evidence a constitutional violation. *See Iqbal*, 556 U.S.

27   at 675-684 (defendants entitled to qualified immunity because plaintiff's complaint was based on

28   "bald" and "conclusory" allegations); *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012)

11

1  (defendants entitled to immunity where complaint did not allege a "*specific* policy implemented

2  by the Defendants or a *specific* event or events instigated by the Defendants"); pp. 18–20, *infra*.

3       Defendants are also entitled to qualified immunity under the second prong of *Saucier*

4  because neither binding precedent nor a robust consensus of persuasive authority would have put

5  every reasonable official on notice, in May and June 2020, that a particular COVID-19 response,

6  which was directed by a court-appointed Receiver, would violate the Eighth Amendment. In two

7  analogous cases, *Hines v. Youseff*, 914 F.3d 1218 (9th Cir. 2019) and *Rico v. Ducart*, 980 F.3d

8  1292 (9th Cir. 2020), the Ninth Circuit found CDCR officials qualifiedly immune.

9       In *Hines v. Youseff,* the Ninth Circuit found CDCR officials qualifiedly immune because

10  not "every reasonable official would [have understood] that exposing inmates to a heightened risk

11  of Valley Fever violated the Eighth Amendment." 914 F.3d at 1229-30. The Ninth Circuit based

12  this decision at least in part on the fact that a "federal Receiver appointed by the federal court to

13  assure Eighth Amendment compliance actively managed the state prison system's response to

14  Valley Fever." *Id.* at 1231. And, because "the Receiver oversaw prison medical care and

15  protective measures regarding Valley Fever, state officials could have reasonably believed that

16  their actions were constitutional so long as they complied with the orders from the Receiver and

17  the *Plata* court." *Id.* The analysis applies equally here.

18       Similarly, in *Rico v. Ducart,* the Ninth Circuit held CDCR officials qualifiedly immune for

19  the alleged improper implementation of Guard One suicide-prevention protocols, which were

20  implemented as part of the remedial phase of the long-running *Coleman v. Newsom* class action.

21  *Rico*, 930 F.3d at 1301-02. The *Rico* plaintiff alleged that floor officers performed the suicide-

22  prevention checks in a manner that disrupted his sleep: officers caused extra noise by running up

23  and down the metal stairs, using the Guard One equipment more loudly than necessary, and

24  rushing through the checks. *Id*. But because the protocol itself was required by the federally-

25  appointed *Coleman* special master, the Ninth Circuit held that an officer could have reasonably

26  believed that complying with the *Coleman* court's directive, even while making more noise than

27  necessary, would not violate the Eighth Amendment. The court noted the difficult position facing

28  the *Rico* defendants: "A reasonable guard could be uncertain whether it was better to rush to

12

1    complete checks—making more noise for a shorter period of time—or to more slowly complete

2    checks—making less noise for a longer period time." *Id.* Even if the officers did, in fact, create

3    extra noise in conducting Guard One checks, they were entitled to qualified immunity because

4    their actions fell "within the vast zone of conduct that is perhaps regrettable but is at least

5    arguably constitutional." *Id.* at 1303 (quoting *Hamby*, 821 F.3d 1095).

6        Like in *Hines* and *Rico*, a surrogate of the federal court—here, the *Plata* Receiver, as well

7    as the *Plata* court itself—supervised CDCR's COVID-19 response. The *Plata* court expressed its

8    intention to—and did—continually monitor CDCR's response to COVID-19, convening weekly

9    case management conferences during which the *Plata* plaintiffs reported on the growing outbreak

10   at CIM. *Id.* at 569; (RJN, Exhs. G-K). When the *Plata* court reviewed CDCR's response up

11   through April 17, 2020, it found the response was consistent with the Eighth Amendment. *Plata*,

12   445 F. Supp. 3d at 562. Then, at the urging of the *Plata* plaintiffs, and the direction of the federal

13   Receiver, CDCR moved 122 medically vulnerable inmates from CIM to San Quentin. (RJN,

14   Exhs. Ex. E at 60:11-61:16, F at 13, I at 14.)

15       As in *Hines* and *Rico*, the decision to transfer those inmates, based on negative COVID-19

16   tests from prior weeks, was made under the direction of a federal Receiver. (*Id.*) The Receiver's

17   then-existing protocols did not mandate how far in advance of the transfer the tests must be

18   conducted. (RJN, Ex. F at 13, Ex. E at 60, Ex. J at 9, n.5.) Nor did they require quarantining of

19   the inmates after transfer. (*Id.*) Under these circumstances, one cannot say that every reasonable

20   official would have known that following the directions of the Receiver, who was appointed to

21   ensure compliance with the Eighth Amendment, and transferring medically vulnerable inmates

22   out of CIM to protect them from COVID-19, would violate the Eighth Amendment.

23       Moreover, out-of-circuit authority supports the conclusion that an imperfect response to

24   COVID-19 in correctional settings is not inherently unconstitutional. *See Swain v. Junior*, 961

25   F.3d 1276, 1283-84 (11th Cir. 2020) ("a resulting harm cannot establish a culpable state of mind,"

26   and holding the entirety of the facility's COVID-19 response was reasonable, despite response's

27   failure to mitigate the spread of COVID-19); *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir.

28

1  2020) (Federal Bureau of Prisons' response to COVID-19 demonstrated officials responded

2  reasonably, despite the fact that six people died).

3        District courts also have not reached a broad consensus about whether the failure to take

4  certain countermeasures, similar to those identified in Nickerson's operative complaint, violate

5  the Eighth Amendment. In *Kesling v. Tewalt*, 476 F. Supp. 3d 1077, 1087-88 (D. Idaho Aug. 4,

6  2020), the district court dismissed a plaintiff's Eighth Amendment claim premised on the failure

7  to issue masks and failure to isolate inmates pending COVID-19 test results, noting that "it would

8  be impossible to isolate every inmate who would be potentially infected." *Id.* In *Young v. Bonner*,

9  No. 2:20-cv-02614-TLP, 2021 WL 4699089, at *1 (W.D. Tenn. Oct. 7, 2021), the district court

10  found no Eighth Amendment claim where prison officials "placed inmates from another facility

11  into the pod without testing them" for COVID-19 in April 2020. Other courts have scrutinized

12  more specific allegations about COVID-19 countermeasures and come to similar conclusions.

13  *Garcia v. Los Angeles County*, No. 2:20-cv-08528-JVS-KES, 2021 WL 4497213, at *4-5 (C.D.

14  Cal. July 7, 2021) (dismissing deliberate indifference claims premised on "refusing to retest

15  inmates who previously tested positive," not providing adequate social distancing, and "not

16  testing inmates coming into MCJ"); *Jones v. Lay*, 4:20-cv-1325-BRW-BD, 2021 WL 687342

17  (E.D. Ark. Jan, 25, 2021) ("reasonable correctional officials would not have known that allowing

18  [plaintiff] to remain in a barracks [with other COVID-19 positive inmates] for six days after his

19  negative test results was a violation of clearly established law"), *R. & R. adopted,* 2021 WL

20  686667 (Feb. 22, 2021); *Adam Lane ADC 155843 v. William Straughn, et al.*, No. 4:20-cv-01067-

21  BRW-JTK, 2021 WL 5240179, at *6 (E.D. Ark. Oct. 13, 2021) ("[A]t the time Plaintiff raised his

22  concerns, there was no clearly-established right as to prison ventilation and COVID-19

23  protocols."), *R. & R. adopted*, 2021 WL 5239973 (Nov. 10, 2021); *Freemen v. United States*, No.

24  2:20-13341-KM, 2021 WL 4129479, at *3-4 (D.N.J. Sept. 9, 2021) (inmate with bronchitis and

25  asthma who cleaned COVID-19 transport van with inadequate masks and gloves did not state an

26  Eighth Amendment claim). That these district court opinions address allegations that arose in the

27  early months of the pandemic shows that what constitutes an Eighth Amendment violation is still

28  in the process of "becoming established." *Sorrels,* 290 F.3d at 971. As these opinions show, no

14

Defs.' Not. of Mot. and Mot. to Dismiss and for Summ. J. (5:20-cv-06326-EJD (PR))

1    existing precedent would have placed Defendants on fair and clear notice, in May 2020, that their

2    conduct might violate the Constitution.

3         Because existing precedent did not recognize the unconstitutionality of this particular

4    response to the COVID-19 pandemic, the allegations fall "within the vast zone of conduct" that is

5    at least arguably constitutional. *Hamby*, 821 F.3d at 1095. Even if more could have been done, the

6    *Plata* court noted in April 2020 that "the Eighth Amendment does not afford litigants and courts

7    an avenue for a *de novo* review of the decisions of prison officials." *Plata v. Newsom*, 445 F.

8    Supp. 3d at 569 (citing *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1132 (N.D. Ill. 2020)). "Nor

9    does the failure to eliminate all risk establish that the Government was deliberately indifferent."

10   *Hope v. Warden, York City Prison*, 972 F.3d 310, 330 (3rd Cir. 2020). In hindsight, additional or

11   heightened measures could have been taken, but no robust consensus of authority would have put

12   Defendants on notice that, in these circumstances, where a burgeoning outbreak threatened the

13   lives of 122 medically vulnerable inmates, the failure to take additional measures violated the

14   Eighth Amendment. Defendants are therefore entitled to qualified immunity.

15   **III.    DEFENDANTS ARE ALSO ENTITLED TO IMMUNITY UNDER THE PREP ACT.**

16        The PREP Act authorizes the HHS Secretary to issue a Declaration immunizing certain

17   individuals and entities from suit under federal and state law for all claims of loss "caused by,

18   arising out of, relating to, or resulting from" administration or use of a "covered countermeasure"

19   during a health emergency. 42 U.S.C. § 247d-6d(a)(1) & (b). "Once the [HHS] Secretary has

20   issued a declaration, the PREP Act provides sweeping immunity for certain claims against certain

21   individuals." *Garcia*, 522 F. Supp. 3d at 739. Here, Defendants are immune under the PREP Act

22   because Nickerson's allegations show that Defendants are "covered persons" and that his injuries

23   arose out of the administration of "covered countermeasures."

24        **A.    Defendants, as Program Planners, Are "Covered Persons."**

25        A "covered person" is a "program planner" of a covered countermeasure, or "an official,

26   agent, or employee" of a program planner. 42 U.S.C. § 247d-6d(i)(2)(B). A "program planner," in

27   turn, is a state or local government or their employee who supervised or administered a program

28   concerning the administration, dispensing, provision, or use of a countermeasure, and who

15

1   establishes requirements, provides policy guidance, or supplies technical advice or assistance, or

2   provides a facility to administer or use countermeasures. (RJN Ex. N.)

3        Defendants Allison and Broomfield were allegedly "aware of the [COVID-19] dangers,"

4   but failed to provide "PPE, and . . . testing" to Nickerson. (ECF No. 9 at 3.) Since COVID-19

5   tests and other countermeasures necessary to treat and mitigate the spread of COVID-19, such as

6   PPE, are covered countermeasures under the PREP Act, Defendants' alleged role in providing

7   policy guidance and establishing requirements for COVID-19 testing and PPE distribution

8   establish that Defendants were "program planners," and thus covered persons. *See Decl. Under*

9   *the PREP Act for Medical Countermeasures Against COVID-19,* 85 Fed. Reg. 15198-01.

10       **B.   Plaintiffs' Alleged Loss Arises Out of the Administration of Covered**
         **Countermeasures.**

11

12       Nickerson's loss arose out of Defendants' administration of covered countermeasures. First,

13  countermeasures include items such as COVID-19 testing, PPE, respirators, mechanical

14  ventilation, thermometers, and face shields. 85 Fed. Reg. 15202; *see also* The Coronavirus Aid,

15  Relief and Economic Security Act (CARES) § 3103, Pub. L. No. 116-136 (March 27, 2020).

16       Second, "administration" means either 1) "physical provision of countermeasures";

17  2) "activities and decisions relating to public and private delivery, distribution, and dispensing of

18  the countermeasures to recipients"; or 3) "the management and operation of countermeasure

19  programs or management and operation of locations for purpose of distributing and dispensing

20  countermeasures." 85 Fed. Reg. 15201. This last aspect of the definition applies even to claims

21  that do not relate directly to the countermeasure, "such as a slip-and-fall injury or a vehicle

22  collision by a recipient receiving a countermeasure at a retail store serving as an administration or

23  dispensing location that alleges, for example, lax security or chaotic crowd control." *Id.*

24       The immunity also applies in "non-use" situations, such as where there is "prioritization or

25  purposeful allocation of a covered countermeasure, particularly if done in accordance with a

26  public health authority's directive." 85 Fed. Reg. 79197. When program planners decide how to

27  use or allocate available countermeasures (as opposed to simple nonfeasance or the failure to

28  obtain countermeasures *in toto*), they are entitled to immunity. *Id*; (RJN Ex. N ("decision-making

16

1   that leads to the non-use of covered countermeasures by certain individuals is the grist of program

2   planning, and is expressly covered by the PREP Act")); *Garcia*, 522 F. Supp. 3d. at 745.

3       Nickerson directly connects his injuries to Defendants' administration of countermeasures.

4   (ECF No. 9 at 3.) Nickerson alleges that he did not receive a timely COVID-19 test and PPE,

5   which are covered countermeasures. (*Id*. at 4.) Nickerson also alleges that he contracted COVID-

6   19 after COVID-positive inmates were transferred from CIM to San Quentin. (*Id*.) The CIM-San

7   Quentin transfer implicates the PREP Act's immunity for "non-use" decisions. The transfer was a

8   policy decision by the federal Receiver and CDCR officials in response to an active outbreak at

9   CIM. (RJN, Exh. B.) Although Nickerson's Complaint lacks particularized allegations as to what

10   each Defendant did or failed to do, any decision to transfer the inmates from CIM to San Quentin,

11   any decisions about when and how to test inmates, and prioritizing precautionary measures such

12   as providing PPE for certain people, are exactly the kinds of non-use decisions that the PREP act

13   immunizes. *See* Advisory Opinion 21-01; (RJN, Exh. N). Nickerson's contracting COVID-19

14   arose out of alleged actions that the PREP Act shields from liability.

15       **C.    If Defendants Are Not Immune, This Court Lacks Jurisdiction.**

16       The sole exception to the PREP Act's broad immunity is an exclusive federal cause of

17   action for death or serious physical injury caused by willful misconduct. 85 Fed. Reg. 79198. But

18   if Nickerson's allegations meet that exception, the claim may only be brought in the United States

19   District Court for the District of Columbia, not in this Court. *See* 42 U.S.C § 247d-6(e).

20   **IV.   NICKERSON'S ALLEGATIONS FAIL TO STATE A CLAIM FOR DELIBERATE

21   INDIFFERENCE TO HIS SAFETY.**

22       To assert an Eighth Amendment claim for deliberate indifference to safety or prison

23   condition, a prisoner must satisfy two requirements: one objective and one subjective. *Farmer v.*

24   *Brennan*, 511 U.S. 825, 834 (1994). Under the objective requirement, the prison official's acts or

25   omissions must be "sufficiently serious," *i.e.*, they must deprive the plaintiff of the "minimal

26   civilized measure of life's necessities." *Id.; Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994).

27       Objectively, there is no Eighth Amendment violation so long as the institution "furnishes

28   sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal

17

safety." *Hoptowit v. Ray,* 682 F.2d 1237 (9th Cir. 1982) (internal quotations omitted). "To the extent [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "[E]xtreme deprivations are required" to rise to the level of a constitutional violation. *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992).

Here, Nickerson alleges that the "Warden and Director were aware of the [COVID-19] dangers and San Quentin being inadequate to keep inmates safe due to old unventilated buildings, no PPE, and room for social distance, no testing protocols in place, and overcrowding." (ECF No. 9 at 3.) Nickerson claims that he tested positive for COVID-19 after "121 inmates were transferred from Chino Prison, and that some were known to be positive for COVID by both prisons and medical staff." (*Id.* at 4.) Although COVID-19 is a serious health concern, Nickerson does not allege any fact linking the transfer of inmates to San Quentin to his contracting of the virus. (*See generally* ECF No. 9.) Nickerson does not allege that he was housed with any of the transferred inmates, or even spent any time in the same cell, building, or facility as any of them. (*Id.*) Nor does Nickerson allege that any of the Defendants were involved in the decision to transfer the inmates from CIM, or how they were to be housed at San Quentin. (*Id.*) Nickerson also does not allege that any of the Defendants denied him PPE. (*Id.*) Nickerson's general allegation that COVID-19 positive inmates were transferred to San Quentin and that his request for PPE was denied, without more, does not show that any Defendant deprived him of the "minimal civilized measure of life's necessities." Thus, Nickerson's allegations in the Amended Complaint do not meet the objective component for cruel and unusual punishment needed to support a claim for deliberate indifference to safety, and this claim should be dismissed.

Besides the objective component, an inmate must also demonstrate that the prison officials had a sufficiently culpable state of mind. *Farmer,* 511 U.S. at 837. "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "This is not an easy test [] to satisfy." *Hallett v Morgan*, 296 F.3d 732, 744-45 (9th Cir. 2002). Deliberate indifference exists when a prison official "knows of and disregards an excessive risk to inmate health and safety." *Farmer*, 511 U.S. at 837. "The official must be both aware of facts from which the

18

1    inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

2    inference." *Id.* "It is *obduracy and wantonness, not inadvertence or error in good faith*, that

3    characterize the conduct prohibited by the" Eighth Amendment. *Wilson v. Seiter,* 501 U.S. 294,

4    299 (1991) (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)) (italics in original; internal

5    quotations omitted)*; see LeMaire v. Maass,* 12 F.3d 1444, 1452 (9th Cir. 1993). When prison

6    officials confront considerable security constraints, "the 'wantonness' that must be established

7    consists of acting 'maliciously and sadistically for the very purpose of causing harm.'" *LeMaire,*

8    12 F.3d at 1452 (quoting *Whitley,* 475 U.S. at 320–21).

9        Here, Nickerson's Complaint lacks sufficient detail to establish that any Defendant had the

10    requisite culpable mental state. (*See* ECF No. 9.) Nickerson alleges no specific facts against any

11    of these Defendants that would show that any of them knew of and disregarded a substantial risk

12    to Nickerson's safety. (*See* ECF No. 9.) With respect to Defendant Clark, Nickerson alleged

13    absolutely nothing except that he listed her as a defendant and stated that she was a "CEO [at]

14    San Quentin." (*Id.* at 2.) Nickerson's Amended Complaint does not show that Clark acted

15    maliciously and sadistically for the very purpose of causing harm to Nickerson. Similarly,

16    Nickerson's general and conclusory allegations that "121 inmates were transferred from Chino

17    Prison, and that some were known to be positive for COVID by both prisons and medical staff"

18    (*id.* at 4), and that Defendants Allison and Broomfield "were aware of the [COVID-19] dangers

19    and San Quentin being inadequate to keep inmates safe due to old unventilated buildings, no PPE,

20    and room for social distance, no testing protocols in place, and overcrowding" (*id.* at 3), do not

21    show that these Defendants were involved in the alleged transfer from CIM to San Quentin or in

22    denying Nickerson PPE, much less that these Defendants acted maliciously and sadistically in

23    connection with the alleged transfer for the very purpose of causing harm to Nickerson. *See*

24    *George v. Diaz,* No. 20-cv-03244-SI, 2020 U.S. Dist. LEXIS 153581, *10 (N.D. Cal. Aug. 24,

25    2020) ("The bare allegations of the existence of a disease and a desire to avoid contracting it

26    simply are not enough to state a claim against any defendant for deliberate indifference.").

27        Nickerson's Amended Complaint makes no effort to explain how each Defendant had the

28    required mental state for deliberate indifference. (*See* ECF No. 9.) Therefore, this action should

19

Defs.' Not. of Mot. and Mot. to Dismiss and for Summ. J. (5:20-cv-06326-EJD (PR))

1  be dismissed for failure to state a claim. *See Robinson v. Broomfield*, No. 21-cv-00972-RMI,

2  2021 U.S. Dist. LEXIS 61148, *6–7 (N.D. Cal. Mar. 30, 2021) (dismissing plaintiff's claim that

3  he was infected with COVID-19 due to a transfer of inmates to San Quentin because plaintiff

4  failed to identify the actions or omissions of any specific defendant); *Fields v. CDCR,* No. 2:21-

5  cv-0548-EFB, 2021 U.S. Dist. LEXIS 67830 *4–5 (E.D. Cal. Apr. 7, 2021) (dismissing plaintiff's

6  claim that he was infected with COVID-19 after inmates from San Quentin and other prisons

7  were transferred to High Desert State Prison because it lacks sufficient detail to establish the

8  deliberate indifference of any defendant); *Cooper v. Allison*, No. 20-cv-09415 BLF, 2021 U.S.

9  Dist. LEXIS 83474 *7, 10–12 (N.D. Cal. Apr. 28, 2021) (dismissing deliberate indifference claim

10  that inmates transferred from CIM to San Quentin were not tested for COVID prior to transfer

11  because plaintiff only presented conclusory allegations with little support, and failed to identify

12  the actions of each defendant and describe how each violated his constitutional rights).

13  ## CONCLUSION

14      As discussed above, Nickerson's Amended Complaint is subject to dismissal because: (1)

15  Nickerson did not exhaust his administrative remedies before filing suit; (2) Defendants are

16  entitled to qualified immunity; (3) Defendants are immune under the PREP Act; and (4) the

17  operative complaint fails to state a claim for deliberate indifference to safety.

18  Dated: January 5, 2022                        Respectfully submitted,

19                                        R OB B ONTA

20                                        Attorney General of California
                                      J EFFREY T. F ISHER

21                                        Supervising Deputy Attorney General

22

23                                      */s/ Zewugeberhan Desta*

24                                      Z EWUGEBERHAN D ESTA
                                    Deputy Attorney General

25                                      *Attorneys for Defendants*

26  SF2021401876
64793318

27

28

# CERTIFICATE OF SERVICE

Case Name:  **M. Nickerson (F77522) v.**          No.    **5:20-cv-06326-EJD (PR)**
            **Broomfield, et al.**

I hereby certify that on <u>January 6, 2022</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT (EXHAUSTION); MEMORANDUM OF POINTS AND AUTHORITIES; DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS AND FOR SUMMARY JUDGMENT (EXHAUSTION); EXHIBITS A – N; DECLARATION OF HOWARD E. MOSELEY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (EXHAUSTION); EXHIBITS A – C; DECLARATION OF M. BELL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (EXHAUSTION); EXHIBITS A – G; DECLARATION OF ZEWUGEBERHAN DESTA IN SUPPORT OF MOTION TO DISMISS AND FOR SUMMARY JUDGMENT; RAND WARNING; [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT.**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

I further certify that some of the participants in the case are not registered CM/ECF users. On <u>January 6, 2022</u>, I have caused to be mailed in the Office of the Attorney General's internal mail system, the foregoing document(s) by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days to the following non-CM/ECF participants:

Michael Vaugh Nickerson CDCR# F-77522
San Quentin State Prison
1 Main Street
San Quentin, CA 94964
In Pro Per

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>January 6, 2022</u>, at Los Angeles, California.

| | |
|---|---|
| D. Beltoya | */s/ D. Beltoya* |
| Declarant | Signature |

SF2021401876
64789350