EXHIBIT E

Atkinson Baker, a Veritext Company
www.depo.com

```
 1                                    )
                                      )
 2                                    )
                                      )
 3                                    )        CERTIFIED COPY
                                      )
 4   _____)

 5

 6

 7

 8

 9

10            TRANSCRIPT OF VIDEO RECORDING OF

11               SENATE PUBLIC SAFETY COMMITTEE

12   SENATE HEARING ON COVID-19 IN CALIFORNIA STATE PRISONS

13                      JULY 1, 2020

14

15

16

17

18

19

20

21

22   ATKINSON-BAKER, A VERITEXT COMPANY
     (800) 288-3376
23   www.depo.com

24
     TRANSCRIBED BY:  MARY HARLOW
25   FILE NO:  AF04953
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1              A P P E A R A N C E S
 2

 3    SENATOR NANCY SKINNER
      COMMITTEE CHAIR
 4

 5    SENATOR JOHN MOORLACH

 6
      SENATOR STEVEN BRADFORD
 7

 8    SENATOR SCOTT WIENER

 9
      SENATOR HOLLY MITCHELL
10

11    HANNAH-BETH JACKSON

12
      SENATOR MIKE MCGUIRE
13

14    MARC LEVINE
      ASSEMBLY MEMBER
15

16    ASH KALRA
      ASSEMBLY MEMBER
17

18    RALPH DIAZ
      SECRETARY
19    CALIFORNIA DEPARTMENT OF CORRECTIONS AND
      REHABILITATION
20

21    MARK GHALY, M.D., MPH
      SECRETARY
22    CALIFORNIA HEALTH AND HUMAN SERVICES AGENCY

23
      SUSAN FANELLI
24    CHIEF DEPUTY DIRECTOR OF POLICY AND PROGRAMS
      CALIFORNIA DEPARTMENT OF PUBLIC HEALTH
25
```

Atkinson Baker, a Veritext Company
www.depo.com

```
 1   CLARK KELSO
     FEDERAL RECEIVER
 2   CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson Baker, a Veritext Company
www.depo.com

| | |
|---|---|
| 1 | TRANSCRIPT OF VIDEO RECORDING OF |
| 2 | SENATE PUBLIC SAFETY COMMITTEE |
| 3 | SENATE HEARING ON COVID-19 IN CALIFORNIA STATE PRISONS |
| 4 | JULY 1, 2020 |
| 5 | CHAIR SKINNER:  All right.  The Senate |
| 6 | Committee on Public Safety will come to order.  Good |
| 7 | morning.  In response to the COVID-19 emergency, and to |
| 8 | protect our public, the Senators, and Senate staff, we |
| 9 | are limiting nonessential gatherings, and adhering to |
| 10 | social distancing.  In compliance with these orders, the |
| 11 | Senate will be holding an essential hearing, and has |
| 12 | made necessary adjustments to normal practices in order |
| 13 | to ensure that the public continues to have access to |
| 14 | the legislative process, while we conduct the hearing in |
| 15 | a way that protects the health and safety of the public, |
| 16 | and our employees. |
| 17 | To allow for public access, we have admitted |
| 18 | members of the public to the balcony, and to a hearing |
| 19 | room, to the extent that social distancing requirements |
| 20 | allow, and we will also be using a teleconference |
| 21 | service for those individuals who wish to testify today. |
| 22 | If you wish to provide public comment at the end of the |
| 23 | hearing, there is a participant toll free number, and |
| 24 | access code.  It is posted on our Senate Public Safety |
| 25 | Committee website, but I will announce it to you now. |

Atkinson Baker, a Veritext Company
www.depo.com

1  It is 844-291-6364, participant code 7365485.  When we
2  move to public comment, a moderator will identify you
3  individually, open your line, and at that time, you may
4  address the Committee.
5          Please note that in order for us to hear you
6  clearly, you must mute the device you are watching the
7  hearing on, prior to giving your testimony over the
8  phone.  Thank you for your patience.
9          While every effort has been made to streamline
10 the hearing process, and conduct our informational
11 hearings a close to the same manner as is customary,
12 there may be lag times for some participants adjusting
13 to the use of the new online tools or technologies, and
14 you never know when there can be just technological
15 difficulties.  Please be respectful and patient, so that
16 all interested parties can be heard.
17         So we will now begin the Bill Hearing.  I want
18 to thank everyone for participating.  In addition to our
19 committee members, we welcome Senator McGuire, and on
20 the Zoom will be Assembly Members Levine, and Assembly
21 Member Kalra.
22         Let me open with some comments, and then I will
23 ask if Senator Moorlach or Senator Bradford would like
24 to make any opening comments, which I hope can be brief,
25 and then we will turn to Senator McGuire and Senator -

1   primarily in the skilled nursing facilities, and
2   prisons.  And we are here to partner, and we continue to
3   have dedicated staff to this effort, and are happy to
4   not only play the role of technical consultants, but to
5   be part of the - these Incident Management Teams.
6            CHAIR SKINNER:  Thank you, Ms. --
7            SUSAN FANELLI:  So I'll stop and --
8            CHAIR SKINNER:  Thank you, Ms. Fanelli.
9            SUSAN FANELLI:  (unintelligible)
10           CHAIR SKINNER:  I will note that the visitation
11  stopped, CDCR ended visitation at all facilities before
12  April 1st.  Additionally, many of the things you
13  described were, at least by the Department's own
14  indications, implemented; and yet - many were not - but
15  yet we have the situation we have today, so, how
16  thoroughly these were implemented.  But I would say that
17  the movement of - the Administration themselves stopped
18  the transfer from county jails.  The visitation was
19  stopped.  All of those things were done.  Anyway - let's
20  now turn to Clark Kelso, who is the Federal Receiver for
21  the - our state prison system, California Correctional
22  Healthcare Services.  Mr. Kelso.
23           RECEIVER KELSO:  Hi.  Good morning, Madam
24  Chair, and members.  My name is Clark Kelso.  I serve as
25  the Federal Receiver responsible for medical care within

Atkinson Baker, a Veritext Company
www.depo.com

1  CDCR.  I was appointed to this position by the federal
2  court in the class action litigation, Plata versus
3  Schwarzenegger in 2008, and was charged with bringing
4  the level of medical care up to Constitutional
5  standards.  As Receiver, I exercise all of the powers
6  that Secretary Diaz possesses, but with respect only to
7  the Department's medical care system.  That's why both
8  Secretary Diaz and I are here today.
9           A significant amount of progress has been made
10 in improving CDCR's overall healthcare system, which has
11 contributed to our capacity to respond to the COVID
12 risk.  And I have delegated back to the State, Madam
13 Chair, as you noted, the management of 19 of its 35
14 institutions, which is a presumptive indicator that
15 those institutions are delivering a Constitutional level
16 of care.
17          COVID, of course, is a new and systemwide
18 challenge.  And so I work most closely with Secretary
19 Diaz, and Undersecretary for Healthcare, Diana Toche, on
20 COVID matters.  Faced with the crisis of COVID, our
21 collaboration has never been closer.
22          I'd like to give you an overview of our
23 planning and efforts to combat COVID-19 over the last
24 four months, some comments on the crisis at San Quentin,
25 and a brief status report; and then of course, take

Atkinson Baker, a Veritext Company
www.depo.com

1 questions.

2      Planning, as you've heard, began in late
3 February.  As you know, CDCR essentially operates the
4 largest congregate living facilities in the state, which
5 are perfect facilities for the spread of communicable
6 diseases.  So on March 11, CDCR's Public Health Branch
7 issued its first COVID guidance to the institutions,
8 based in part, and including links to, guidance
9 published by the Centers for Disease Control, California
10 Department of Public Health, and the California
11 Occupational Safety and Health Administration, and we
12 began posting that guidance on our intranet pages.

13      We also released our public-facing internet
14 sites that contain the COVID tracker for the prisons,
15 CDCR's COVID preparedness pages, and Healthcare's
16 interim guidance.  The interim guidance is particularly
17 important for our institutions, because it has the
18 basics to combat an outbreak, including directions on
19 testing, isolation, contact tracing, quarantine,
20 monitoring, hospital referrals - everything that Dr.
21 Ghaly has mentioned.

22      Two days later, on March 13, Secretary Diaz and
23 I sent out our first communication to all CDCR employees
24 to begin reorienting everyone to the challenges that
25 were to come.  And our first case occurred only one week

1  later, on March 20th, at CIM, the California Institution
2  for Men.  Now, during March and April, as you have
3  heard, CDCR took a series of important steps, including
4  establishing an overall COVID-19 Coordinator, standing
5  up the Department's Operations Center, sending out
6  guidance for facility entrance screening for all staff,
7  implementing an accelerated release program, imposing
8  severe restrictions on intra-facility movement, shutting
9  down visitations, halting all nonessential transfers
10 between prisons, and closing CDCR to intake.
11         The number of cases at CIM grew slowly during
12 April, but cases spiked on May 1st, jumping from 91 to
13 218.  And the number of cases continued climbing,
14 reaching a high of 475 by May 15th.  ==As a result, during==
15 ==the first three weeks of May, we considered whether we==
16 ==could safely move a large number of those vulnerable==
17 ==patients, the negatives, to another facility - with the==
18 ==goal of saving lives.==  ==The decision involved a balancing==
19 ==of the growing risks to the CIM patients against the==
20 ==risks of any large scale transfer.==
21         We were also considering in May how the
22 Department could slowly begin reopening and
23 reestablishing some of its normal processes.  And on May
24 22, a memorandum was distributed to the field,
25 announcing CDCR's phased approach, which included a slow

Atkinson Baker, a Veritext Company
www.depo.com

1  reopening of intake, and the resumption of inter-
2  institution movement.
3              Attached to that memorandum was a COVID
4  screening and testing matrix for patient movement.  The
5  - the matrix provided, among other things, that a
6  transferring patient should receive a COVID test; that a
7  patient could transfer only if the test was negative;
8  and that no individual should be transferred to another
9  institution prior to the availability of their test
10 results.
11             On or about May 23rd, we decided that the
12 expanding cases at CIM posed an unacceptable risk to the
13 last remaining dorm, where hundreds of COVID high risk
14 patients were housed, and the decision was taken to move
15 those patients out of CIM.  Some were moved to Corcoran,
16 and the remainder were moved to San Quentin.
17             Because the matrix did not specify that the
18 required negative test had to occur within only a short
19 period of time in relation to the transfer, such as
20 seven days or less, when the moves were made out of CIM,
21 although all patients had negative test results, in many
22 cases, the tests were two, three, and in some cases,
23 four weeks old - far too old to be a reliable indicator
24 for the absence of COVID.  As it turned out, two of the
25 66 patients moved to Corcoran tested positive when they

Atkinson Baker, a Veritext Company
www.depo.com

1   were retested at Corcoran.  The rest were negative.
2   Corcoran has been managing their outbreak pretty well so
3   far.  They have 125 cases active, 30 cases have already
4   resolved, and they have had 47 of the 125 cases in the
5   last 14 days.  They've sent out to the hospital only one
6   patient.
7             San Quentin, of course, has been a very
8   different story, and is in crisis.  Upon retesting at
9   San Quentin, 25 out of 122 transferees tested positive,
10  and San Quentin almost immediately fell behind the
11  virus.  On June 12, I asked Dr. Brie Williams from the
12  University of California at San Francisco, and Dr.
13  (unintelligible)  Pretrosi (phonetic) from the UC
14  Berkeley School of Public Health, to conduct an in
15  person assessment.  They visited the prison the next
16  day, on June 13, and reported serious resource
17  deficiencies in the physical plant, in COVID support
18  staffing, and in testing.
19            The following deficiencies, most of which were
20  identified in their report, materially contributed to
21  the rapid spread of covid at San Quentin.  First, the
22  five-tiered cell blocks lack good ventilation, and they
23  have virus spread characteristics, similar to a
24  dormitory setting, even though inmates are housed in
25  cells in those cell blocks.  The virus spread very

1  rapidly in those conditions.
2          Second, we had testing turnaround time
3  problems.  Now, we did not have this problem at other
4  institutions, where we successfully contained the virus.
5  But we have this problem at San Quentin.  Our vendor has
6  agreed to put our tests at a higher priority within
7  their testing system, and we are working with the Biohub
8  in San Francisco to perform some of our tests.  We have
9  completed the first round of testing of all patients at
10 San Quentin who've consented to be tested.
11         Third, many patients at San Quentin refused
12 being tested, or even being assessed for symptoms.  So
13 for example, between two and three hundred patients in
14 the East Block are refusing tests and assessments, and
15 that makes it difficult to manage the outbreak.
16 Yesterday, the Prison Law Office offered to assist us in
17 working with their clients on this issue - an offer we,
18 of course, have accepted, and I'm grateful to the Prison
19 Law Office for their help in this regard.
20         Fourth and finally, the physical layout at San
21 Quentin makes it difficult to manage the population
22 during an outbreak.  It has been difficult to separate
23 patients appropriately, and the institution needs
24 additional bed space.  We had hoped last week that one
25 way of increasing the available space was to move 100

Atkinson Baker, a Veritext Company
www.depo.com

1  inmates from the San Quentin gymnasium, to an empty wing
2  of housing at North Kern State Prison.  To ensure the
3  safety of that transport, we had adopted a much stricter
4  transport testing policy, so that all 100 patients had
5  to receive a negative COVID test no more than 48 hours
6  prior to the transport.  On Saturday, we learned that
7  two of those patients have received positive test
8  results, and we cancelled the entire move.
9           As of this morning, San Quentin reports 1127
10 active cases, with 809 of those occurring in the last 14
11 days.  We have had one death of a patient who tested
12 positive for COVID-19.  We've had 42 hospital admissions
13 out of San Quentin.  I believe during the week of July
14 6, it is likely that we should be seeing a significant
15 number of the positive cases at San Quentin, perhaps as
16 many as 300, move from active to resolved status, since
17 we know that we have at least that many positives who
18 are still asymptomatic.
19          Our two biggest concerns now are insufficient
20 resources at San Quentin to handle the enormity of the
21 crisis, and the capacity of local hospitals to deal with
22 the flow of San Quentin patients.  The Administration is
23 responding to the resources problem by directing Cal OES
24 to establish a unified Incident Command to help manage
25 the outbreak.  That began yesterday, I believe.

Atkinson Baker, a Veritext Company
www.depo.com

1        And we are redirecting an Associate Director
2   from the Division of Adult Institutions, and a regional
3   healthcare executive to support institution staff, and
4   the Incident Commander.  This will help stabilize
5   response to the outbreak.  The State has also flown in
6   tents for additional clinic and housing space, and Cal
7   OES will be bringing in a field hospital to provide more
8   beds, and housing.
9        With respect to local hospital capacity, we are
10  in frequent, ongoing contact with Bay area hospitals.
11  And at this point, we are confident the necessary
12  capacity exists.  For example, Seton Medical Center in
13  Daly City is making itself ready to - to accept a
14  substantial number of our patients, and we have other
15  arrangements in place with other hospitals.  We do
16  monitor this on a daily basis, because we know that
17  hospital utilization can change rapidly during the
18  pandemic.
19       We also appreciate that Marin General Hospital,
20  San Quentin's primary local hospital, does not itself
21  have sufficient resources for our likely needs.  And
22  they and the community are understandably concerned
23  about their ability, even in their Emergency Department,
24  to stabilize patients before transfer to other
25  hospitals.  We'll continue working with Marin General.

Atkinson Baker, a Veritext Company
www.depo.com

1   And if it appears that Marin General cannot handle the
2   flow, arrangements will be made to transport patients
3   directly to other hospitals, so as not to overwhelm
4   Marin General's resources.  We are sensitive to their
5   concerns.
6              Let me close with a brief status report.
7   Systemwide, we have 2600 active cases, 2200 cases that
8   have resolved, and 22 deaths.  That gives us an overall
9   death rate of 0.44%.  While acknowledging the
10  statistical challenges of different population sizes and
11  confounders, CDCR's crude death rate of 0.44% is a
12  magnitude of order less than the state of California's
13  COVID death rate, which is 2.7%, and the United States'
14  overall COVID death rate, which is 4.9%.  Don't put too
15  much reliance on that comparison until we've had an
16  opportunity for the California Department of Public
17  Health to perform a, a more granular, better analysis of
18  the comparison to make sure that we're not comparing
19  apples to oranges.
20             We have had very large outbreaks in four
21  prisons - San Quentin with 1113 positives; Chuckawalla,
22  with 1012 positives; Avenal, 938 positives; and CIM, 896
23  positives.  The outbreaks at Chuckawalla and Avenal have
24  mostly resolved.  CIM and San Quentin - CIM has not
25  resolved; San Quentin, we're at the beginning of.

Atkinson Baker, a Veritext Company
www.depo.com

1            Next, we successfully managed a moderate
2    outbreak at California Institution for Women, which had
3    at one time 168 total cases, but which now has only six
4    cases, and only one of those was in the last 14 days.
5    CIW experienced one death.  A second prison, Lancaster,
6    also had a moderate outbreak with 128 positives, all of
7    whom have now resolved, with zero cases in the last 14
8    days.  We have another four prisons with moderate
9    outbreaks that so far appear to have peaked, with around
10   200 or fewer total cases.  Finally, we have 14
11   institutions that have experienced small outbreaks that
12   have not blossomed into moderate or large events, and 11
13   facilities with no COVID cases among inmates currently
14   identified.
15            These are significant achievements, given
16   COVID's ease of entering and spreading in congregate
17   housing settings.  These numbers, I think, do indicate
18   that COVID has not spread yet throughout the CDCR system
19   in an uncontrolled fashion.  But given that COVID is
20   going to be with us for quite some time, I share
21   everyone's concern that what we have done to date still
22   is not enough.  There is more that can be done, because
23   the virus has plenty of time to continue spreading
24   throughout the system.
25            Right now, and until things stabilize further

Atkinson Baker, a Veritext Company
www.depo.com

1  systemwide, Secretary Diaz has closed intake again,
2  stopped all unnecessary movement between institutions,
3  reimposed a systemwide modified program, and adopted a
4  new and continued accelerated release program.  And I
5  know that he shares my view that we will not open
6  intake, or start movement again until we have assured
7  ourselves, and others are assured, that it can be done
8  safely.  Thank you, members for your attention.  I'll be
9  happy to take questions, along with the rest of the
10 panel.
11              CHAIR SKINNER:  Thank you, Mr. Kelso.  So
12 members, we've now heard from the panelists for the
13 first panel.  So I will open it to questions.  I would
14 first, though, like to ask - and this can be Secretary
15 Diaz or Mr. Kelso - while there was indication that, you
16 know, there is now limited numbers, I just want to be
17 clear that by CDCR's own statistics posted on your
18 website, there have been incarcerated individuals who
19 have tested positive at 24 out of 35 facilities.  That's
20 on your own website.  Now, I would suspect there could
21 be far more than that, only because it is my
22 understanding, and it seems to have been confirmed by
23 all the panelists thus far, that not every inmate is
24 tested.  So since there is not thorough testing, we
25 can't know.

```
1              TRANSCRIBER'S CERTIFICATE
2
3
4        I, MARY HARLOW, attest that the foregoing proceedings
5   provided to me via video were transcribed by me to the
6   best of my ability.
7        I further attest that I am not a relative or employee
8   to any attorney or party nor financially interested in
9   this action.
10       I declare under penalty of perjury under the laws of
11  the state of California that the foregoing is true and
12  correct.
13       Dated this 23rd day of June, 2021.
14
15
16  ---------------------------------
17  MARY HARLOW
18
19
20
21
22
23
24
25
```