EXHIBIT F

1  FUTTERMAN DUPREE DODD CROLEY MAIER LLP
   MARTIN H. DODD (SBN 104363)
2  601 Montgomery Street, Suite 333
   San Francisco, California 94111
3  Telephone: (415) 399-3840
   Facsimile: (415) 399-3838
4  Email: mdodd@fddcm.com

5  Attorneys for Receiver
   J. Clark Kelso

6

7

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10        **AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11  MARCIANO PLATA, et al., | Case No. C01-1351-JST |
| 12  *Plaintiffs*, | |
| 13  v. | |
| 14  GAVIN NEWSOM, et al., | |
| 15  *Defendants*. | |
| 16  RALPH COLEMAN, et al., | Case No. CIV-S-90-0520-KJM-DB |
| 17  *Plaintiffs*, | |
| 18  v. | |
| 19  GAVIN NEWSOM, et al., | |
| 20  *Defendants*. | |
| 21  JOHN ARMSTRONG, et al., | Case No. C94-2307-CW |
| 22  *Plaintiffs*, | |
| 23  v. | |
| 24  GAVIN NEWSOM, et al., | |
| 25  *Defendants*. | |

26              **NOTICE OF FILING OF RECEIVER'S**
                **FORTY- FIFTH TRI-ANNUAL REPORT**
27

28

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

1        PLEASE TAKE NOTICE that Receiver J. Clark Kelso has filed herewith his Forty-Fifth

2   Tri-Annual Report in *Plata, et al. v. Newsom., et al.*, Case No. C01-1351-JST; *Coleman, et al. v.*

3   *Newsom, et al.* Case No. CIV-S-90-0520-KJM-DB; and *Armstrong, et al. v. Newsom, et al.* Case

4   No. C94-2307-CW.

5

6   Dated:  October 1, 2020                         FUTTERMAN DUPREE DODD CROLEY

7                                          MAIER LLP

8                              By:_____/s/ Martin H. Dodd_____

9                                    Martin H. Dodd
                               Attorneys for Receiver J. Clark Kelso

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP



CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

# Achieving a Constitutional Level of Medical Care in California's Prisons

## Forty-fifth Tri-Annual Report of the Federal Receiver For May 1 – August 31, 2020

## October 1, 2020

# California Correctional Health Care Receivership

## Vision:

We enhance public safety and promote successful community reintegration through education, treatment and active participation in rehabilitative and restorative justice programs.

## Mission:

To facilitate the successful reintegration of the individuals in our care back to their communities equipped with the tools to be drug-free, healthy, and employable members of society by providing education, treatment, rehabilitative and restorative justice programs, all in a safe and humane environment.

# Table of Contents

Page

1.  **Status and Progress Concerning Remaining Statewide Gaps**.......................................  **1**

    A.  Reporting Requirements and Reporting Format.................................................... 1

    B.  Progress during this Reporting Period.................................................................. 2

    C.  Particular Problems Faced by the Receiver, Including Any Specific Obstacles
        Presented by Institutions or Individuals.............................................................. 12

2.  **Other Matters Deemed Appropriate for Judicial Review** .........................................  **14**

    A.  California Health Care Facility – Level of Care Delivered......................................... 14

    B.  Statewide Medical Staff Recruitment and Retention.............................................. 15

    C.  Data Quality.................................................................................................. 16

    D.  Coordination with Other Lawsuits.................................................................... 16

    E.  Master Contract Waiver Reporting.................................................................... 16

    F.  Consultant Staff Engaged by the Receiver........................................................... 16

    G.  Accounting of Expenditures............................................................................. 17

## Section 1: Status and Progress Concerning Remaining Statewide Gaps

### A. Reporting Requirements and Reporting Format

This is the forty-fifth report filed by the Receivership, and the thirty-ninth submitted by Receiver J. Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006, calls for the Receiver to file status reports with the *Plata* Court concerning the following issues:

1. All tasks and metrics contained in the Turnaround Plan of Action (Plan) and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.
2. Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.
3. Particular success achieved by the Receiver.
4. An accounting of expenditures for the reporting period.
5. Other matters deemed appropriate for judicial review.

(Reference pages 2–3 of the Appointing Order at https://cchcs.ca.gov/wp-content/uploads/sites/60/2017/08/2006-02-14_Order_Appointing_Receiver.pdf)

The Court's March 27, 2014, Order Re: Receiver's Tri-Annual Report directs the Receiver to summarize in each Tri-Annual Report the level of care being delivered at California Health Care Facility (CHCF); difficulties with recruiting and retaining medical staff statewide; sustainability of the reforms the Receiver has achieved and plans to achieve; updates on the development of an independent system for evaluating the quality of care; and the degree, if any, to which custodial interference with the delivery of care remains a problem.

The Receiver filed a report on March 10, 2015, entitled Receiver's Special Report: Improvements in the Quality of California's Prison Medical Care System wherein he outlined the significant progress in improving the delivery of medical care in California's prisons and also the remaining significant gaps and failures that must still be addressed. The identified gaps are availability and usability of health information; scheduling and access to care; care management; and health care infrastructure at facilities.

To assist the reader, this Report provides two forms of supporting data:

- *Appendices*: This Report references documents in the Appendices of this Report.
- *Website References*: Website references are provided whenever possible.

In support of the coordination efforts by the three federal courts responsible for the major health care class actions pending against California Department of Corrections and Rehabilitation (CDCR), the Receiver files the Tri-Annual Report in three different federal court class action cases: *Armstrong, Coleman,* and *Plata*. An overview of the Receiver's enhanced reporting responsibilities related to these cases and to other *Plata* orders filed after the Appointing Order

can be found in the Receiver's Eleventh Tri-Annual Report on pages 15 and 16. (https://cchcs.ca.gov/wp-content/uploads/sites/60/2017/08/T11_20090601_11thTriAnnualReport.pdf)

Court coordination activities include: health care contracting; facilities, construction, and activation; telemedicine, information technology, and the Electronic Health Records System (EHRS); nursing; pharmacy; recruitment and hiring; statewide health care grievances; institutional Chief Executive Officers; credentialing and privileging; and space coordination.

## B.  Progress during this Reporting Period

### (i)    COVID-19 Status

Responding to the COVID-19 pandemic remains the highest priority for both CDCR and California Correctional Health Care Services (CCHCS).   Response activities, tracking information, updates, and COVID-19 related communications can be found on the CDCR and CCHCS websites at https://www.cdcr.ca.gov/covid19/covid-19-response-efforts/ and https://cchcs.ca.gov/covid-19-interim-guidance/.

As of September 28, 2020, there have been 14,097 confirmed COVID-19 patients throughout CDCR institutions, of which 11,449 have resolved, with 2,154 active cases in custody. Seventy percent of the confirmed cases occurred in six institutions, all with predominately or exclusively dorm housing including Avenal State Prison (ASP), San Quentin State Prison (SQ), Chuckawalla Valley State Prison (CVSP), California Rehabilitation Center (CRC), Folsom State Prison (FSP) and California Institution for Men (CIM).  There have been 67 deaths, with 76 percent of those occurring at two institutions (SQ and CIM).

The following summary includes four sections: Policy Development, Releases, Testing Strategies, and Lessons Learned from San Quentin.

Policy Development

CCHCS began its COVID-19 policy development in late February 2020, when it became apparent that the virus had spread into the United States and was likely to pose a risk to CDCR. CDCR and CCHCS have historically dealt with a wide variety of infectious viruses, including influenza, tuberculosis, chicken pox, and norovirus, and the starting point for COVID-19 policy development was the existing California Seasonal Influenza Infection Prevention and Control Guidance (August 2019).

Drawing upon general guidance issued by the Centers for Disease Control and Prevention (CDC), on March 3, 2020, CDCR and CCHCS distributed to all institutions a COVID-19 Preparedness Assessment Tool, which included a lengthy checklist that institutional leadership was responsible "to review in preparation for potential patients who are confirmed or suspected COVID-19 patients." The checklist included the following:

- Infection prevention and control policies and training;

- Process for rapidly identifying and isolating patients with confirmed or suspected COVID-19;
- Patient placement;
- Transmission-based precautions, including use of personal protective equipment (PPE);
- Movement of patients within the facilities;
- Hand hygiene;
- Environmental cleaning;
- Monitoring and managing health care staff;
- Visitor access and movement; and,
- Facility leaderships' responsibility to monitor public health updates on COVID-19.

This initial guidance was followed in rapid succession by a series of memoranda focusing on particular aspects of CDCR and CCHCS operations in light of COVID-19. By the end of March 2020, CCHCS released its COVID-19 and Seasonal Influenza: Interim Guidance for Health Care and Public Health Providers. This Interim Guidance is updated continuously to reflect new information and guidance, particularly new guidance from the CDC and the California Department of Public Health (CDPH). The general purpose of the guidance is to provide an integrated approach to preventing, monitoring, and containing outbreaks of COVID-19, Influenza A and B, and other respiratory pathogens.

In late March 2020, CDCR and CCHCS made available to clinicians an internal patient registry to assist institutions in monitoring patients with suspected or confirmed COVID-19. The COVID-19 Registry is updated twice daily and draws from multiple data sources, including the EHRS, claims data received from hospitals, and the Strategic Offender Management System to compile risk factor data. The registry also includes release date information for each individual, in the event individuals are to be considered for early release during the pandemic. This tool is not publicly available as it contains patient information protected by medical privacy laws.

CDCR and CCHCS also activated the Department Operations Center (DOC) to be prepared to respond in a coordinated fashion to departmental impacts resulting from COVID-19. The DOC is the department's central location where CDCR and CCHCS experts monitor information, prepare for known and unknown events, and exchange information centrally in order to make decisions and provide guidance quickly.

Communication is essential in managing a large emergency such as COVID-19. At the beginning of March 2020, a statewide communication campaign was initiated to educate our population about COVID-19 and how to take precautionary measures to keep themselves and their neighbors safe. This initial campaign included handouts; internally produced videos; CDC videos; socially distanced, in-person meetings with Inmate Advisory Councils; posters; and more. Over the last several months, the communications effort has expanded to include the most current information, topic-specific brochures such as testing and release precautions, as well as information from valued stakeholders such as University of California, San Francisco (UCSF), Amend; program partners; and families. Additionally, institutions created local communications

to address issues at each facility, such as daily communications to the population during the SQ outbreak.

To keep the members of the public, media and family members informed, CDCR and CCHCS launched a COVID-19 website (www.cdcr.ca.gov/covid19) with detailed response information, testing data, case statistics and more. Emails were also sent to all stakeholder groups almost daily to share high-level updates. An email address, COVID19@cdcr.ca.gov, was established to answer questions from the public and families, including release calculations during the first wave of early releases. The website and stakeholder communication continues.

Recognizing that the three major vectors for spread of COVID-19 within CDCR are (1) new inmates arriving from jails; (2) staff, visitors, and contractors who enter and leave the institutions on a daily basis; and (3) inmates living in dorms or transferred from one institution to another, CDCR and CCHCS took the following responsive actions during March and April 2020: (1) closed intake to new inmates; (2) closed visitation, began staff and contractor screening at institution entrances, and provided guidance regarding use of PPE and face coverings; and (3) attempted to create better social distancing in the dorms and halted all non-essential inter-institution transfers.

As the pandemic developed within California and CDCR, several weaknesses in our initial planning and preparedness became apparent. First, CDCR and CCHCS had not developed an adequately stringent set of protocols to protect against the spread of COVID-19 resulting from inter-institution transfers. The failure of those protocols led to a massive outbreak at SQ (summarized further below) and smaller outbreaks at a number of other institutions. Second, the department had not set aside adequate isolation and quarantine space at all institutions for managing the initial weeks of an outbreak. In some institutions, this led to delays in the critical first days of an outbreak. Third, the risk posed by staff and contractors was not sufficiently reduced by simple screening processes; a robust testing program was needed.

These weaknesses have been or are in the process of being addressed. First, on August 24, 2020, after receiving extensive input from external public health experts and the Prison Law Office (PLO), a revised COVID Screen and Testing Matrix for Patient Movement was adopted. For ordinary movement, the matrix requires a 14-day quarantine prior to the movement with testing at the beginning and end of the quarantine, use of N95 masks and increased spacing on transport vehicles, and repeat testing along with a 14-day quarantine at the receiving institution. Second, pursuant to the *Plata* court's Order to Set Aside Isolation and Quarantine Space dated July 22, 2020, the department has identified and set aside isolation space for patients infected with the COVID-19 virus and quarantine space for patients who cannot safely be quarantined in their existing housing units (coordination with the PLO continues for a small number of institutions that lack the necessary cell space). Third, partially in response to the *Plata* court's Order to Show Cause Re: Baseline Staff Testing for COVID-19 dated June 28, 2020, CDCR indicated that it would complete baseline testing of all staff at all institutions by July 16, 2020, and that it would expand staff testing at institutions with significant outbreaks. Subsequently, CCHCS agreed

to take over the staff testing program for planning and implementation purposes. A staff testing policy revised by CCHCS is being finalized, after input was received from external public health experts and the PLO.

Although the initial COVID-19 policy development activities have now concluded, CDCR and CCHCS are constantly reevaluating our COVID-19 policies in light of new information that becomes available in the public domain and in light of our experiences with the pandemic. In addition, new COVID-related topics under active consideration include the following, among other things:

- Strategies to respond to the upcoming flu season;
- When and how to restart groups sessions, such as the Integrated Substance Use Disorder Treatment (ISUDT) drug treatment program, and more normal programming; and,
- Reevaluation of which patients should be placed in dormitory settings, including at SQ and FSP.

Releases

Reducing the density of the population within CDCR's institutions has been a strategy for diminishing the spread of COVID-19. Population reduction has occurred through early release of inmates and reducing or closing intake, which first occurred on March 25, 2020. On April 1, 2020, acting pursuant to the emergency powers granted by Government Code, section 8658, CDCR announced an immediate accelerated release of certain nonviolent inmates who were within 60 days of release as well as some patients receiving hospice care. As of April 13, 2020, CDCR expedited the release of approximately 3,500 eligible inmates pursuant to this determination.

Beginning on July 1, 2020, CDCR expanded the program of expedited releases to include inmates within 180 days of release who met certain other criteria. This expansion resulted in the release of another 6,000 eligible inmates. The April 2020 releases were done on a one-time basis. The July 2020 program, by contrast, was designed to operate on a continuing, rolling basis so that daily additional inmates would become eligible for release based being within 180 days of a release date.

Subsequently, CDCR expanded the early release program to certain inmates within 365 days of release who were being held in select institutions that house large populations of high-risk patients including SQ; Central California Women's Facility (CCWF); CHCF; CIM; California Institution for Women (CIW); California Men's Colony (CMC); California Medical Facility (CMF), FSP, California State Prison, Los Angeles County (LAC), Mule Creek State Prison, Richard J. Donovan Correctional Facility (RJD), and California State Prison, Solano (SOL). This resulted in 475 patients being released. CDCR also granted a one-time Positive Programming Credit of 12 weeks to over 100,000 inmates which had the consequence of advancing some 2,100 inmates to the point of early release by the end of July 2020.

Finally, CDCR agreed to undertake an individualized review of certain patients deemed high-risk

for morbidity or mortality from COVID-19. Most of the members of this group are age 65 and older. Thirty-four patients have been released as a result of this review.

Testing Strategies

Testing supplies were scarce throughout March, April, May, and even into June 2020. Because of the scarcity, testing was generally limited to determine whether patients with symptoms had developed COVID-19 and to manage COVID-19 outbreaks at the few institutions with COVID-19 cases. Only three institutions had COVID-19 patients in March 2020 [LAC, CIM and North Kern State Prison (NKSP)]; another three institutions had COVID-19 patients in April 2020 [CIW, CMC, California State Prison, Centinela (CEN)]; and five additional institutions had their first COVID-19 patients in May 2020 [CVSP, ASP, California City Correctional Facility, California State Prison, Corcoran (COR) and SQ].

Eventually, testing supplies became more widely available, and CDCR and CCHCS developed a patient testing strategy consistent with guidance provided by federal and state public health experts. The strategy remains flexible as the department continuously reassesses the overall dynamic of the virus and responds to the needs of each unique institution. Testing for the incarcerated population is offered in the following circumstances, with the top priority always being symptomatic patients:

- Symptomatic patients;
- Outbreak investigations;
- Arrivals at Reception Centers from county jails;
- Transfers out of Reception Centers and inter-institution movement;
- Surveillance testing

Our ability to identify COVID-19 positive patients steadily increased as additional supplies were acquired to expand testing. As of May 1, 2020, CDCR had tested only 1,479 patients. The number of tests taken increased month-over-month as follows: June 1—16,932; July 1—45,953; August 1—71,233; and September 1—87,363.  As of September 22, 2020, CDCR is testing 771 patients per 1,000, compared to a testing rate for California of 349 per 1,000 and a testing rate for the United States of 293 per 1,000.

At various times during the reporting period, delays were encountered in receiving polymerase chain reaction test results, sometimes extending the test turnaround time to well over seven days. When managing an outbreak, test results that are delayed by a week or more are significantly less valuable. Most of these delays occurred during periods of very high testing volume for the entire State of California. Throughout the pandemic, CDCR and CCHCS have worked with our contracted laboratories to decrease the turnaround time for lab results for both patient and staff test results. Most recently, turnaround times are generally in the 1-2 day range.

Lessons Learned from San Quentin State Prison

As of the beginning of this reporting period (May 1, 2020), the pandemic's impact on CDCR patients and staff was still in its very early stages. As of May 1, 2020, there were 388 confirmed cases within CDCR equivalent to 3.3 cases per 1,000 patients. On that same date, there were 3.4 cases per 1,000 nationally, and 1.3 cases per 1,000 within California. One institution, CIM, accounted for two-thirds of CDCR's active cases on May 1, 2020, and a second institution, LAC, accounted for another thirty percent of CDCR's active cases.

The number of cases within CDCR more than doubled between May 1 and May 15, 2020, (i.e., 327 to 679) and increased by 2.5 times between May 15 and June 1, 2020 (i.e., 679 to 1,692). The dramatic increase in cases was largely due to an outbreak at ASP that began on May 18, 2020. Within the next two weeks, almost 600 patients at ASP tested positive for COVID-19. In retrospect, it seems likely that the outbreak at ASP had been ongoing for some time before it was identified. Nearly all of the patients at ASP were asymptomatic, and the outbreak was discovered as a result of the beginning of a modest surveillance testing program instituted in mid-May (that program has since expanded, as testing supplies increased and stabilized).

The large outbreaks at CIM and ASP, where the total number of COVID-19 positive cases during May and June 2020 approached 50 percent of each institution's population, occurred where most or all housing was in dormitory settings. At that time, it was clearly understood that COVID-19 spread by droplets, but it was not yet clear that the virus could survive and spread in an aerosolized form. If COVID-19 spread only by droplets or direct contact, then there might not be a substantial difference in the risk of spread in a dorm setting versus a celled housing setting. If, however, COVID-19 spread by aerosolization in addition to droplet spread, then all dorm settings throughout CDCR would be particularly risky for rapid COVID-19 spread as compared with celled housing settings.

The outbreak at CIM had initially been isolated to a few dorm facilities. As the outbreak spread, however, it became clear that a previously unaffected dorm housing a large number of older, COVID-19 high-risk patients, stood in the path of COVID-19's spread at CIM. The question presented was whether to leave those patients where they were – even though they were at an increasing risk of contracting COVID-19 – or to transfer those patients to a safer institution. During most of May 2020, new protocols for inter-institution transfers were still in draft form, and the general limitation on inter-institution transfers was still in place. Given these circumstances, it was concluded that these patients needed to remain at CIM at least until the new protocols for transfer were completed.

On May 22, 2020, CCHCS issued new protocols for inter-institution transfers. Those protocols provided as follows for "routine transfers:"

> *Non-essential transfers are discouraged. COVID screen and test if patient is to transfer. May transfer if COVID screen and test negative. Wear cloth face covering during transportation.*

Because of those new protocols, which were intended to make inter-institution transfers safer and because the risk to the patients at CIM continued to increase, the decision was made on May 23, 2020, to move the COVID-19 high-risk patients out of the dorm at CIM to safer institutions. The two institutions chosen to receive these patients were COR and SQ.

The intention behind the above language in the new protocol for movement was that, once a determination was made to move a patient, that patient would *then* be tested and would move only if the test result was negative. As a practical matter, since test results at that time generally were available within 2-5 days, the intention was that a patient would receive a test and then move no later than 7 days after the test was administered. However, those intentions were not expressed in the language of the protocol as absolute requirements, and many of the patients who were transferred from CIM had tests that were two, three and even four weeks or more old. The test results were negative, but the old tests meant there was a significant risk that some of the transferees out of CIM were actually COVID-19 positive.

As it turned out, 2 of the 66 patients moved to COR tested positive upon arrival at COR. The result was a moderate outbreak at COR which peaked with 153 cases on June 16, 2020, and had dropped to 8 cases as of July 20, 2020 (COR had a second outbreak that peaked with 166 cases on August 17, 2020). As of September 29, 2020, COR has had one COVID-19 related death.

A very different story resulted at SQ.  Catastrophic is an appropriate description, as SQ suffered through one of the worst prison outbreaks in the country. Upon arrival at SQ, 25 out of 122 transferees tested positive, and SQ almost immediately fell behind the virus. On June 12, 2020, the Receiver asked Dr. Brie Williams from UCSF and Dr. Stefano Bertozzi from the University of California, Berkeley, School of Public Health, to lead a team for an on-site assessment. After their June 13, 2020, visit, the team reported serious resource deficiencies in the physical plant, COVID-19 support staffing, and testing, as follows (for the full report and recommendations refer to https://amend.us/wp-content/uploads/2020/06/COVID19-Outbreak-SQ-Prison-6.15.2020.pdf):

First, the five-tier cell blocks lacked good ventilation and have virus spreading characteristics similar to a dormitory setting even though inmates are housed in cells. The virus, which Dr. Bertozzi convincingly argued was clearly spreading through aerosolization, spreads very rapidly in these conditions.

Second, at the time of the SQ outbreak, there were severe testing turnaround delays, which affected all of California at the time. Our testing vendor ultimately agreed to put our tests at a higher priority within their testing system, but the delays affected SQ's ability to manage its outbreak.

Third, early on, many patients refused testing or even being assessed for symptoms.  CDCR and CCHCS worked with the PLO to overcome the resistance to testing, and were largely successful in that effort. The PLO has provided similar assistance at other institutions when needed.

Fourth, and finally, the housing options at SQ made it difficult at the beginning of the outbreak to manage the population appropriately. It was difficult to separate patients in accordance with policy and best practices.

CDCR and CCHCS responded to the crisis by establishing an Incident Command Center at SQ, coordinated by the California Office of Emergency Services (OES), which was responsible for managing the crisis. Daily phone calls with the command center and state officials from OES, CDPH, CDCR and CCHCS ensured that any resource needs could be responded to immediately. This emergency management structure resulted in SQ receiving substantial resources to assist in managing the outbreak including:

- A substantial number of new beds and housing options were provided in the form of many small, 10-person tents and a large 100-person tent;
- Assistance in reopening a Prison Industry Authority (PIA) building at SQ to serve as housing for 250 patients;
- The execution of a contract with VXL to provide substantial clinical resources including primary care providers (PCP) and nursing staff;
- The execution of a contract to undertake emergency deep cleaning of SQ; and,
- The execution of a contract to provide emergency food service.

When an institution experiences a COVID-19 surge, additional staffing resources are required to assist with the increased workload as well as to back-fill staff who are off work.  For example, SQ was staffed with 302 additional resources during the outbreak; 228 of which were nursing staff but there was a variety of other resources deployed including 31 additional PCPs.  Staff resources at SQ also included California Health Corp, VXL, and UCSF.

The outbreak at SQ lasted a little over 2 months. In that time, 2,240 patients tested positive for COVID-19; 58 positive patients were released from custody; 2,153 patients resolved; and 27 patients died. As of September 29, 2020, SQ has only two positive patients, both testing positive within the last 14 days.

The management of SQ's outbreak resulted in significant lessons learned. Most significantly, it was clear that the incident command center structure was effective, and it worked so well that CDCR and CCHCS directed all institutions to immediately establish their own incident command centers to manage outbreaks. CDCR and CCHCS continue to report to the statewide group organized by OES on COVID-19 related issues affecting CDCR institutions. Health care staff at all institutions were also directed to coordinate with their respective county public health officers to improve communications and relationships that would be critically important during outbreak management (something that did not happen well during the SQ outbreak). In addition, daily reports detailing COVID-19 status and responses are now received from all institutions, and daily calls are now scheduled for certain institutions that are managing very large outbreaks. Additional lessons learned included the need for pre-planning regarding housing and bed availability, surge capacity for staffing, appropriate use of PPE by staff and patients, testing

strategies during an outbreak, and methods of reducing the risk to COVID-19 high-risk patients.

    (ii)    <u>Office of the Inspector General</u>

As of the filing of this report, the Office of the Inspector General (OIG) completed Cycle 6 medical inspections at Valley State Prison (VSP); LAC; Wasco State Prison (WSP); California Correctional Center (CCC); SOL; CRC; COR; CMF; and NKSP. The clinician site visits for CRC and COR, which were previously postponed due to COVID-19, were also completed. Draft reports for CRC; COR; CMF; and NKSP are pending completion by the OIG. The OIG issued final reports for LAC; WSP; VSP; SOL and CCC. All five institutions received an adequate rating.

    (iii)    <u>Delegations</u>

As of the filing of this report, the Receiver has delegated the medical operations at 19 institutions to the CDCR Secretary's authority. No additional delegations were made during this reporting period.

    (iv)    <u>*Armstrong*</u>

During this reporting period, 18 *Armstrong* Monitoring Tours were scheduled. Plaintiffs conducted 14 *Armstrong* Monitoring Tours and cancelled four due to COVID-19. CCHCS continues to coordinate with CDCR in examining the *Armstrong* Monitoring Tour Reports and remedying systemic issues identified. CCHCS remains committed to collaborating with stakeholders to address concerns and refine processes in the joint audit tool; however, workgroup efforts related to the joint audit tool and position papers for disputed items are delayed, as significant resources are necessary to address the COVID-19 pandemic. Statewide efforts to mitigate and manage the COVID-19 impact are ongoing, including consideration for *Armstrong* class members. CCHCS participates in weekly meetings with *Armstrong* Plaintiffs, CDCR, and other stakeholders to discuss COVID-19 related matters and Court mandates. CCHCS continues to receive patient-specific and systemic inquiries by Plaintiffs on behalf of *Armstrong* class members related to COVID-19.

In a continuing effort to provide transparency during the COVID-19 pandemic, CCHCS voluntarily provides Plaintiffs with data on a weekly basis. The data indicates *Armstrong* class members who are on quarantine or isolation status related to COVID-19. The data also includes *Armstrong* class members who have been identified as positive for COVID-19 and indicates whether they are appropriately or inappropriately housed. Furthermore, the data includes new or existing *Armstrong* class members with impacting Disability Placement Program codes and indicates whether they are appropriately or inappropriately housed. Limitations associated with the COVID-19 modified programming have been a contributing factor for inappropriately housed inmates. CCHCS and CDCR monitor activity on a case-by-case basis to ensure housing needs are addressed and accommodations are provided. Any *Armstrong* class member found to be inappropriately housed is reported to the institution and addressed accordingly. During this reporting period, the number of *Armstrong* class members who were found to be inappropriately housed has been reduced considerably due to CCHCS' and CDCR's continual monitoring.

(v)     Integrated Substance Use Disorder Treatment

Expanding Training and Treatment
As implementation of the ISUDT program continued during this reporting period, CCHCS finalized and released guidance to the field related to Substance Use Disorder (SUD) treatment.  In May 2020, the CCHCS SUD Care Guide was released.  The care guide provides information on the tools, techniques, and treatments necessary to reduce SUD related morbidity and mortality through successfully managing addiction and ensuring continuity of care while patients are incarcerated and reintegrating into the community.

As of August 31, 2020, there are 4,706 patients receiving Medication Assisted Treatment (MAT), an increase of approximately 2,000 patients since May 2020.  ISUDT expanded access to evaluation and treatment statewide, assessing an additional 10,425 patients with the National Institute on Drug Abuse – Modified Assist Tool.  The ISUDT program currently has 6,850 patients pending an initial consultation for treatment.

In June 2020, CCHCS began to engage PCPs to receive training to assume the care of patients in their panel who are stable on MAT.  As of the end of this reporting period, these trainings have taken place at CEN; Pleasant Valley State Prison (PVSP); and Kern Valley State Prison (KVSP), resulting in an additional 19 trained PCPs.  Training sessions provide a mixture of case-based didactics and experiential shadowing and observational sessions with a trained mentor.  Ongoing support and technical assistance is available from providers experienced with caring for patients with SUD, as well as a nationally recognized expert in addiction medicine.  All providers treating patients with MAT, including newly trained PCPs, receive ongoing technical support.

Buprenorphine is the most common of all MAT agents prescribed.  Since buprenorphine prescribing is regulated by the need for a Drug Enforcement Agency X-Waiver and by limits placed on the total number of allowable patients to be managed, increasing the number of providers equipped with X-Waivers is critical.  Since June 2020, an additional 163 providers have received their X-Waiver, increasing the total number of X-Waived providers to 356 (65 percent of the provider workforce).  While new X-Waivers are limited to managing 30 patients, once an experience threshold is demonstrated, incremental increases may be requested to manage 100 patients and then 275 patients.  Since June 2020, 61 providers have increased their buprenorphine prescription limit to the maximum of 275 patients.

Medications
All institutions stock MAT medications on-site with the exception of Methadone, which must be administered by a licensed Narcotic Treatment Program (NTP).  During this reporting period, on-site delivery and administration of Methadone by a contracted NTP has been implemented at (CCWF; COR; and NKSP, which brings the total number of institutions offering this service to seven.  CCHCS continues to offer Narcan® (naloxone), the life-saving opioid overdose reversal agent, to all patients upon release from CDCR and connects patients to providers in the community for continuation of MAT.

<u>Impact of COVID-19</u>
During the COVID-19 pandemic, MAT remains an essential service which patients are able to access; however, Cognitive Behavioral Interventions programming and screening of patients who are within 15-24 months of release currently remain on hold.

**C. Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals**

(i)     <u>In-State Contracting for Community Correctional Facilities</u>
Currently, there are two in-state contracted, modified community correctional facilities (MCCF) and one in-state female correctional re-entry facility (FCRF).  As of the end of this reporting period, the total population was 1,024, which is a decrease of 883 inmates during this reporting period.  The CDCR Division of Adult Institutions closed Golden State MCCF on May 26, 2020, and Delano MCCF on August 21, 2020.  The remaining facilities are anticipated to close as follows:

- McFarland FCRF – September 30, 2020
- Shafter MCCF – October 30, 2020
- Taft MCCF – June 30, 2021

In May, remote audits were initiated at Delano MCCF; McFarland FCRF; and Shafter MCCF.  The remote audit for Delano MCCF was cancelled due to the facility closure in August 2020, and the remote audits for McFarland FCRF and Shafter MCCF will not be completed or submitted, due to the anticipated closures.

The facilities continue to follow the COVID-19 guidelines issued by the Centers for Disease Control and Prevention and the California Department of Public Health, as well as orders mandated in their respective counties.  All inmate movement in and out of each facility remains restricted to urgent or emergent situations.  If an inmate is transferred to another facility or institution, the inmate must test negative prior to transfer.  Each facility remains closed to visitors.

Between June 15 – 17, 2020, Corrections Services staff visited the four facilities open at the time to observe their efforts to mitigate the spread of the virus.  Staff noted each facility was actively engaged in taking the necessary measures.  All persons are screened for symptoms upon entering each facility; dorm capacities are reduced to create distance between cohorts of eight inmates; programing is modified to ensure no more than ten inmates are grouped together at one time; cleaning frequency is increased; hand sanitizer and cleaning equipment is available to all inmates and staff throughout the facility; and the majority of inmates are wearing facility issued masks.

During this reporting period, 210 inmates from two facilities tested positive for COVID-19. McFarland FCRF had 85 inmates test positive, all of which have been resolved.  Taft MCCF had 125 inmates test positive, 118 of which had been resolved by the end of this reporting period.

    (ii)    <u>Transportation Vehicles</u>

During this reporting period, six Paratransit buses with modifications were completed and delivered to CHCF (two); CMF (two); RJD (one); and COR (one). As of the end of this reporting period, there are six Americans with Disabilities Act (ADA) vehicles requiring inspection by the California Department of General Services prior to retrofitting at the PIA facility located at SOL. A total of 17 ADA vehicles were retrofitted and a total of 17 ADA vans were delivered to the following institutions: ASP (one); CIM (two); Deuel Vocational Institution (one); Pelican Bay State Prison (one); PVSP (two); Salinas Valley State Prison (three); WSP (one); SOL (one); SQ (one); CVSP (one); CCWF (two); and CMC (one).

    (iii)    <u>Health Care Infrastructure at Facilities</u>

Despite the shutdown of construction due to COVID-19, a few projects did activate during this reporting period. These projects include the health care administrative space at Calipatria State Prison, the new health care administrative building at CVSP, the Triage and Treatment Area in the Central Health Services Building at FSP, and the Facility A primary care clinic renovation at VSP.

As reported in the forty-fourth Tri-Annual Report, on March 20, 2020, direction was issued to cease all construction within the secure perimeters at California state prisons due to COVID-19. At that time, all construction related to the Health Care Facility Improvement Program (HCFIP) was halted. Construction restarted in June, with specific COVID-19 related instructions on restarting provided to general contractors and Inmate Ward Labor (IWL). The restart of construction is largely dependent on local conditions, including COVID-19 restrictions. As of the end of this reporting period, construction has restarted on some level at all institutions with remaining HCFIP work, except CVSP, where the pandemic response has prevented restarting until September, and CCC and High Desert State Prison, where the general contractor has been unresponsive to attempts to restart construction. There have been some difficulties restarting construction due to both inmate and staff issues for IWL. Quarantine issues and inmate releases have resulted in reduced availability of inmate labor and there has also been a shortage of available casual labor in many locations. These issues will have an ongoing impact on the HCFIP completion dates.

Due to COVID-19 and the potential need for health care space, both to provide care to infected patients and also to conform to social distancing needs, several sub-projects continue to be activated. During the previous reporting period, CCHCS and CDCR reviewed HCFIP projects nearing completion that could potentially receive some level of approval for occupancy from the State Fire Marshal and submitted requests for 12 subprojects. The State Fire Marshal has approved all of the requests; however, other issues prevented activation of some spaces. CCHCS and CDCR are working to secure final occupancy on the requested spaces. During this reporting period, the following spaces were activated under special permit:

- CCWF Sub Project 4-Pharmacy
- VSP Sub Project 3.1-3.2- Facility D Primary Care Clinic

- COR Sub Project 1-3C-Facility C Primary Care Clinic
- COR Sub Project 3-4A-Facility 4A Swing Space
- COR Sub Project 3-4B-Facility 4B Primary Care Clinic
- KVSP Sub Project SP1-C-Facility C Primary Care Clinic
- NKSP Sub Project 6.1-TTA
- California Substance Abuse Treatment Facility Sub Project 1.1G-Facility G Primary Care Clinic Addition

While the State Fire Marshal approved emergency occupancy, other issues prevented the opening of the following spaces:

- California Correctional Institution Sub Project 4.2-Facility C Primary Care Clinic
- CMC Sub Project 7.2-Central Health Services Specialty Clinic
- SOL Sub Project 2.1-Central Health Services Phase 1
- CCWF Sub Project 1.2-RC Processing

Occupancy is anticipated for all of these spaces by early September 2020.
The Aleph Group, Incorporated (AGI), continues to have difficulty completing the mobile medical clinic for CRC. During site visits to the factory, intermittent progress has been observed. The vendor's progress is difficult to predict based on past performance, although AGI indicates they will complete the project during the next few months. AGI had some difficulty with staffing due to COVID-19, and has also had some difficulty in manufacturing some portions of the building, including doors. Most of the issues appear to be resolved; however, a completion date remains unknown at this time.

    (iv)   <u>Scheduling and Ducating</u>

Due to COVID-19, Corrections Services was unable to conduct any Operations Monitoring Audits (OMA) or Scheduling and Ducating Program Special Reviews during this reporting period. Once audits resume, Corrections Services will report on the relative success of the revised OMA questions in addressing scheduling and ducating issues.

## Section 2: Other Matters Deemed Appropriate for Judicial Review

### A. California Health Care Facility – Level of Care Delivered

CHCF's health care leadership remains focused on ensuring the delivery of quality health care services to its patient population. CHCF opened a 30-bed Palliative Care Services Unit in July 2018 and a 30-bed Memory Care Unit in February 2019. As of the end of this reporting period, CHCF is at 86 percent capacity (2,539 current population; 2,951 capacity) and 33 of the 36 budgeted provider positions at CHCF are filled as follows:
- Physician and Surgeon (P&S): 32 positions, 29 filled, 3 vacant
- Nurse Practitioners: 1 position, 1 filled, 0 vacant

- Physician Assistants: 3 positions, 3 filled, 0 vacant

As reflected in the August 31, 2020, Primary Care Provider Vacancy/Coverage Report (Refer to Appendix 1), civil service telemedicine providers and contract registry providers are utilized to deliver care at CHCF, which increases the available coverage to just over 99 percent for providers.

## B.  Statewide Medical Staff Recruitment and Retention

CCHCS is making progress in resolving the challenges present at the beginning of the Receivership, which were outlined in the March 10, 2015, *Special Report: Improvements in the Quality of California's Prison Medical Care System*.  Since that time, CCHCS has developed strategies to adapt and respond to new challenges.  Through frequent assessment of staffing ratios, health care delivery models, and retention strategies, CCHCS has implemented a series of flexible and continuously evolving solutions to ensure the delivery of timely, quality health care services to patients through a stable provider workforce.  As of July 31, 2020, 37 percent of institutions (13 institutions) have achieved the goal of filling 90 percent or higher of their civil service provider positions; 34 percent (12 institutions) have filled between 75 and 89 percent of their civil service provider positions; and 29 percent (10 institutions) have filled less than 75 percent of their civil service provider positions.  However, when on-site civil service, telemedicine, and contract registry providers are utilized to deliver care statewide, coverage at 31 institutions is at or above 90 percent (refer to Appendix 1).  The following summarizes the continuous recruitment efforts during this reporting period:

- The robust media and recruiting outreach combined with a CCHCS streamlined hiring process continues to produce positive results.  Since January 1, 2020, CCHCS hired 27 new physicians, with 1 hired in the Telemedicine program, 3 hired at headquarters, and 23 hired at institutions.  Additionally, 10 new Advanced Practice Providers were hired, with 2 in the Telemedicine Program and 8 at the institutions.
- The Telemedicine Program is experiencing continued recruitment and health care delivery success.  As of the end of this reporting period, the current telemedicine provider workforce is 85.54 percent filled, with 47.9 PCP positions filled and five hires pending.
- CCHCS' contracted marketing firm has submitted its department recruitment campaign, which is being assessed to determine suitability for implementation.  The firm is tasked with developing a campaign of updated marketing material, website templates, and recruitment copy based on current best practices for health care recruitment with the ultimate goal of supporting CCHCS' image as a modern and current health care provider.
- CCHCS continues its recruitment at virtual career fairs and conferences as more professional associations, colleges, and universities turn to virtual platforms to support recruitment events given current stay-at-home orders in place in many states.  CCHCS is ensuring it maintains a recruitment presence on these platforms through participation in digital advertising, virtual booths, and chat rooms.
- CCHCS has developed a Complete Candidate Engagement process to guide institution hiring programs in the critical steps needed to ensure PCP candidate connection from

initial communication with the hiring manager to start date. The program is currently in the approval process. Upon implementation, it will provide a step-by-step engagement process for institutions to utilize, similar to the process candidates would encounter in the private sector.

## C.  CCHCS Data Quality

Implementation of the final Intueor Consulting recommendations, which include reformatting the Health Care Services Dashboard glossary and revising the methodology for workload measures, has been deferred to allow data analysts to focus on operational tools and reports critical to COVID-19 response efforts. CCHCS anticipates addressing the final recommendations in 2021.

## D. Coordination with Other Lawsuits

Meetings between the three federal courts, *Plata, Coleman,* and *Armstrong* (Coordination Group) class actions have occurred periodically. During this reporting period, the Coordination Group met on June 4, 2020, and July 22, 2020.

## E. Master Contract Waiver Reporting

On June 4, 2007, the Court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of state laws that normally govern state contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007, Order and in addition to those project areas identified in supplemental orders issued since that date. The approved project areas, the substitute bidding procedures, and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report and are fully articulated in the Court's Orders, and therefore, the Receiver will not reiterate those details here.

The Receiver did use the substitute contracting process during this reporting period. The CCHCS Acquisitions Management Section obtained approval to utilize the Alternative Contracting Waiver Process for a sole source contract, executed on July 3, 2020, in the amount of $22,270,633.36 with VXL Enterprises, LLC, for emergency medical staffing and services at SQ. The term of the contract is through October 6, 2020.

## F. Consultant Staff Engaged by the Receiver

The Receiver did not engage any new consultant staff during this reporting period.

## G. Accounting of Expenditures

(i)     Expenses

The total net operating and capital expenses of the Office of the Receiver for the fiscal year ending June 30, 2020, were $2,572,019 and $0.00, respectively.  A balance sheet and statement of activity and brief discussion and analysis is attached as Appendix 2.

For the two months ending August 31, 2020, the net operating and capital expenses were $289,915 and $0.00 respectively.

(ii)     Revenues

For the months of May and June 2020, the Receiver requested transfers of $875,000 from the state to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the Office of the Receiver.  Total year to date funding for the FY 2019-20 to the CPR from the State of California is $2,600,000.

For the months of July and August 2020, the Receiver requested transfers of $250,000 from the state to the CPR to replenish the operating fund of the Office of the Receiver.

All funds were received in a timely manner.