# EXHIBIT I

XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | CASE NO. 01-1351 JST <br><br> **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** <br><br> Date: May 28, 2020 <br> Time: 10:00 a.m. <br> Crtrm.: 6, 2nd Floor <br> Judge: Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the May 28, 2020 Case Management Conference. The parties exchanged their respective sections at approximately 2:00 p.m. today.

I. PLAINTIFFS' STATEMENT

    A.    CDCR Must Transfer Vulnerable Patients from Dormitories to Cells

The public health recommendations for preventing transmission of the virus that causes COVID-19 are well known and undisputed. Dr. Arthur Reingold, Division Head of Epidemiology and Biostatistics at the University of California, Berkeley, School of Public Health, explains that "SARS-CoV-2 is readily spread through respiratory transmission. All people are susceptible to and capable of getting COVID-19 because of the ease with which it spreads. The virus is spread through droplet transmission; that is, when an infected individual speaks, coughs, sneezes, and the like, they expel droplets which can transmit the virus to others in their proximity." Reingold Decl. at ¶ 8. It is estimated that one infected person infects two to eight other individuals and some "superspreaders" cause widespread infection. *Id.*

Because there is no vaccine, the current recommendations for avoiding infection include isolation, social distancing, frequent handwashing, wearing masks, and disinfecting surfaces. *Id*. at ¶ 9. "[C]rowded indoor rooms, such as dormitories, with poor ventilation, are prime environments for the spread of SARS-CoV-2 infection. Prolonged confinement in such spaces dramatically increases the transmission of SARS-CoV-2 infection and it is particularly important that people at high risk of serious injury from SARS-CoV-2 not be exposed to those environments." *Id*. at ¶ 19.

Seven out of the nine deaths in CDCR thus far have come from people who were housed in dormitories at CIM. In light of the risk of further deaths and serious harm, "prison cells rather than dormitories should be used to house patients who are at medically high risk, even in prisons where there is not yet an outbreak." *Id*. at ¶ 20. Since CDCR's current and past measures have failed to stem outbreaks and stop the spread, it is

imperative that vulnerable patients receive additional protection immediately. *Id.* at ¶¶ 17, 23. Therefore, Defendants must be directed to work with the Receiver to identify the vulnerable patients who are most at risk, test them for COVID-19, and transfer those in dormitories to cells with other people who have tested negative. Defendants have indicated that they are transferring approximately 700 people high risk people from the CIM dorms to 15 other prisons. This assessment and transfer process must be extended system-wide.

### B. Population Reduction Measures

According to Defendants, "CDCR does not currently plan to conduct additional early inmate releases because it believes that it has taken and continues to take sufficient appropriate steps to improve the safety of inmates and staff in its prisons through social distancing, screening, enhanced cleaning and sanitation, staff and inmate education, and increased testing." Joint Case Management Conference Statement, ECF No. 3328, May 20, 2020, at 10. However, as the Receiver informed the Court at the May 21 Case Management Conference, the population reduction measures that CDCR undertook in the early days of the pandemic had a significant positive impact on State's ability to contain the deadly spread of the virus in the prisons. See also Reingold Decl. at ¶ 24. Defendants are therefore rejecting measures they can take – and have taken in the past – to save lives.

In fact, the State is already planning significant additional population reductions in the coming years, including the closure of at least one prison. See Governor's Revised Budget Summary 2020-21, found at http://www.ebudget.ca.gov/budget/2020-21MR/#/BudgetSummary, at 83.

In this state of emergency, where CDCR prisons continue to experience severe outbreaks and patients continue to die, the State refuses either to repeat measures already proven successful or to speed up measures already planned over the course of the next year. The refusal is baffling, and profoundly dangerous to members of the Plaintiff class.

Moreover, Director Gipson, Deputy Directors, and Associate Directors from CDCR's Division of Adult Institutions are conducting tours to verify compliance at other institutions.

Plaintiffs' next tour is scheduled at California Medical Facility (CMF) on Friday, May 29. This tour will occur in person.

### B. Increased COVID-19 Testing

As Defendants anticipated in their last status report to the Court, there has been a significant increase in the level of testing throughout the prisons since last week. As of May 1, only 1,469 COVID-19 tests had been performed on inmates statewide. As of May 27, the number of completed inmate tests has jumped to 11,808, a rate approximately three times the testing rate of California and the United States in general. Defendants anticipate that the level of testing will continue to quickly rise. And, as discussed more fully below, staff testing is also increasing.

### C. Efforts To Ensure The Safety Of Medically High Risk Inmates at CIM

Although the Receiver has not drafted formal written guidelines and procedures concerning high-risk[3] inmates during the pandemic, the following describes Defendants' understanding of the Receiver's strategy for protecting high-risk inmates during the

---

[3] The CCHCS Health Care Department Operations Manual at Chapter 1, Article 2, section 1.2.14 sets forth the medical classification system, including the medical factors that are considered in making patient placement decisions. The policy also defines "high risk" to include: (1) the chronic care of complicated, unstable, or poorly-controlled common conditions (e.g., asthma with history of intubation for exacerbations, uncompensated end-stage liver disease, hypertension with end-organ damage, diabetes with amputation); (2) the chronic care of complex, unusual, or high risk conditions (e.g., cancer under treatment or metastatic, coronary artery disease with prior infarction); (3) implanted defibrillator or pacemaker; (4) high risk medications; and (5) transportation over a several day period would pose a health risk, such as hypercoagulable state. Those risk categories, which were established pre-pandemic. As Defendants understand it, inmates who are particularly at risk of a bad outcome if they contract COVID-19 are: (1) over age 65, (2) obese, and (3) suffer a kidney insufficiency.

-13-  Case No. 01-1351 JST

COVID-19 pandemic:

- High-risk inmates are to be sheltered in place so long as they are in COVID-free facilities within a particular institution;
- If a facility housing high-risk inmates has an outbreak of COVID-19, high-risk inmates who are COVID negative should be moved to a facility that is COVID-free within the same institution;
- If it is determined that the risk to shelter in place for COVID-negative high-risk inmates is greater than transferring patients due to the prevalence of COVID within the institution, negative high-risk inmates should be considered for transfer to another institution.

Defendants' understanding is that this strategy is based in large part on the concept that unnecessary transfers of inmates increase the risk of spreading COVID-19 throughout the system, and that there are additional considerations, such as maintaining continuity of care, and ordinary risks associated with moving vulnerable populations that weigh against unnecessarily transferring high-risk inmates. Furthermore, as testing throughout the prison system increases, it should become easier to mitigate the risk of high-risk inmates by confirming that they are housed in COVID-free facilities or units.

==Because COVID-19 has spread to every housing unit within CIM, the Receiver, in consultation with the Secretary, has directed that high-risk inmates at CIM who test negative for COVID-19 be transferred to facilities in institutions that remain COVID-free.== As noted above, the Secretary's visit to CIM last week confirmed the need for such transfers. The Receiver has notified CDCR that 691 high-risk inmates at CIM tested negative for COVID-19 and should be transferred out of CIM. CDCR immediately began the process of evaluating this group of inmates to determine where they could be transferred based on their case factors. CDCR anticipates that the transfer of this group of inmates will begin by the end of this week.

Under the Receiver's policy, other high-risk inmates throughout the system will

continue to shelter in place unless the facilities where they are housed have outbreaks of COVID-19. In those cases, the evaluation of potential moves will be analyzed pursuant to the strategies outlined above.

### D. Efforts To Limit The Spread Of COVID-19 Via Staff

CDCR continues to screen staff every day before they enter the prisons, all staff are required to wear cloth masks at a minimum in the prisons, and all staff have been ordered to maintain physical distancing to the extent possible as they perform their duties in the prisons. Staff may also be required to don an N95 mask, face shield, gloves and/or additional PPE depending on assignment and duties.

CDCR recognizes that staff are potential vectors for the introduction of COVID-19 into CDCR's prisons, and CDCR has been working with the California Department of Public Health, and in some cases with local county health departments, on plans and strategies for staff testing. Earlier this month, 250 staff were tested at California Men's Colony and 150 staff were tested at California Institution for Women. Beginning this week, COVID-19 testing of all staff at CIM and Avenal State Prison will commence. CDCR will continue to work with State and local public health professionals on staff-testing strategies in the coming days and weeks to further mitigate the risk of spread of COVID-19 in CDCR's institutions.

Under normal operating procedures, custody staff are assigned to a particular primary post where they work for five days each week. CDCR is making efforts to ensure that primary-post positions are permanently filled, which should limit the number of different staff who are working in various housing units. But in such a large and complex system, it is impossible to completely and permanently limit the staff who work in various locations throughout the prisons.

### E. CDCR's Efforts Regarding Cleaning

CDCR plans to issue a supplemental memorandum to the prisons regarding cleaning and physical distancing. The purpose of the memorandum is to provide

clarification concerning cleaning requirements and to require institutions to provide confirmation that they are complying with required cleaning and physical distancing rules.

The supplemental memorandum will require that captains and managers conduct weekly inspections and complete check lists confirming compliance with rules for social distancing, mask wearing, dorm-cohort separation, and increased cleaning and disinfecting. The memorandum also provides an example of an appropriate shower cleaning schedule.[4]

The memorandum will require the use of cleaning logs to document the cleaning of showers, toilets, and sinks between use periods, and will require the use of gloves and masks by the inmate porters who perform the cleaning. The memorandum will direct the wardens at each institution to provide the logs to CDCR headquarters so that associate directors can confirm compliance.

### F. Early Releases

While CDCR is not currently planning to grant early release to additional inmates, the State and CDCR continue to meaningfully evaluate this and other options on a daily basis and will continue to provide updates in future filings. It is important to note that, at the same time, institutional population has continued to decline. As reported last week, CDCR has decided to maintain the closure of intake for an additional 30 days with the exception of a very limited number of individuals from four counties. CDCR also continues to release on parole or post release community supervision approximately 3,000 inmates each month. CDCR will continue to evaluate the situation and will consider all options for mitigating risk and increasing physical distancing.

As noted above, the resumption of transfers from CIM and other facilities will

---

[4] Last week, Defendants reported that the showers at one institution were cleaned after 83 uses. Upon further inquiry, Defendants learned that the institution misunderstood the survey question and provided the number of inmates living in a particular dorm rather than answering the question pertaining to their cleaning schedule.

1 enable CDCR to more flexibly use its facilities to reduce density and expand social
2 distancing. CDCR will, as it always does, look to vacant, usable space to house inmates as
3 additional transfers are completed later this week and next, including the first internal
4 movement out of CIM since the outbreak began, as well as approximately 1,500 other
5 internal transfers scheduled for next week (which include mental health patients, transfers
6 out of reception centers, and transfers out of segregated housing).

7 Of course, early releases and internal transfers are only one factor to employ to
8 reduce the spread of the virus, and CDCR is working with its internal team and CCHCS's
9 public health experts to evaluate all available options on an ongoing basis. Further, as
10 stated below, CDCR is also vetting public health experts and will explore additional
11 options with the expert once retained.

**G. Road Map to Reopening Operations**

On May 22, 2020, CCHCS issued a memorandum to all wardens and chief executive officers jointly signed by Connie Gipson, Director of the Division of Adult Institutions, Dr. Joseph Bick, Director of the Division of Health Care Services, and Dr. Steven Tharratt, Director of Health Care Operations and Statewide Chief Medical Executive at CCHCS, entitled "COVID 19 Pandemic – Road Map to Reopening Operations." The memorandum outlines Phase 2 Operations within CDCR/CCHCS, including permissible activities and strategies to continue to mitigate and prevent the spread of the virus, including modified reception center intake, screening, housing, testing, social distancing and separation of populations. The memorandum also attaches a "Covid Screening and Testing Matrix for Patient Movement," which provides clear direction to institutions regarding the testing and housing of inmates under particular movement scenarios. For instance, the matrix indicates that patients who are transferring from a county jail into a CDCR Reception Center must be placed in quarantine and cohorted for 14 calendar days and offered testing. Inmates who screen positive must not be transferred; asymptomatic inmates who refuse testing must be placed in Orientation Status for 14

-17-  Case No. 01-1351 JST
16576559.1  JOINT CASE MANAGEMENT CONFERENCE STATEMENT

calendar days and reoffered testing at the new institution. Inmates who are a returning from hospitalization of 24 hours or longer or an emergency department visit must be placed in quarantine for 14 calendar days and offered testing.

The memorandum further mandates that the following categories of inmates must be tested: (1) all patients entering CDCR from county jail must be offered testing within 24 hours of arrival; (2) all patients transferring to another CDCR institution or camp; (3) all patients returning from an outside healthcare facility shall be offered testing within 24 hours of their return; (4) all patients returning from an out-to-court appearance that included at least one night away shall be offered testing within 24 hours of their return; and (5) all patients to be released back into the community.

The memorandum also explains when patients who have been previously diagnosed with COVID-19 can be released from isolation, and further reiterates when cloth face coverings must be worn by staff and inmates. The memorandum also states that "basic public health and environmental hygiene efforts must continue indefinitely," including hand washing, use of personal protective equipment, and disinfection of all shared and frequently used surfaces.

### H. Update Regarding Expert Retention

Defendants investigated several candidates and are in the process of vetting a public health medical expert for retention in this matter following this Court's suggestion at the last case management conference. However, Defendants continue to work in collaboration with the Receiver and his public health experts to address this crisis.

| | | |
|---|---|---|
| DATED: May 27, 2020 | | PRISON LAW OFFICE |
| | By: | */s/ Alison Hardy* |
| | | ALISON HARDY |
| | | Attorney for Plaintiffs |
| | | |
| DATED: May 27, 2020 | | XAVIER BECERRA |
| | | Attorney General of California |
| | | |
| | By: | */s/ Damon McClain* |
| | | DAMON MCCLAIN |
| | | Supervising Deputy Attorney General |
| | | NASSTARAN RUHPARWAR |
| | | Deputy Attorney General |
| | | Attorneys for Defendants |
| | | |
| DATED: May 27, 2020 | | HANSON BRIDGETT LLP |
| | By: | */s/ Samantha Wolff* |
| | | PAUL B. MELLO |
| | | SAMANTHA D. WOLFF |
| | | Attorneys for Defendants |