# EXHIBIT J

XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777-3200
Facsimile:   (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:　　June 9, 2020<br>Time:　　10:00 a.m.<br>Crtrm.:　6, 2nd Floor<br>Judge:　Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the June 9, 2020 Case Management Conference (CMC).

Since the last CMC, the parties have met and conferred regarding certain aspects of Defendants' response to the current health crisis. On Monday, June 1, Plaintiffs sent Defendants an email, with a copy to the Receiver, requesting "a meet and confer this week on the following topics with the people identified below and anyone else whom you or [the Receiver] believe would be helpful to our discussions." 1) Testing CDCR and CCHCS staff for COVID-19; 2) Moving high risk patients from cells to dorms; and 3) "Steps necessary to improve the safety of people living in cells and dorms, especially high risk people living in congregate living areas." The email did not contain any specific proposals with respect to the topics listed therein.

On Wednesday, June 3, at 3:16 p.m., Plaintiffs emailed Defendants, again copying the Receiver. In that email Plaintiffs wrote that "[i]n order to make the Meet and Confer scheduled for Friday as productive as possible in the attached document we have set forth our proposals on the three subjects we outlined below [in the June 1, email]." Plaintiffs attached a two paged single-spaced document entitled "Plaintiffs Proposals For June 5, 2020 Meet and Confer." That document set forth Plaintiffs positions and demands on "testing staff" and "steps necessary to improve the safety of people living in cells and dorms, and especially high risk people living in congregate living areas."

On Friday, June 5, the parties had a conference call that lasted more than one and a half hours. Approximately 20 people participated in the conference call, including the Receiver and members of his staff, CDCR Division of Adult Institutions staff, CDCR Employee Health and Wellness staff and lawyers from the Prison Law Office, the Attorney General's office, Hanson Bridgett, and CDCR's Office of Legal Affairs to discuss the proposals. With the exception of what is described below, no agreements were reached. This was due in part to the short time frame that Defendants had to respond to the document, the number of people on the call and because the Defendants are evaluating

nor could the Receiver say when a decision would be reached.

**Plaintiffs' Position:**

It is the opinion of Dr. Arthur Reingold that cells are safer for the medically vulnerable patients than dormitories, and that those medically vulnerable people who have tested negative should be moved out of prisons where there are outbreaks.

This issue has been pending for three months, yet despite Dr. Reingold's uncontradicted expert opinion, thousands of high-risk patients remain in dormitories throughout the state. During the meet and confer session, the Receiver announced that this issue was a top priority and he was now considering the appropriateness of moves from dorms to cells. Plaintiffs urge the Receiver and Defendants to take action to safely rehouse these people as soon as possible.[3]

In addition to Dr. Reingold's opinion, dorms are plainly the locus of the largest, most widespread, and serious outbreaks. In one Avenal dorm, more than 90% of patients tested positive. At Chuckawalla Valley, which houses nearly 3,000 people, all in dorms, hundreds had been tested and CCHCS last week said the positive rate was approximately 75%. By contrast, the outbreaks in celled housing at Lancaster and CMC, while concerning, were stopped before they extended nearly as widely and appear to be contained. Lancaster has had 128 cases, but only one is currently active; CMC has had 11 cases, but only one is currently active. With regard to morbidity and mortality, almost all of the approximately 50 people currently hospitalized statewide due to COVID-19 were infected while living in dorms, and the same is true of the dozen patients who have died thus far. Dorms present an unacceptable risk of infection and harm under current conditions.

---

[3] In order to more precisely ascertain the extent of the risk, Plaintiffs have asked for and the Receiver's office stated that it will provide a list of all people incarcerated in CDCR who have one or more risk factors for complications from COVID-19, along with the number of such factors for each person, and whether the person is housed in a cell or a dorm.

CCHCS had a plan to move almost 700 medically high risk patients who had tested negative for the virus from California Institution for Men (CIM) to other prisons. Those transfers began on or around May 29th. The patients who were transferred had tested negative, but in many cases the tests were done *two to three weeks before the transfer*. Not surprisingly, some of those people tested positive shortly after their arrival at the new prisons. As a result, the process was suspended after the first 125 transfers[4]. CCHCS is now reconsidering its testing strategy for transfers, including of the medically vulnerable.[5] Plaintiffs have requested to review the proposed revised testing protocols before they are finalized.

At the meet and confer, the Receiver raised concerns that some people who are high risk may prefer not to transfer from a dorm to a cell, and asked Plaintiffs what such patients should be told, and what should be done. Plaintiffs now propose the following approach: a high risk patient living in a congregate area who has recently tested negative may refuse a transfer to a celled housing unit, unless the Receiver or his medical staff determines that the patient's continued presence in that congregate living area would be a public health threat. Before the patient is asked to make a decision, the patient must receive meaningful education from a Primary Care Provider on the medical risks of staying in his/her present congregate living space and potential medical benefits of being transferred to another location, and an opportunity to have any questions answered.

---

[4] On May 22, a week before the first transfer, Plaintiffs asked the Receiver's office to consider whether certain practices regarding the housing of CIM patients who had tested positive with those who tested negative created a risk of infection for the latter group and for others if any members of that group became infected and were then transferred.

[5] On June 2nd, after the date of many of 125 transfers from CIM, CCHCS published clinical guidelines stating that those who transfer "may be tested within a week prior to transfer or upon arrival." *COVID-19: Interim Guidance for Health Care and Public Health Providers,* at https://cchcs.ca.gov/covid-19-interim-guidance/. Plaintiffs do not know why this standard was not applied to the CIM patients discussed above, although we note that as posted it is discretionary not mandatory.

**Defendants' Position:**

As reported last week, on May 26, the Receiver notified CDCR that 691 high-risk inmates at Correctional Institution for Men (CIM) tested negative for COVID-19 and should be transferred out of CIM. CDCR immediately began the process of evaluating this group of inmates to determine whether they should be excluded from transfers based on factors such as display of COVID-19 related symptoms, their overall medical or mental health condition, pending appointments, or upcoming release within the next ten days. Between May 28 and May 30, 194 inmates on the Receiver's list were moved out of CIM to Corcoran and San Quentin. All inmates tested negative for COVID-19 before their transfers out of CIM. Transfers of approximately 125 more inmates out of CIM were planned for June 4 and 5. But the Receiver ordered the suspension of all transfers from CIM on June 4 after it was discovered that some of the inmates who transferred out of CIM tested positive when they arrived at their destinations. To date, sixteen of the transferred inmates have tested positive. Unfortunately, San Quentin, which was previously a COVID-free prison, now has COVID-positive inmates. San Quentin is taking a number of measures to prevent spread of COVID-19 from these inmates, including placing all inmates transferred from CIM in quarantine or isolation, and strictly limiting their movement and exposure to other inmates and staff.

CDCR is prepared to work with the Receiver once he has determined an approach for housing medically high-risk patients.

### III. ESTABLISHING AND ENFORCING WORKABLE DISTANCING PROTOCOLS AT CDCR'S INSTITUTIONS

Plaintiffs' proposal to improve the safety of people living in cells and dorms included two elements: (1) establish and enforce workable distancing protocols for all incarcerated people; and (2) create livable dorms and gyms.

Specifically, Plaintiffs recommended people be assigned to cohorts for yard, chow hall, showers, and dayroom, and staff be assigned to working with a particular cohort to

California Institution for Women and California Health Care Facility.

**VII. OTHER UPDATES**

**Defendants' Position:**

During Nurses Week in mid-May, CDCR and CCHCS honored and celebrated their hard working nurses by providing food and giving out COVID-19 prizes (such as toilet paper, disinfectant and paper towels) as well as gift cards while complying with social distancing practices. Photos and more details can be found at https://www.cdcr.ca.gov/insidecdcr/2020/06/02/across-california-cdcr-cchcs-honor-nurses/.

On June 5, Wardens and Chief Executives Officers from across the State participated in a discussion titled "Lessons Learned the First 90 days" where leadership who have experienced COVID outbreaks at California Institution for Women, California Men's Colony, and California Institution for Men candidly shared advice and strategies that greatly assisted their staff during these recent outbreaks.

DATED: June 8, 2020             PRISON LAW OFFICE


By:     /s/ Alison Hardy
        ALISON HARDY
        Attorney for Plaintiffs

DATED: June 8, 2020

XAVIER BECERRA
Attorney General of California

By:    */s/ Damon McClain*
DAMON MCCLAIN
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR
Deputy Attorney General
Attorneys for Defendants

DATED: June 8, 2020

HANSON BRIDGETT LLP

By:    */s/ Samantha Wolff*
PAUL B. MELLO
SAMANTHA D. WOLFF
Attorneys for Defendants