EXHIBIT K

| | |
|---|---|
| XAVIER BECERRA<br>Attorney General of California<br>MONICA N. ANDERSON<br>Senior Assistant Attorney General<br>DAMON G. MCCLAIN<br>Supervising Deputy Attorney General<br>NASSTARAN RUHPARWAR - 263293<br>Deputy Attorney General<br>455 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102-7004<br>Telephone: (415) 703-5500<br>Facsimile: (415) 703-58443<br>Email: Nasstaran.Ruhparwar@doj.ca.gov | PRISON LAW OFFICE<br>DONALD SPECTER (83925)<br>STEVEN FAMA (99641)<br>ALISON HARDY (135966)<br>SARA NORMAN (189536)<br>RANA ANABTAWI (267073)<br>SOPHIE HART (321663)<br>1917 Fifth Street<br>Berkeley, California 94710<br>Telephone: (510) 280-2621<br>Fax: (510) 280-2704<br>dspecter@prisonlaw.com |
| HANSON BRIDGETT LLP<br>PAUL B. MELLO - 179755<br>SAMANTHA D. WOLFF - 240280<br>KAYLEN KADOTANI - 294114<br>425 Market Street, 26th Floor<br>San Francisco, California 94105<br>Telephone: (415) 777--3200<br>Facsimile: (415) 541-9366<br>pmello@hansonbridgett.com | Attorneys for Plaintiffs |
| Attorneys for Defendants | |

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>    Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date: June 19, 2020<br>Time: 3:00 p.m.<br>Crtrm.: 6, 2nd Floor<br>Judge: Hon. Jon S. Tigar |

be asked to decide whether to move from a dorm until a cell at a specific location is offered.

### C. The CIM Transfers and Updated Transfer Protocols

**Plaintiffs' Position:**

At the time of the late May transfers of hundreds of medically vulnerable patients from the California Institution for Men (CIM) to San Quentin and Corcoran State Prison – done to try to remove those patients from the massive COVID-19 outbreak at CIM – CCHCS protocols, issued on May 22, provided that patients must test negative for COVID-19 before transfer, but did not specify a pre-transfer time frame for that test. Nor were CIM staff specially told by Headquarters any time frame for testing these particular patients before the transfers, which were ordered by Headquarters. Nor were any directives given regarding testing after Plaintiffs' May 22nd email raising concerns about CIM housing practices possibly exposing patients who previously tested negative, including those up for transfer, to the virus. It also appears that CDCR staff who drive the buses and provide security may not have been tested prior to transfer, increasing the risk of transmission.

Patients were transferred from CIM at the end of May based on negative COVID-19 negative tests done in the middle or near the start of the month. Some of those tested positive for COVID-19 shortly after arrival at San Quentin and Corcoran, meaning they were likely positive at the time they were transferred. Others transferred to San Quentin on the same bus as those patients subsequently tested positive for the virus. One of them is hospitalized, in an ICU and on a ventilator.

It is deeply unfortunate that transfers done to keep people safe have resulted in some becoming positive, and have introduced the virus to a prison – San Quentin – where previously there were no confirmed cases. Although it cannot be said for certain that negative tests done closer in time to the transfer date would have prevented what has now occurred, it was a poor decision to not require such tests to incarcerated people and staff, given public health principles and common sense, and the alert about CIM housing

-11- Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16632948.3

practices we sent to CCHCS on May 22. CCHCS's current comprehensive reconsideration of its testing and transfer protocols is clearly necessary.

The more general lessons are also clear. CCHCS must specify timeframes for testing, transfers, the staff who should be tested and all related matters involving patient safety.[3] Similarly, CCHCS must mandate action, including regarding the timing of tests, so that the message is clear and staff can be held fully accountable for noncompliance. In this regard, the use of discretionary language, such as the "may" and "should not" in the June 2 and June 5 policy statements regarding testing, cannot continue. The new policy, strategy, or protocol must use unambiguous language.

Plaintiffs have asked to review the new testing and transfer policy or protocol in advance of implementation later this month, so that if necessary we can comment on it, as has been the standard practice for years with dozens of other policy changes. Such reviews, which we will do on an expedited basis if so asked, have previously resulted in changes that reduce the risk of harm to patients. CCHCS has not indicated whether it will share the new testing and transfer policy or protocol in advance. Plaintiffs ask that the Court direct the Receiver to do so.

Finally, and fundamentally, the Receiver must prohibit all inter-prison transfers except those necessary for healthcare reasons or other emergencies until the new testing and transfer policy or protocol is fully implemented, piloted in a substantial way, and deemed adequate. In addition to the CIM to San Quentin transfers, Plaintiffs this week discovered that people on or about June 8th were moved from San Quentin for purely custody reasons and that one of those persons – who had tested negative six days before transfer, subsequently tested positive for COVID-19 at the new prison. When asked about this, CCHCS stated the patient is believed to have infected a nurse and two officers at the

---

[3] On June 17, 2020, CCHCS informed Plaintiffs that last week, it provided CDCR with recommendations to reduce the risk of COVID-19 transmission during bus transports, including limits on bus capacity, but did not know whether CDCR would adopt them.

new prison.  In addition, CCHCS stated this week that an officer who drove patients to California Medical Facility in Vacaville tested positive for COVID-19, and those who were in the bus may have been infected.  As noted above, the Receiver, for public health reasons, should prohibit all except essential transfers until it is clear that the revised testing and transfer policy or protocol is adequate.

**Defendants' Position:**

As reported in the May 27, 2020 Joint Case Management Conference Statement, on May 22, 2020, CCHCS issued a memorandum to all wardens and chief executive officers jointly signed by Connie Gipson, Director of the Division of Adult Institutions, Dr. Joseph Bick, Director of the Division of Health Care Services, and Dr. Steven Tharratt, Director of Health Care Operations and Statewide Chief Medical Executive at CCHCS, entitled "COVID 19 Pandemic – Road Map to Reopening Operations."  Attached to that memorandum was a "Covid Screening and Testing Matrix for Patient Movement," which set forth direction to institutions regarding the testing and housing of inmates under particular movement scenarios.  That memorandum did not provide specific time frames for the testing of inmates prior to inter-prison transfers, for instance, in circumstances like the transfers from CIM to San Quentin and Corcoran, that were discussed during the June 9, 2020 Case Management Conference.  As a result of the lessons learned from the CIM transfers (which are described more fully below), all inmates: (1) must be administered a COVID-19 test no more than seven days before transfer and; (2) must receive a negative test result before transfer.  This modification to the transfer protocol was memorialized in an email from CCHCS's Vince Cullen to all Chief Executive Officers on June 5, 2020.  A copy of this email is attached as **Exhibit B.**

As it pertains to the CIM transfers, on May 23, 2020, CCHCS provided the Division of Adult Institutions (DAI) with a list of 691 inmates at CIM who were deemed "medically high risk" and who had tested negative for COVID-19.  CCHCS directed DAI to transfer the listed inmates out of CIM.  DAI immediately started the classification process required to transfer the inmates to San Quentin and Corcoran.  DAI kept CCHCS apprised of the

-13-  Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

anticipated schedule for transferring the inmates, and CCHCS did not object to that schedule. CCHCS did not notify DAI that a retest would be necessary of the inmates before they were transferred, nor had CCHCS issued a general directive concerning the timing of COVID-19 tests in relation to inmate transfers. On May 28—four business days after CCHCS sent the transfer list to DAI—the transfers commenced. CCHCS suspended the transfers on June 4, 2020, when it was discovered that some of the transferred inmates tested positive for COVID-19 after they arrived at San Quentin and Corcoran. On June 5, 2020, CCHCS issued a new "testing and transfer strategy" dictating that "a patient should not transfer if the date of their NEGATIVE test is past 7 days on the date of transfer. This means 7 days from the date the test was administered." There have been no additional transfers from CIM since CCHCS suspended transfers on June 4.

## IV. RESUMPTION OF INTAKE

As reported in the parties' June 8, 2020 Joint Case Management Conference Statement, CDCR has maintained the closure of county jail intake, with the exception of the intake of approximately 50 county jail inmates per week, for a total of 200 inmates. Four counties (Los Angeles, San Bernardino, Fresno, and San Diego) are permitted to send inmates to CDCR according to a set schedule.[4] Due to the number of positive COVID-19 cases in Los Angeles County jails, CDCR temporarily suspended the intake of inmates from Los Angeles County jails on June 5, 2020 and replaced that intake with inmates from Kern County. After receiving assurances from Los Angeles County that it is testing and screening its inmates prior to transfer, CDCR will resume limited intake from Los Angeles County on June 24, 2020. CDCR will continue to limit county jail intake to 50 county jail inmates total per week from these same four counties through July 3, 2020. The parties discussed intake at the meet and confer on June 16, 2020 and with CCHCS on the June 17, 2020 informational call.

---

[4] Should any of these four counties be unable to fulfill their quota, two other counties – Orange County and Kern County – may send people to complete the quota.

-14- Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16632948.3

cleaning, and other measures are appropriately implemented to ensure the health and wellbeing of both inmates and staff at each institution. However, a one-size-fits-all approach to cleaning schedules and physical distancing is not appropriate for every housing unit at every institution. Each housing unit is different and therefore, it is best left to the discretion of the wardens to determine how to implement CDCR directives pertaining to cleaning and physical distancing.

Director Gipson is also in the process of working with the wardens at each institution to encourage them to implement incentives for inmates who comply with cohorting principles and mask-wearing directives. Wardens have been very receptive to this directive and are in the process of meeting with Inmate Advisory Committees and health care staff to brainstorm potential incentives and are also in the process of considering suggested incentives provided by Plaintiffs' counsel.

DATED: June 18, 2020                    HANSON BRIDGETT LLP


                                        By:    */s/ Samantha Wolff*
                                            PAUL B. MELLO
                                            SAMANTHA D. WOLFF
                                            KAYLEN KADOTANI
                                            Attorneys for Defendants


DATED: June 18, 2020                    XAVIER BECERRA
                                        Attorney General of California


                                        By: */s/ Damon McClain*
                                            DAMON MCCLAIN
                                            Supervising Deputy Attorney General
                                            NASSTARAN RUHPARWAR
                                            Deputy Attorney General
                                            Attorneys for Defendants

| | | |
|---|---|---|
| 1 | DATED: June 18, 2020 | PRISON LAW OFFICE |
| 2 | | |
| 3 | | By: /s/ Alison Hardy |
| 4 | | ALISON HARDY<br>Attorney for Plaintiffs |

# Exhibit A

**California Department of Corrections and Rehabilitation
COVID-19 Staff Testing Guidance**

The following applies to all California Department of Corrections and Rehabilitation (CDCR) institutions, except for the California Medical Facility (CMF), Central California Women's Facility (CCWF), and California Health Care Facility (CHCF), identified by the Receiver, which provide skilled nursing level of care. These three institutions should follow the Skilled Nursing Facility (SNF) [testing guidance](#) issued by the California Department of Public Health (CDPH).

Testing does not replace or preclude other infection prevention and control interventions, including monitoring all staff and inmates for signs and symptoms of COVID-19, universal masking by staff and inmates for source control, use of recommended personal protective equipment, maintaining appropriate physical distancing, and environmental cleaning and disinfection. When testing is performed, a negative test only indicates an individual did not have detectable infection at the time of testing; individuals might have SARS-CoV-2 infection that is still in the incubation period or could have ongoing or future exposures that lead to infection.

### Institutions without COVID-19 Cases

In institutions that currently do not have any newly diagnosed COVID-19 cases among inmates or staff within the last 14 days, CDPH recommends surveillance testing. The purpose of a surveillance testing strategy is to monitor the spread of the virus in order to isolate the virus and mitigate outbreaks.

CDPH recommends the institution implement surveillance testing of 10 percent of all staff every 14 days including staff from multiple shifts and various locations within the institution. The institution must ensure that a different cohort of staff are tested every 14 days.

In addition, specific testing is recommended for the following groups:

1) All employees who have not had a prior confirmed case of COVID-19 and who are regularly assigned to work in a Correctional Treatment Center, Outpatient Housing Unit, hospice, Psychiatric Inpatient Program, or Mental Health Crisis Bed shall be tested per the SNF testing guidance issued by CDPH.
2) All regularly assigned transportation staff who have not had a prior confirmed case of COVID-19 shall be tested at least once every month, with testing occurring throughout the month.

3) All staff who are regularly assigned to guarding duty at a community hospital, or equivalent, who have not had a prior confirmed case of COVID-19 shall be tested at least once every month, with testing occurring throughout the month.

4.) All regularly assigned culinary area staff who have not had a prior confirmed case of COVID 19 shall be tested once every month with testing occurring throughout the month.

**NOTE:** State may adjust the scope and frequency of staff testing based on community spread data and prevalence of the virus in the community.

*Staff who test negative:*

All staff should be screened for fever, respiratory symptoms, or [other symptoms](#) before entering any institution each day. To the extent possible, the institution should educate staff regarding the possible exposure of staff movement between multiple yards or buildings. Additionally, staff who are ill should stay home and notify their supervisor. Personnel who develop fever, respiratory symptoms, or [other symptoms](#) should be instructed not to report to work.

*Staff who test positive:*

Staff who test positive for COVID-19 and who have had NO symptoms shall be instructed to isolate themselves at home and shall not return to work until the following condition is met:

- At least 10 days have passed since the date of the positive COVID-19 diagnostic (federally approved Emergency Use Authorized molecular assay) test.

Staff who test positive for COVID-19, initially have no symptoms, but then develop symptoms during their 10-day home isolation period may return to work once the following conditions are met:

- At least 10 days have passed since symptoms first appeared; **AND**
- At least 3 days (72 hours) have passed since recovery, defined as resolution of fever without the use of fever-reducing medications; **AND**
- Improvement in respiratory symptoms[1] (e.g., cough and shortness of breath)

---

[1] It is possible that individuals may still have residual respiratory symptoms despite meeting the criteria to discontinue isolation. These individuals should continue to wear a facemask/cloth face covering when within 6 feet of others until symptoms are completely resolved or at baseline.

Staff should be provided information about how to appropriately isolate within their home. This includes the following recommendations:

**Setup**:

- A separate bedroom. If a bedroom must be shared with someone who is sick, consider advising the following:
    - Make sure the room has good air flow by opening the window and turning on a fan to bring in and circulate fresh air if possible.
    - Maintain at least 6 feet between beds if possible.
    - Sleep head to toe.
    - Put a curtain around or place other physical divider (e.g., shower curtain, room screen divider, large cardboard poster board, quilt, or large bedspread) to separate the ill person's bed.
- A separate bathroom **or** one that can be [disinfected](#) after use.

**Equipment:**

- A facemask (or if unavailable, a cloth face covering) should be worn by the infected person if there are others in the household or when healthcare or home care workers enter the house.
- Gloves for any caregivers when touching or in contact with the person's infectious secretions.
- Appropriate [cleaning](#) supplies for disinfecting the household.
- A thermometer for tracking occurrence and resolution of fever.

**Services:**

- Clinical care and clinical advice by telephone or telehealth.
- Plan for transportation for care if needed.
- Food, medications, laundry, and garbage removal.

**When and how to seek care:**

- If new symptoms develop or their symptoms worsen.
- If the infected person is going to a medical office, emergency room, or urgent care center, the facility should be notified ahead of time that the person has COVID-19; the person should wear a facemask (or if unavailable, a cloth face covering) for the clinical visit.
- Any one of the following emergency warning signs signal a need to call 911 and get medical attention immediately:
    - Trouble breathing
    - Bluish lips or face

- Persistent pain or pressure in the chest
- New confusion or inability to arouse
- New numbness or tingling in the extremities

**Institutions with COVID-19 Cases**

As soon as possible after one (or more) COVID-19 positive individual(s) (inmate or staff) is identified in an institution, serial retesting of all staff should be performed every 14 days until no new cases are identified in two sequential rounds of testing. The institution may then resume their regular surveillance testing schedule as outlined above.

For institutions which are organized by yard, initial testing can be limited to the yard where the positive inmate is housed or staff is assigned. If there are multiple yards at an institution, and the those who have tested positive are clustered in one yard, serial testing should only occur among staff in that yard. It is not necessary to test staff across multiple yards as long as staff are not moving among buildings to provide services.

If there are positive cases across multiple yards at any given institution, all staff across all yards should be tested every 14 days until no new cases are identified in two sequential rounds of testing. The institution may then resume their regular surveillance testing schedule as outlined above.

Staff who are pending a COVID test result and are asymptomatic can continue to work while wearing face coverings and utilizing appropriate PPE. All staff should be screened for fever, respiratory symptoms, or other COVID related <u>other symptoms</u> each time they enter any Institution.

*Staff who test negative:*

Staff who test negative and are asymptomatic can continue to work while wearing face coverings and utilizing appropriate PPE. All staff should be screened for fever, respiratory symptoms, or other COVID related [other symptoms](#) each time they enter any Institution. To the extent possible, the institution should limit staff movement among multiple yards to limit exposure. Additionally, staff who are sick should stay home. Personnel who develop fever, respiratory symptoms, or [other symptoms](#) should be instructed not to report to work and notify their supervisor.

*Staff who test positive:*

Staff who test positive for COVID-19 and who have had NO symptoms shall follow the instructions outlined above.

**Retesting of a Previously Confirmed Positive Employee**
An employee who has been confirmed positive by a diagnostic COVID-19 test shall not retest through either institutional surveillance, outbreak, or specialty assignment.

**Testing of New Employees and Employees Returning from a Leave of Absence**
All new employees of the institution or employees returning from a leave of absence (whether industrial or non-industrial) shall be tested for COVID-19. Testing should occur 48 hours prior to the start of or return to work date, unless documentation of prior positive diagnostic COVID-19 test is provided.

**General Definitions:**
1. Staff- for the purpose of this policy, any individual whose work assignment is to a particular institutional facility, including but not limited to, CDCR and California Correctional Health Care Services staff, registry, contract, Division Adult Parole Operations, Prison Industry Authority and Board of Parole Staff who interact with inmates.
2. New Employee- an employee who has not previously been assigned to a particular institution/worksite.
3. Leave of Absence- for the purposes of this policy is any employee who has not worked a shift within a consecutive 14 calendar day period. Vacations apply.

The California Department of Human Resources (CalHR) administrative time off (ATO) guidelines will be evaluated and applied. In unique situations, CDCR of CCHCS Human Resources designees will consult with CalHR.

**This policy is subject to change as CDC guidelines, PPE availability and testing options change.**

# Exhibit B

Case 2:00-cv-06325-JDS Document 1325-2 Filed 06/08/20 Page 15 of 219

**From:** Cullen, Vincent@CDCR
**Sent:** Friday, June 5, 2020 2:03 PM
**To:** CDCR CCHCS CEOs <CDCRCCHCSCEOs@cdcr.ca.gov>
**Cc:** Tharratt, Steven@CDCR <Steven.Tharratt@cdcr.ca.gov>; 'Bick, Joseph (CMF)@CDCR (Joseph.Bick@cdcr.ca.gov)' <Joseph.Bick@cdcr.ca.gov>; Rosenberg, Morton@CDCR <Morton.Rosenberg@cdcr.ca.gov>; Barney-Knox, Barbara@CDCR <Barbara.Barney-Knox@cdcr.ca.gov>; Podratz, Christopher@CDCR <Christopher.Podratz@cdcr.ca.gov>; Herrick, Robert@CDCR <Robert.Herrick@cdcr.ca.gov>; Brockenborough, Rainbow@CDCR <Rainbow.Brockenborough@cdcr.ca.gov>; McElroy, Donald@CDCR <Donald.McElroy@cdcr.ca.gov>; Halverson, Dennis@CDCR <Dennis.Halverson@cdcr.ca.gov>; Moss, Joseph@CDCR <Joseph.Moss@cdcr.ca.gov>; Callahan, Charles@CDCR <Charles.Callahan@cdcr.ca.gov>; Seibel, Kim@CDCR; Gipson, Connie@CDCR <Connie.Gipson@cdcr.ca.gov>
**Subject:** Testing and Movement Strategy

CEO's,
We need to make a slight change to our testing and transfer strategy regarding the timing of tests. In consultation with Dr. Tharratt, it has been determined that a patient should not transfer if the date of their NEGATIVE test is past 7 days on the date of transfer. This means 7 days from the date the test was administered. This will require many of the inmates scheduled to transfer next week to be retested.

CCHCS will work with CDCR to identify a process to inform CEO's the specific date a patient will transfer so the ideal test date can be determined based on the individual institution's testing response times and inmates will only need to be tested once.

If you have any questions or concerns, please let me know.

<image004.png>  **vincent s. cullen**
**DIRECTOR**
**Corrections Services**
**California Correctional Health Care Services**
**(916) 691-2887 office**
Vincent.Cullen@cdcr.ca.gov

# Exhibit C

Case 2:01-cv-06825-JDST Document 1325-3 Filed 06/08/20 Page 17 of 19

 

# MEMORANDUM

| | |
|---|---|
| **Date:** | June 11, 2020 |
| **To:** | California Department of Corrections and Rehabilitation (CDCR) - All Staff<br>California Correctional Health Care Services (CCHCS) - All Staff |
| **From:** | Ralph M. Diaz<br>Secretary<br>CDCR / J. Clark Kelso<br>Receiver<br>CCHCS |
| **Subject:** | UPDATE TO THE MARCH 13, 2020 MEMORANDUM MESSAGE TO EMPLOYEES REGARDING COVID-19 |

We hope that you and your families are staying healthy. As COVID-19 guidance continues to evolve, we remain dedicated to the safety, health, and well-being of staff and the inmate population. While stay at home orders are beginning to lift and local businesses are reopening, please remember there are still very important safety guidelines that should be followed both at work and as individuals residing in our communities.

Reminders:

At Work
- Adhere to cleaning and disinfection protocols for example, clean your face coverings and any other equipment such as computers, phones, copiers, and state issued equipment kept on your person or assigned work vehicle.
- Physically distance at all times possible.
- Staff working or performing duties on institutional grounds shall wear cloth or other approved face barrier coverings at all times with the exception of an outdoor setting where 6 feet physical distancing can be accomplished. Please note, this is a slight modification from the April 16, 2020 CalPIA Cloth Face Mask Barrier memorandum. If alone in an office space or tower a mask is not required. If someone enters the space, masks are required. Failure to do so may result in progressive discipline.
- As a reminder, maintaining physical distancing requirements when moving about the institution for routine tasks is still recommended.
- Additionally, staff working in headquarters offices, regional offices, or institution administrative offices shall be required to wear cloth face coverings when in close proximity of others where 6 feet physical distancing cannot be achieved.
- Wear proper PPE according to guidance provided on the memorandum authored by Heidi M. Bauer, MD MS MPH and Diana O'Laughlin, FNP-BC, DNP on April 6th, 2020 COVID-19 Personal Protective Equipment (PPE) Guidance and Information.

CDCR Employees Statewide
CCHCS Employees
Page 2

- Wash your hands frequently.
- Answer the daily screening questions with any new symptoms that you may be experiencing or if you feel sick during your work shift, or have COVID symptoms, report to your supervisor and go home.

Common occurrences that should <u>not</u> happen:

- Handshakes, fist bumps, and hugging.
- Potlucks.
- Gathering in a breakroom, or small space for breaks or lunches, even for small amount of time.

At Home

- Change out of your work clothes before or when you get home. Launder frequently with normal detergent. No extra laundering or special handling is needed.
- At the beginning of the day and when you get home, disinfect items that are frequently touched by yourself or others. Such items could include cellphones and cellphone cases, utility belts, door handles, and keyboards. Regular household disinfectants are effective.
- Disinfecting surfaces and items and cleaning your hands will reduce transmission.
- Cover your mouth and nose when sneezing, cough into your sleeve, and wash your hands if you accidentally soiled them with respiratory secretions.

Each day, our gratitude goes out to each of you during this challenging time and encourage staff and their families to continue their efforts at work and home to control the spread of COVID-19. Working together, we will get through this.