EXHIBIT L



**Roy W. Wesley**, *Inspector General*

**Bryan B. Beyer**, *Chief Deputy Inspector General*

# OIG | OFFICE *of the* INSPECTOR GENERAL

Independent Prison Oversight

February 2021



## COVID-19 REVIEW SERIES

### *Part Three*

California Correctional Health Care Services and
the California Department of Corrections
and Rehabilitation Caused a Public Health
Disaster at San Quentin State Prison When They
Transferred Medically Vulnerable Incarcerated Persons
From the California Institution for Men
Without Taking Proper Safeguards

Electronic copies of reports published by the Office of the Inspector General
are available free in portable document format (PDF) on our website.
We also offer an online subscription service.
For information on how to subscribe,
visit **www.oig.ca.gov**.

For questions concerning the contents of this report,
please contact Shaun Spillane, Public Information Officer,
at 916-255-1131.

STATE *of* CALIFORNIA

# OIG | OFFICE *of the* INSPECTOR GENERAL

*Roy W. Wesley, Inspector General*
*Bryan B. Beyer, Chief Deputy Inspector General*

Independent Prison Oversight

*Regional Offices*

*Sacramento*
*Bakersfield*
*Rancho Cucamonga*

February 1, 2021

Anthony Rendon
Speaker of the Assembly
State Capitol
Sacramento, California

Dear Mr. Speaker:

Enclosed is the Office of the Inspector General's (the OIG) report titled *COVID-19 Review Series, Part Three: California Correctional Health Care Services and the California Department of Corrections and Rehabilitation Caused a Public Health Disaster at San Quentin State Prison When They Transferred Medically Vulnerable Incarcerated Persons From the California Institution for Men Without Taking Proper Safeguards*. In April 2020, you requested the OIG to assess the policies, guidance, and directives the California Department of Corrections and Rehabilitation (the department) had implemented since February 1, 2020, in response to the novel coronavirus disease (COVID-19). *Part One* of our COVID-19 review series focused on the department's efforts to screen prison staff and visitors for signs and symptoms of COVID-19. *Part Two* addressed the distribution and use of personal protective equipment, along with the department's implementation of physical distancing. In this report, we focused on the department's decision to transfer medically vulnerable incarcerated persons from the California Institution for Men to California State Prison, Corcoran (Corcoran), and San Quentin State Prison (San Quentin).

The California Institution for Men was one of the department's first prisons to experience an outbreak of COVID-19. Among the prison's population were many incarcerated persons with various medical conditions, which made them vulnerable to severe morbidity and mortality from COVID-19 disease. Between May 28, and May 30, 2020, in an effort to protect them from the virus, California Correctional Health Care Services (CCHCS) and departmental management transferred 189 incarcerated persons to Corcoran and San Quentin.

Our review found that the efforts by CCHCS and the department to prepare for and execute the transfers were deeply flawed and risked the health and lives of thousands of incarcerated persons and staff. Insistence by CCHCS and the department to execute the transfers and subsequent pressure to meet a tight deadline resulted in the California Institution for Men ignoring concerns from health care staff and transferring the medically vulnerable incarcerated persons, even though the vast majority had not been recently tested for COVID-19. With outdated test results, the prison had no way to know whether any of the incarcerated persons were currently infected with the virus. According to email conversations that we reviewed, a California Institution for Men health care executive explicitly ordered that the incarcerated persons not be retested the day before the transfers began, and multiple CCHCS and departmental executives were aware of the outdated nature of the tests before the transfers occurred.

In addition to the department transferring the medically vulnerable incarcerated persons despite outdated tests, prison health care staff conducted verbal and temperature screenings on multiple transferring incarcerated persons too early to determine whether they had symptoms of COVID-19 when they boarded the buses. As a result, some of the incarcerated persons may have been experiencing symptoms consistent with COVID-19 when

*Gavin Newsom, Governor*



Speaker of the Assembly
February 1, 2021
COVID-19 REVIEW SERIES
*Part Three: California Correctional Health Care Services and the California Department of Corrections and Rehabilitation Caused a Public Health Disaster at San Quentin State Prison When They Transferred Medically Vulnerable Incarcerated Persons From the California Institution for Men Without Taking Proper Safeguards*
Page 2

they left the prison. The risk of placing some symptomatic incarcerated persons on the buses was exacerbated by another inexplicable decision approved by CCHCS executives to increase the number of incarcerated persons on some of the buses, thus decreasing the physical distance between them, and increasing the risk that the virus could spread among the incarcerated persons and staff on the buses.

Once the incarcerated persons arrived at San Quentin, nursing staff immediately noted that two of the incarcerated persons arrived with symptoms consistent with COVID-19. Nonetheless, the prison housed almost all of the incarcerated persons who arrived from the California Institution for Men in a housing unit without solid doors, allowing air to flow in and out of the cells. By the time the prison tested the incarcerated persons for COVID-19, many of those who tested positive had been housed in the unit for at least six days. The virus then spread quickly through the housing unit and to multiple areas throughout the prison. The prison's inability to properly quarantine and isolate incarcerated persons exposed to or infected with COVID-19, along with its practice of allowing staff to work throughout the prison during shifts or on different days, likely caused the virus to spread to multiple areas of the prison. According to data the department provided to support its COVID-19 population tracker, by the end of August 2020, 2,237 incarcerated persons and 277 staff members became infected with the virus. In addition, 28 incarcerated persons and one staff member died as a result of complications from COVID-19. In contrast, Corcoran, likely because it is a much newer prison consisting mostly of cells with solid doors, experienced a much smaller outbreak. An animated graphic displaying the progression of the COVID-19 outbreaks coursing through the various housing units at San Quentin and Corcoran after the transfers had been effected can be viewed on our website at **www.oig.ca.gov**.

Our review also found that when staff became aware of the positive test results shortly after the incarcerated persons arrived, both prisons failed to properly conduct contact tracing investigations. According to San Quentin, there were too many positive cases over a short period of time to conduct contact tracing. In addition, Corcoran staff failed to identify any contacts other than those living in cells adjacent to those of the incarcerated persons who tested positive. By failing to thoroughly conduct contact tracing, the prisons may have failed to alert some close contacts of the infected individuals, increasing the risk of further spread of the virus.

Since the transfers, CCHCS and the department have taken multiple actions to better safeguard incarcerated persons transferring between prisons, including implementing procedures requiring prisons to conduct COVID-19 testing of transferring incarcerated persons no more than five days before the transfer, followed by a *rapid test* on the day of the scheduled transfer. We did not review the adequacy of the additional steps taken by CCHCS and the department, but if consistently carried out, they should help prevent future disasters such as the one detailed in this report. Nonetheless, on December 31, 2020, the department reported 8,507 active cases of COVID-19 among its incarcerated population and 4,333 active cases among its staff. In addition, tragically, the department reported COVID-19-related deaths of 130 incarcerated persons and 11 staff members. Therefore, CCHCS' and the department's arduous task of containing the virus within its prisons remains unfinished.

Respectfully submitted,

Roy W. Wesley
Inspector General

Case 5:20-cv-06326-EJD   Document 17-26   Filed 01/06/22   Page 6 of 70
CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020   |   iii

Return to Contents

# Contents

Illustrations                                                                                  iv

Summary                                                                                  1

Introduction                                                                              7

  Background                                                                              7

  Scope and Methodology                                                                 16

Review Results                                                                          19

  Pressured by California Correctional Health Care Services'
  Executives, the California Institution for Men Inadequately
  Screened 189 Incarcerated Persons Before Transferring Them
  to San Quentin State Prison and California State Prison, Corcoran    19

  The Department Transferred Incarcerated Persons on
  Buses Without Allowing for the Proper Amount of Physical
  Distance Between Incarcerated Persons                                              38

  San Quentin State Prison Was Not Equipped to Properly
  Quarantine or Isolate Incarcerated Persons With Suspected
  and Confirmed Cases of COVID-19, and the Prison Failed to
  Take Actions That Could Have Mitigated the Resulting
  Widespread Outbreak                                                                 41

  After Confirming Cases of COVID-19, Both San Quentin State
  Prison and California State Prison, Corcoran, Failed to Properly
  Conduct Contact-Tracing Investigations, Risking Further
  Spread of COVID-19                                                                  54

Response to the OIG's Report                                                          57

The OIG's Comments Concerning the Response Received
From California Correctional Health Care Services and
the California Department of Corrections and Rehabilitation          59

Return to Contents

# Illustrations

## Figures

1. Cumulative Cases of COVID-19 Among the California Institution for Men's Incarcerated Population From March 27, 2020, Through May 27, 2020 — 8

2. Time Line of COVID-19 Testing of Incarcerated Persons Transferred From the California Institution for Men on May 28, 29, and 30, 2020 — 28

3. The Department's Process for Screening Incarcerated Persons for Signs and Symptoms of COVID-19 Before Transferring to Another Prison — 33

4. Duration of Time Between When California Institution for Men Health Care Staff Screened Transferring Incarcerated Persons for COVID-19 Signs and Symptoms and When the Incarcerated Persons Departed the Prison — 37

5. Spread of COVID-19 Among Incarcerated Persons Housed in San Quentin's South Block Facility's Badger Housing Unit After the Incarcerated Persons Arrived from the California Institution for Men — 47

6. Cumulative Cases of COVID-19 Among San Quentin's Incarcerated Population and Staff From May 31, 2020, Through August 31, 2020 — 53

## Tables

1. San Quentin Housed Multiple Incarcerated Persons With COVID-19 in Its South Block Facility's Badger Housing Unit for Multiple Days — 46

## Photographs

1. Prison Cell Door: Adjustment Center, San Quentin State Prison — 43

2. Hallway, Adjustment Center, San Quentin State Prison — 44

3. Prison Cell Door: Badger Housing Unit, San Quentin State Prison — 45

4. Prison Section Entryway; Solid Prison Cell Doors, California State Prison, Corcoran — 49

5. Solid Prison Cell Door: California State Prison, Corcoran — 50

## Graphics

The OIG Mandate — v

California Department of Corrections and Rehabilitation Institutions and Parole Regions — vi

Iconography, page 33: flaticon.com

Coronavirus image, cover and throughout, courtesy of the U.S. Centers for Disease Control and Prevention: Image Library

CDCR 8 and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020   |   v

Return to Contents

Whamen requested by the Governor, the
Senate Committee on Rules, or the Speaker
of the Assembly, the Inspector General shall
initiate an audit or review of policies, practices,
and procedures of the department. . . . Following a
completed audit or review, the Inspector General
may perform a followup audit or review to determine
what measures the department implemented to
address the Inspector General's findings and to
assess the effectiveness of those measures.

Upon completion of an audit or review . . . ,
the Inspector General shall prepare a complete
written report, which may be . . . disclosed in
confidence . . . to the Department of Corrections and
Rehabilitation and to the requesting entity.

The Inspector General shall also prepare a public
report. . . . Copies of public reports shall be
posted on the Office of the Inspector General's
internet website.

The Inspector General shall . . . during the course
of an audit or review, identify areas of full and
partial compliance, or noncompliance, with
departmental policies and procedures, specify
deficiencies in the completion and documentation
of processes, and recommend corrective
actions . . . including, but not limited to, additional
training, additional policies, or changes in
policy . . . as well as any other findings or
recommendations that the Inspector General
deems appropriate.

*— State of California*
*Excerpted from*
*Penal Code section 6126 (b), (c), and (d)*



Map provided courtesy of the California Department of Corrections and Rehabilitation.

Case 5:20-cv-06326-EJD   Document 17-26   Filed 01/06/22   Page 10 of 70

CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020   |   1

# Summary

On April 17, 2020, the Speaker of the California Assembly asked the Office of the Inspector General (the OIG) to assess the policies, guidance, and directives the California Department of Corrections and Rehabilitation (the department) had implemented since February 1, 2020, in response to the novel coronavirus disease (COVID-19).[1] In the request, the Speaker identified the following areas of concern: the department's screening process of all individuals entering a prison or facility in which incarcerated persons are housed or are present; its distribution of personal protective equipment (PPE) to departmental employees and incarcerated persons and the efficacy of PPE use; and the treatment of incarcerated persons who were suspected to have contracted or been exposed to COVID-19, including a time line of the outbreak.

In response to the Speaker's request, the OIG launched a series of reports on COVID-19. Specifically, we have addressed the spread of the disease throughout the State's prison system and the department's response to the pandemic in the prison system. The first report, *Part One*, addressed the screening of individuals entering prisons, and the second, *Part Two*, addressed the distribution and use of PPE, along with the department's implementation of physical distancing.[2] In this report, *Part Three*, our final one of the series, we address the remaining requests in the context of the department's decision to transfer 189 medically vulnerable incarcerated persons from the California Institution for Men to the California State Prison, Corcoran (Corcoran), and San Quentin State Prison (San Quentin).

The California Institution for Men, located in Chino, California, was one of the department's first prisons to experience an outbreak of COVID-19. According to the department's public COVID-19 tracker, the prison, which housed approximately 3,300 incarcerated persons, reported 654 cumulative COVID-19 cases as of May 27, 2020, the day before the department began transferring incarcerated persons from the prison. Among the prison's population were many incarcerated persons with various medical conditions, such as diabetes and hypertension, which made them vulnerable to severe morbidity and mortality were they to contract COVID-19 disease. The prevalence of the prison's confirmed COVID-19 cases, along with the prison's limited capacity to quarantine and isolate medically vulnerable patients from potential exposure to the virus prompted California Correctional Health Care Services (CCHCS) and departmental management to explore transferring many of the medically vulnerable incarcerated persons to other prisons within the State that were not experiencing outbreaks at that point in time. In an attempt to better protect the health of the medically vulnerable

---

1.  More information on COVID-19 can be found on the CDC's website (**http://www.cdc.gov/coronavirus/2019-ncov/index.html**).

2.  More information on the OIG's prior reports can be found on the OIG's website (**https://www.oig.ca.gov/publications/**).

incarcerated persons, the department transferred 67 incarcerated persons to Corcoran on May 28, and May 29, 2020, and 122 incarcerated persons to San Quentin on May 30, 2020.

Our review found that the efforts by CCHCS and the department to prepare for and execute the transfers were deeply flawed and risked the health and lives of the medically vulnerable incarcerated persons the entities transferred in their effort to protect them, as well as the thousands of other incarcerated persons and staff at Corcoran and San Quentin. In an effort to remove the medically vulnerable incarcerated persons from the prison's COVID-19 outbreak, CCHCS and departmental executives locked themselves into a tight deadline for beginning the transfers by the end of May 2020. The tight deadline and the resultant pressure from executives to meet the deadline created apprehension among staff, causing some prison staff members to question the safety of the transfers. For example, on May 28, 2020, two days before the California Institution for Men transferred 122 medically vulnerable incarcerated persons to San Quentin, a California Institution for Men supervising nurse emailed a prison nurse executive, asking the nurse executive to "put something in writing to our chain of command about the last-minute transfers at CIM [California Institution for Men] yesterday." In addition, the supervising nurse noted the pressure "to fill the seats" on the buses, questioning, "What about Patient [*sic*] safety? What about COVID precautions?" Nonetheless, executives and managers from CCHCS and the department's headquarters pressured the prison to carry out the transfers by the end of the month as planned.

This insistence on completing the transfers and the subsequent pressure to begin the transfers by the end of May 2020 resulted in the California Institution for Men ignoring concerns from health care staff and transferring the medically vulnerable incarcerated persons, even though the vast majority had not been recently tested for COVID-19. According to the incarcerated persons' electronic health records, despite direction from a CCHCS director to conduct COVID-19 testing on the incarcerated persons within four to six days of the transfers, the prison tested only three of the 189 incarcerated persons who were transferred to Corcoran and San Quentin within two weeks of the transfers. With such outdated test results, the prison had no way of knowing whether any of the incarcerated persons were currently infected with the virus. The decision to transfer the medically vulnerable incarcerated persons despite such outdated test results was not simply an oversight, but a conscious decision made by prison and CCHCS executives. Shortly before the transfers, a California Institution for Men supervising nurse sent an email to a California Institution for Men medical executive alerting the executive that some of the transferring incarcerated persons had not been tested for COVID-19 since May 1. The nurse asked, "Is there a re-swabbing criteria to be met before transfer?" The California Institution for Men medical executive responded with the following email just 11 minutes later:

Case 5:20-cv-06326-EJD   Document 17-26   Filed 01/06/22   Page 12 of 70

CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020   |   3

From:               California Institution for Men Medical Executive
Sent:               Wednesday, May 27, 2020 8:23 PM
To:                 California Institution for Men Supervising Nurse
Cc:                 California Institution for Men Physician and Nurse Executive
Subject:            Re: DLT CIM HRM Transfers Out

No reswabing.

California Institution for Men Medical Executive
[Official Title]
CIM


On May 27, 2020, at 8:12 PM,   California Institution for Men Supervising Nurse   wrote:


Good Evening  Medical Executive  and  Physician  Some of the test dates are at the beginning of May 1st week. Does the test dates matter for tomorrow's transfer? Is there a re-swabbing criteria to be met before transfer?

Not only did the prison fail to test the transferring incarcerated persons within the appropriate window of time to ensure they were not infected with COVID-19 on the day they would be transferred, but prison health care staff conducted verbal and temperature screenings on multiple incarcerated persons too early to determine whether they had symptoms of COVID-19 when they boarded the buses to Corcoran and San Quentin. Prison health care staff screened 55 of the incarcerated persons they transferred more than six hours before the incarcerated persons boarded the buses. Vague directives issued jointly by CCHCS and the department may have contributed to the early screenings. Although the directives issued at the time required nursing staff to screen incarcerated persons for symptoms of COVID-19 before such persons were transferred, the procedures did not specify how close to the time of the actual transfer that nursing staff should complete these screenings. As a result, some of the incarcerated persons may have been experiencing symptoms consistent with COVID-19 when they left the prison. In fact, some incarcerated persons we interviewed who were included in the transfers stated that some individuals displayed symptoms while on the hours-long bus rides to San Quentin.

The risk of placing some symptomatic incarcerated persons on the buses was exacerbated by another inexplicable decision made by CCHCS executives. In an effort to transfer more of the incarcerated persons from the California Institution for Men, CCHCS executives authorized the prison and the department to disregard a previous directive limiting the number of incarcerated persons who could be placed on each bus. To increase the physical distance between incarcerated persons and mitigate

the spread of COVID-19, the department's directives at the time of the transfers instructed prisons and transportation staff to place only 19 incarcerated persons on each bus, half of the buses' typical capacity of 38 incarcerated persons. For the first day of transfers to Corcoran, the department adhered to the directive and achieved a limited bus capacity. However, CCHCS executives approved transporting up to 25 incarcerated persons per bus for the May 29 transfers to Corcoran and the May 30 transfers to San Quentin:

**From:** CCHCS Medical Executive
**Sent:** Wednesday, May 27, 2020 1:20 PM
**To:** CCHCS Director
**Subject:** RE: 114 CIM inmates to COR 03B

Are the group all going to the same place? If so we would be ok with a larger group with face coverings. The benefit of a more rapid move in this specific situation appears to outweigh the risks

Initial

> **From:** CCHCS Director
> **Sent:** Wednesday, May 27, 2020 1:12 PM
> **To:** CCHCS Medical Executive
> **Subject:** FW: 114 CIM inmates to COR 03B
>
> First Name
> See below. If DAI can move of our CIM HR inmates in groups larger than 19 (those housed in the same dorm), would you be opposed to upping the number of patients on the buses, knowing they're negative and have been housed together?

Results from COVID-19 testing conducted by Corcoran and San Quentin shortly after the transfers clearly demonstrated the effects of the mismanaged screening and transfer process. Within two weeks of arriving at Corcoran, two of the 67 incarcerated persons tested positive for COVID-19. Moreover, 15 of the 122 incarcerated persons whom the department transferred to San Quentin tested positive for COVID-19 shortly after arrival to the prison. In addition, on June 15, 2020, a little more than two weeks after the department transferred the incarcerated persons to San Quentin, two of the department's staff members who transported the incarcerated persons reported testing positive for COVID-19. Although we cannot link their infections definitively to their duties, given the California Institution for Men's inadequate testing and screening before the transfers, and the close confines of the poorly ventilated buses, it is very likely that some of the incarcerated persons boarded the buses while infected with COVID-19, and that the virus spread among staff and incarcerated persons during the trips.

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 14 of 70

CGHS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020 | 5

Once the incarcerated persons arrived at San Quentin, nursing staff immediately noted two of the incarcerated persons had symptoms consistent with COVID-19, including one with a fever of 101.1 degrees F. The prison's health care staff promptly ordered COVID-19 tests for all 122 of the incoming incarcerated persons. However, even though the prison's health care staff suspected the arriving incarcerated persons may have been exposed to COVID-19, the prison housed 119 of the 122 incarcerated persons who arrived from the California Institution for Men in a housing unit without solid doors, which allowed air to flow in and out of the cells. By the time the COVID-19 test results were available, 14 incarcerated persons infected with COVID-19 had been housed in the unit for at least six days. Likely because the unit did not allow for the proper quarantining of those infected incarcerated persons, the virus spread quickly, both to the other incarcerated persons who transferred from the California Institution for Men, as well as to the 202 incarcerated persons already housed in the same unit. By August 6, 2020, more than half the incarcerated persons housed in the unit on May 31, 2020, tested positive for COVID-19. Of the 122 medically vulnerable incarcerated persons whom the department transferred from the California Institution for Men to San Quentin in an effort to protect them from the virus, 91 eventually tested positive for COVID-19, and two died from complications related to the virus.

Unfortunately, the outbreak at San Quentin was not limited to one housing unit. The prison's inability to properly quarantine and isolate incarcerated persons exposed to or infected with COVID-19, along with its practice of allowing staff to move throughout the prison during their working shifts or on different days, likely caused the virus to spread to multiple areas of the prison. According to data the department provided to support its COVID-19 population tracker, by the end of August 2020, 2,237 incarcerated persons and 277 staff members had become infected with the virus. In addition, 28 incarcerated persons and one staff member died as a result of complications from COVID-19.

In contrast to San Quentin, Corcoran is a newer prison with a design better suited for quarantining and isolating patients.[3] Because the prison's housing predominantly consists of cells with solid doors, Corcoran was able to place all of its arriving incarcerated persons in cells with solid doors. This likely significantly reduced the spread of the virus at the prison, as only two

> "By all accounts, the COVID-19 outbreak at San Quentin has been the worst epidemiological disaster in California correctional history."
>
> Source: California First District Court of Appeals ruling on October 20, 2020. *In re Von Staich* (2020) 56 Cal.App.5th 53, 57, review granted and cause transferred *sub nom. Staich* on H.C. (Cal., Dec. 23, 2020, No. S265173) 2020 WL 7647921.

---

3. According to the department's website, construction was completed on Corcoran in 1988. San Quentin was built in the mid-1800s and early 1900s.

Return to Contents

of the 67 incarcerated persons who were transferred from the California Institution for Men tested positive for the virus. While the virus was spreading at San Quentin, the department reported a much smaller outbreak was occurring at Corcoran. Between May 30, and July 31, 2020, the department reported that the largest number of active cases at Corcoran at any given time was 153 on June 17, 2020. An animated graphic displaying the progression of the COVID-19 outbreaks coursing through the various housing units at San Quentin and Corcoran after the transfers had been effected can be viewed on our website at **www.oig.ca.gov**.

Once staff at Corcoran and San Quentin received the positive COVID-19 test results for some of the arriving incarcerated persons, we found that both prisons failed to properly follow CCHCS' COVID-19 contact tracing policy. In response to our request for all contact tracing documentation related to the first positive COVID-19 results at San Quentin, the prison responded that there were too many positive cases over a short period of time to conduct contact tracing. Although Corcoran staff made some attempts to conduct contact tracing for the two incarcerated persons who tested positive shortly after their arrival to the prison, it failed to identify any contacts other than those living in cells adjacent to those of the incarcerated persons who tested positive. Proper contact tracing is a tool that can help slow the spread of infectious diseases, such as COVID-19. By failing to thoroughly conduct contact tracing, the prisons may have failed to alert some close contacts of the infected individuals, increasing the risk of further spread of the virus.

Since the transfers occurred, CCHCS and the department have taken multiple actions to better safeguard incarcerated persons transferring between prisons. For example, directives issued jointly by CCHCS and the department now require prisons to conduct COVID-19 testing five days prior to the transfer of the incarcerated person and, if the results of that person's test are negative, the prison is to use a *rapid test* to retest that person again on the day of the scheduled transfer. If the results of both tests are negative, the incarcerated person is eligible for transfer within one day of the rapid test. In addition, the department has required all prisons to submit documentation detailing plans to handle future outbreaks, including setting aside space to properly quarantine and isolate incarcerated persons exposed to and infected with COVID-19. We did not review the adequacy of the additional steps taken by CCHCS and the department, but if consistently carried out, they should help prevent future disasters such as the one detailed in this report. However, on December 31, 2020, the department reported 8,507 active cases of COVID-19 among its incarcerated population and 4,333 active cases among its staff. In addition, tragically, the department has reported 130 COVID-19-related deaths among the incarcerated population and 11 COVID-19 related deaths among its staff. Therefore, CCHCS' and the department's arduous task of containing the virus within its prisons remains unfinished.

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 16 of 70

CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020    |    7

Return to Contents

# Introduction

## Background

On April 17, 2020, the Speaker of the California Assembly requested that the Office of the Inspector General (the OIG) assess the policies, guidance, and directives the California Department of Corrections and Rehabilitation (the department) had implemented since February 1, 2020, in response to the novel coronavirus disease (COVID-19). Specifically, the Speaker requested we focus on three concerns pertaining to the department's response to the looming crisis, particularly as it related to the State's prison system:

1. Its screening process as applied to all individuals entering a prison or facility in which incarcerated persons are housed or are present,

2. The means by which it distributes PPE to departmental staff and incarcerated persons, and

3. How it treats incarcerated persons suspected of either having contracted or been exposed to COVID-19.

*Part One* of our COVID-19 review series focused on the Speaker's first concern listed above: the department's efforts to screen prison staff and visitors for signs and symptoms of COVID-19.

*Part Two* of the series focused on the Speaker's second concern: the department's efforts to distribute PPE to departmental staff and incarcerated persons, and both groups' adherence to physical distancing guidelines.

In this final report, *Part Three*, we address how the department treated incarcerated persons suspected of either having contracted or been exposed to COVID-19. We focused on the activities that devolved from the department's decision to transfer incarcerated persons identified as being medically vulnerable for complications were they to contract COVID-19. Specifically, we focused on the transfer of those high-risk persons from the California Institution for Men, located in Chino, California, to California State Prison, Corcoran (Corcoran) and San Quentin State Prison (San Quentin). To accomplish our objectives, we reviewed the process that CCHCS and the department used to screen and test those incarcerated persons for COVID-19 before their transfer between institutions and how the department executed the transfers. We reviewed the housing assignments of the incarcerated persons once they arrived at San Quentin and analyzed the time frames in which prisons conducted COVID-19 testing of those persons following their arrivals to their respective destinations. Finally, we addressed whether prison staff completed any follow-up contact tracing at San Quentin or Corcoran and, if so, how thoroughly they conducted the process.

### The COVID-19 Outbreak at the California Institution for Men That Led to the Transfer of Medically Vulnerable Incarcerated Persons to Two Other Prisons

The California Institution for Men was one of the department's first prisons to experience an outbreak of COVID-19. According to the department's COVID-19 tracker, the prison identified its first confirmed case of COVID-19 on March 27, 2020. Throughout April and May, more incarcerated persons tested positive for the virus at this prison. According to the department's data, the prison counted 92 active cases among its incarcerated population on April 30. Barely one month later, the number of active cases had climbed to 281 on May 27, the day before the department began transferring 189 incarcerated persons to Corcoran and San Quentin. As shown in Figure 1 below, between March 27, and May 27, 2020, the department reported 654 confirmed cases of COVID-19 at the Chino prison.

Figure 1. Cumulative Cases of COVID-19 Among Both the Incarcerated Population and Departmental Staff at the California Institution for Men From March 27, 2020, Through May 27, 2020



Note: **Confirmed Date** is the earliest collection date of a *positive* or *detected* COVID-19 test.

Source: Unaudited data provided by the California Department of Corrections and Rehabilitation to support its population and staff COVID-19 trackers.

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 18 of 70

Return to Contents

According to the department's website, the California Institution for Men was activated in 1941. As of December 2020, this prison encompassed four separate facilities housing incarcerated persons of various security levels. According to the department's population statistics, the California Institution for Men housed 3,303 incarcerated persons on May 27, 2020. Many of the prison's incarcerated persons live in congregate, dormitory-style housing units that have multiple beds arranged in rooms of varying sizes with little to no physical barriers between the beds. Moreover, these housing units offer no unoccupied space in which to isolate or quarantine incarcerated persons suspected or confirmed of having an infectious disease such as COVID-19.

Among the prison's incarcerated population were men at high risk for experiencing severe complications from contracting COVID-19, due to either disabilities, or because they suffered from chronic medical conditions or other risk factors. According to CCHCS' COVID-19 guidance, multiple factors are associated with persons at high risk for severe morbidity and mortality from COVID-19 disease; three of the most critical are being 65 years of age or older, or having either diabetes or hypertension.[4] The prevalence of the prison's confirmed COVID-19 cases, coupled with the prison's limited ability to quarantine and isolate medically vulnerable incarcerated persons from the virus, prompted the decision made by CCHCS and departmental management to explore the possibility of transferring a cohort of medically vulnerable persons to other prisons that, at that point in time, were not experiencing COVID-19 outbreaks.

> **High risk includes:**
>
> - Age > 65;
> - Uncontrolled diabetes, hypertension, cardiovascular disease, chronic lung disease or moderate to severe asthma;
> - Chronic kidney disease; liver disease/cirrhosis;
> - Cerebrovascular disease;
> - Cancer;
> - Immunosuppressed patients;
> - Pregnancy;
> - Patients with multiple chronic conditions.
>
> Source: *COVID-19 Interim Guidance for Health Care and Public Health Providers, Public Health Nursing Program, Version 2.0* (April 3, 2020).



### California Correctional Health Care Services and the California Department of Corrections and Rehabilitation: Roles and Responsibilities

The decision to transfer incarcerated persons between prisons was driven by a collaboration between executives from CCHCS and from the department. The coequal relationship between CCHCS and the department was established more than a decade ago as a consequence of the *Plata* v. *Newsom* litigation.[5] At the prison level, a warden manages all

---

4.  *COVID-19: Interim Guidance for Health Care and Public Health Providers*, California Correctional Health Care Services' internal publication created for its public health nursing program, version 2.0.

5.  *Plata/Coleman* v. *Newsom*, Case Nos. C01-1351 JST (N.D. Cal.) and 2:90-cv-0520 KJM DB (E.D. Cal.).

custody-related matters, and a chief executive officer (CEO) manages all health care-related matters. These institutional leaders report to a higher level of authority through separate command structures within their respective organizations; wardens ultimately report to the Secretary of the department, whereas CEOs ultimately report to the federal receiver through CCHCS.

Although day-to-day institutional operations require close coordination among staff who oversee all programs and services provided to the incarcerated population, this pair of coleaders maintains established standards distinguishing between their respective areas of responsibility, separating health care from custody. The CEO exercises sole province over concerns pertaining to health care while the warden responds to matters regarding custody. In the present environment of the COVID-19 pandemic, these otherwise bright lines have been increasingly blurred. Institutional safety and security are inextricably intertwined with the health of the incarcerated population and that of the department's staff. In fact, several policies we reviewed were signed by officials from both organizations.

### Public Health Organizations' Guidance Concerning the Treatment of Incarcerated Persons Suspected of Either Having Contracted or Been Exposed to COVID-19

Since the beginning of the COVID-19 pandemic, public health agencies have issued numerous and varied publications describing the COVID-19 virus and providing recommendations for controlling its spread. In its March 2020 publication titled *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* the United States Centers for Disease Control and Prevention (Centers for Disease Control) identified the enhanced risk to the prison environment.[6] According to the Centers for Disease Control, prisons face unique challenges for controlling the spread of disease during the COVID-19 pandemic as these institutions can include custody, housing, education, recreation, health care, food service, and workplace components in a single physical setting. The Centers for Disease Control identified multiple challenges prisons face related to COVID-19; these include the following:

1. Many opportunities for COVID-19 to be introduced into a correctional facility, including daily staff ingress and egress; transfer of incarcerated persons between facilities, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other members of the community.

2. Limited options for medical isolation.

---

6. See the Centers for Disease Control and Prevention's website for more information at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

Return to Contents

CDCR and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020  |  11

3.  Persons incarcerated or detained in a facility often come from a variety of locations, such as from other prisons or returning from court appearances or medical appointments outside the prison, increasing the potential to introduce COVID-19 into the prison setting.

The Centers for Disease Control outlines specific recommendations regarding screening, physical distancing, transferring, and isolating and quarantining of incarcerated persons in correctional settings. Specifically, the Centers for Disease Control recommends that correctional facilities perform screening and temperature checks for all new entrants before beginning the intake process, and implement physical distancing strategies (also known as social distancing), including increasing the spacing of bunks or reassigning bunks to provide more space between individuals. It also recommends that correctional facilities restrict transfers of incarcerated persons to and from other jurisdictions and facilities unless necessary for medical evaluation; medical isolation or quarantine; clinical care; or due to extenuating security concerns, or to prevent overcrowding. If a transfer is absolutely necessary, the Centers for Disease Control recommends completing verbal screening for COVID-19 symptoms (asking the person whether he or she has experienced fever, cough, shortness of breath within a specific span of time) and a temperature check before the incarcerated person leaves the facility. If an individual does not clear the screening process, the facility should delay the transfer and initiate the protocol for a suspected COVID-19 case. If the transfer must nonetheless occur, the Centers for Disease Control recommends ensuring that the receiving correctional facility has sufficient capacity to properly isolate the person upon arrival and, if possible, the facility should consider placing all new intakes in quarantine for 14 days before they enter the facility's general population.

The State of California has also issued recommendations for its prison system. Specifically, the California Department of Public Health recommends that all incarcerated persons entering a prison be screened for fever, cough, and shortness of breath, and receive a temperature check, as well as undergo a medical evaluation before being placed in any type of housing.



The Centers for Disease Control's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* as of March 23, 2020, provides the following guidance for housing multiple quarantined individuals:

In order of preference, multiple quarantined individuals should be housed:

- Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully.

- Separately, in single cells with solid walls but without solid doors.

- As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least six feet of personal space assigned to each individual in all directions.

- As a cohort, in a large, well-ventilated cell with solid walls and at least six feet of personal space assigned to each individual in all directions, but without a solid door.

- As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least six feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

- As a cohort, in multiperson cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least six feet of space between individuals housed in the same cell.

- As a cohort, in individuals' regularly assigned housing unit, but with no movement outside the unit (if an entire housing unit has been exposed). Employ social distancing strategies related to housing in the Prevention section above to maintain at least six feet of space between individuals.

- Safely transfer to another facility with capacity to quarantine in one of the above arrangements.

Note: Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.



Case 5:20-cv-06326-EJD   Document 17-26   Filed 01/06/22   Page 22 of 70

CDCR and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020   |   13

## California Correctional Health Care Services' COVID-19 Screening and Testing Process for Incarcerated Persons Before They Transfer to Another Prison

During the early stages of the pandemic, the department heeded many of these numerous public health recommendations in an effort to control the spread of COVID-19 within the prison system. Consistent with the Centers for Disease Control's recommendations, in March 2020, the department suspended all transfers of out-of-state parolees and incarcerated persons, and restricted nonessential transfers of incarcerated persons between the department's prisons. The department permitted transfers only in the following scenarios:

- removal from restricted housing units;

- transfers from reception centers;

- transfers to and from mental health crisis beds, conservation camps, male community reentry programs, custody-to-community transitional reentry programs, and alternative custody programs; and

- transfers from modified community correction facilities due to deactivation efforts.

The department also permitted transfers that were deemed necessary due to health care placement oversight program placement,[7] court appearances, and medical emergencies.

The department revised its directives as the pandemic situation unfolded within the system. Since March 2020, CCHCS and the department have issued a series of memoranda, several of which addressed expectations governing the movement of incarcerated persons and the treatment of those suspected of either having contracted or been exposed to COVID-19. They include the following:

1. On March 20, 2020, CCHCS and the department jointly issued guidance providing that immediately upon entry into the prison, all incarcerated persons should be screened for symptoms of influenza-like illness, including COVID-19. The directive specified that the screening include checking each person's temperature and asking him or her a series of questions to assess the health condition of each person. However, this memorandum does not address screening when an incarcerated person transfers to another prison.

---

7. The health care placement oversight program at CCHCS' headquarters is responsible for various population management functions, including the endorsement of patients to specialized health care housing in the event the prison does not have appropriate noncontract inpatient beds available.

2.  On April 10, and April 12, 2020, the federal receiver of CCHCS[8] recommended the department not authorize or undertake any further movement of incarcerated persons between prisons to achieve necessary physical distancing without the approval of CCHCS and the department's health care placement oversight program. The directive allowed for transfers between prisons if necessary for medical, mental health, or dental treatment needs not available at the transferring prison, or if safety and security issues could not be managed at the transferring prison.

3.  On May 22, 2020, CCHCS and the department jointly issued their memorandum titled "COVID-19 Pandemic—Road Map to Reopening Operations," which expanded its previous directive to screen incarcerated persons for COVID-19 upon entry into a prison to include offering COVID-19 testing to incarcerated persons transferring from one prison to another. However, the directive did not make testing mandatory, nor did it provide a clear time frame in which to complete the testing before the transfer occurred. Curiously, if the person refused to undergo a COVID-19 test, the person would nonetheless be transferred.[9] After arriving at the receiving prison, the incarcerated person would be placed on orientation status.[10] Except for an urgent or emergent health care situation, no incarcerated person would be transferred to another prison or camp before receiving his or her test results. The directive further provided that "in general, re-testing an individual is usually not be necessary [*sic*] if they have been tested in the previous 7 calendar days."

In the ensuing months, CCHCS and the department have continued issuing updated guidance addressing the process for transferring incarcerated persons between prisons. The department announced requirements effective June 10, 2020, directing that any incarcerated person scheduled to transfer to another prison be required to test negative for COVID-19 within seven days of transfer. If more than seven days had elapsed since the date of the test, the incarcerated person would need to be tested again before the transfer could take place.

---

8.  U.S. District Court Judge Thelton E. Henderson established the federal receivership as the result of a 2001 class-action lawsuit (*Plata* v. *Schwarzenegger,* 4:01-cv-01351-JST (N.D. Cal.)) against the State of California over the quality of medical care in the State's prisons. The receiver reports to the federal court regarding the delivery of medical care in the prison system.

9.  Although the memorandum does not specify the type of transportation to be used, the department provided additional documentation indicating the department would use separate transportation, such as a van, to transfer those incarcerated persons who refuse testing rather than place them on a bus with other incarcerated persons.

10.  *Orientation status* means the incarcerated person is placed in a single cell with minimal or no access to prison programs, such as an exercise yard, phones, the dayroom, work assignments, the dining hall, and similar programs, for 14 days. Incarcerated persons who refuse testing may be double-celled with other persons who refuse testing at the sending prison.

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 24 of 70

CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020    |    15

On August 19, 2020, and then again on January 12, 2021, CCHCS and the department issued updated requirements placing more stringent time lines on COVID-19 screening and testing before transferring incarcerated persons between prisons. As of January 12, 2021, the revised matrix required COVID-19 screening and testing five days prior to transfer, and if the incarcerated person has a negative COVID-19 test, the prison is to screen that person again and obtain a *rapid test* on the day of the scheduled transfer. If the screening does not identify any symptoms and test results are negative, the prison is to transfer that person within five days of the initial COVID-19 test and within one day of the rapid test. Also, the revised matrix required prisons to place incarcerated persons scheduled for transfer into quarantine status if they refuse testing or the receiving prison is unable to quarantine that person. Anyone who is symptomatic or tests positive during the pretransfer screening and testing process shall not be transferred, but is to be placed in isolation.

Return to Contents

## Scope and Methodology

On April 17, 2020, the Speaker of the Assembly requested that the OIG assess the department's response to the COVID-19 pandemic. Specifically, the Speaker asked that we focus on the policies, guidance, and directives the department had developed and implemented since February 1, 2020, in the following three areas:

1. Screening of all individuals entering a prison or facility where incarcerated persons are housed or are present.

2. Distribution of PPE to departmental staff and incarcerated persons.

3. Treatment of incarcerated persons who are suspected to have contracted COVID-19 or been exposed to COVID-19.

The Speaker requested that our review include, at a minimum, an assessment of the following:

1. The department's method of communication and implementation of its policies, guidance, and directives.

2. Measures the department instituted to ensure ongoing compliance with its policies, guidance, and directives.

3. The department's actions to rectify noncompliance.

4. A time line that quantifies the outbreak over time.

Our work for this review focused on the third area of the request, treatment of incarcerated persons who are suspected to either have contracted or been exposed to COVID-19. We limited our review to those persons whom the department transferred from the California Institution for Men to two other prisons on May 28, 29, and 30, 2020: Corcoran and San Quentin, the latter in which a catastrophic outbreak occurred. We reviewed the department's efforts to screen incarcerated persons for signs and symptoms of COVID-19 before transfer, and to test those incarcerated persons who were transferred. We also evaluated the department's and prisons' compliance with and effectiveness of related policies, guidance, and directives. We considered guidance that other governmental organizations issued, including the Centers for Disease Control and the California Department of Public Health. We also addressed where, specifically, in the prison setting the department housed those incarcerated persons at San Quentin and the time frame in which the prison conducted COVID-19 testing following the transfers. Finally, we addressed contact tracing efforts at both Corcoran and San Quentin.

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 26 of 70

CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020    |    17

We performed detailed reviews of pertinent records received from the California Institution for Men—the sending prison—and Corcoran and San Quentin—the two receiving prisons. The records we reviewed from the three prisons pertained to the transfer of 189 incarcerated persons between May 28, and May 30, 2020, and to the screening, testing, and rehousing of those incarcerated persons as a departmental reaction to the COVID-19 pandemic. We also reviewed multiple vehicle transfer records and staffing time records the department provided. A team of OIG staff visited the three prisons, where they interviewed departmental management, key staff, and incarcerated persons, and directly observed prison operations. In addition, we reviewed pertinent legal filings associated with class-action lawsuits that name the department as a party, as well as published articles and reports related to outbreaks in the prison environment.

Finally, we interviewed a select sample of 56 men from the group of incarcerated persons who transferred from the California Institution for Men during this period. We conducted the interviews to obtain the perspectives of the incarcerated persons directly affected by the department's management of the processes of pretransfer screening, testing, and transferring, and to learn more about the housing assignments following the transfers.

After we provided CCHCS and the department with a draft of this report, we became aware of another scope limitation imposed on us by the department (refer to our first report for a complete description). In this instance, we learned that the department failed to fully respond to our document request concerning the provision of emails. During our review, we requested multiple documents from CCHCS and the department, including all emails related to transfers of incarcerated persons between prisons. Although the California Institution for Men, San Quentin, and Corcoran provided us with copies of multiple email messages, some of which we reprinted for display in this report, the department failed to provide us with any email messages generated from an account belonging to any departmental headquarters staff, management, or executives. Upon receiving the draft report, CCHCS executives did provide us some email messages that were not previously given to us; however, considering the importance of the decision to transfer the medically vulnerable incarcerated persons, we find it unfathomable that other email communications among departmental executives did not occur. In other words, we do not believe the department provided us with all emails, which limited our scope and insight into the transfers. Therefore, because of the department's failure to provide us with all pertinent emails, we could not determine the full extent to which additional CCHCS and departmental executives were aware of the issues we identified in the report and their involvement in approving the transfers.

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 27 of 70

*(This page left blank for reproduction purposes.)*

Case 5:20-cv-06326-EJD   Document 17-26   Filed 01/06/22   Page 28 of 70

CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020   |   19

Return to Contents

# Review Results

## Pressured by California Correctional Health Care Services' Executives, the California Institution for Men Inadequately Screened 189 Incarcerated Persons Before Transferring Them to San Quentin State Prison and California State Prison, Corcoran

Our review found that the department's efforts to prepare for and execute the transfers of 67 medically vulnerable incarcerated persons to Corcoran and 122 to San Quentin were deeply flawed and risked the health and lives of the medically vulnerable incarcerated persons whom the department was attempting to protect, as well as the staff transferring the incarcerated persons and those who worked at Corcoran and San Quentin. In an effort to remove the medically vulnerable incarcerated persons from the prison's outbreak, CCHCS and departmental executives locked themselves into a tight deadline for beginning the transfers by the end of May 2020. In a Joint Case Management Conference Statement filed May 27, 2020, in conjunction with the ongoing litigation in *Plata* v. *Newsom*, the department committed to the court that the transfers would take place around the end of that month. Faced with this self-imposed deadline, CCHCS executives and management at the department's headquarters pressured staff at the California Institution for Men to take whatever action was necessary to execute the transfers within this time frame.

The deadline and resulting pressure from executives to meet the deadline created apprehension among prison staff, causing some to question the safety of the transfers. Numerous email messages the OIG reviewed illustrate these concerns. At 7:14 p.m. on May 27, 2020, the day before the transfers started, a California Institution for Men manager involved in the transfer process sent the following email in response to a manager at the department's headquarters who had requested adding two incarcerated persons to fill a bus:

**From:** California Institution for Men Manager
**Sent:** Wednesday, May 27, 2020 7:14 PM
**To:** Departmental Headquarters Manager
**Subject:** Re: DLT CIM HRM Transfers Out

It's difficult to get things right when there is a rush. We have a lot to consider with this whole COVID issue. I'm surprised HQ wants to move our inmates right now. But we have to make sure we are not infecting another institution.

Just like when they had us move 120 level II inmates to our RC, many of those guys came up positive two weeks later and we contaminated the RC

On May 28, 2020, a California Institution for Men supervising nurse asked a prison executive to "put something in writing to our chain of command about the last-minute transfers at CIM [California Institution for Men] yesterday." The supervising nurse also noted the pressure "to fill the seats" on the buses and questioned, "What about Patient [*sic*] safety? What about COVID precautions?" Nevertheless, executives and managers from CCHCS and the department pressured the prison to begin the transfers by the end of the month as planned.

The insistence on beginning the transfers by the end of May 2020 resulted in the California Institution for Men transferring medically vulnerable incarcerated persons despite knowing that weeks had passed since many of them had been tested for COVID-19. According to our review of the incarcerated persons' electronic health records, despite direction from a CCHCS director to conduct COVID-19 testing of the incarcerated persons within four to six days of the transfers, the prison only tested one of the incarcerated persons in that time frame, and tested only three of the 189 incarcerated persons within two weeks prior to the transfers. With such outdated test results, the prison had no way of knowing whether any of those persons were infected with the virus. This risk was enhanced considering the entire basis for the transfers: that the incarcerated persons were vulnerable to COVID-19 disease and residing at a prison experiencing a significant outbreak of COVID-19.

The decision to transfer the medically vulnerable incarcerated persons despite such outdated test results was not simply an oversight; instead, it was a conscious decision made by prison and CCHCS executives. Shortly before the transfers, a California Institution for Men supervising nurse sent an email to a California Institution for Men medical executive alerting the executive that some of the transferring incarcerated persons had not been tested for COVID-19 since May 1. The supervising nurse asked, "Is there a re-swabbing criteria to be met before transfer?" The California Institution for Men medical executive responded with the following email just 11 minutes later:

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 30 of 70

CDCR and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020 | 21

| From: | California Institution for Men Medical Executive |
|---|---|
| Sent: | Wednesday, May 27, 2020 8:23 PM |
| To: | California Institution for Men Supervising Nurse |
| Cc: | California Institution for Men Physician and Nurse Executive |
| Subject: | Re: DLT CIM HRM Transfers Out |

No reswabing.

California Institution for Men Medical Executive
[Official Title]
CIM

On May 27, 2020, at 8:12 PM, California Institution for Men Supervising Nurse wrote:

Good Evening Medical Executive and Physician Some of the test dates are at the beginning of May 1st week. Does the test dates matter for tomorrow's transfer? Is there a re-swabbing criteria to be met before transfer?

CCHCS nurse executives were also aware of the risks posed by outdated COVID-19 testing and a lack of retesting. For example, a CCHCS nurse executive sent the following email to another CCHCS nurse executive and a CCHCS medical executive:

From: CCHCS Nurse Executive
Sent: Wednesday, May 27, 2020 9:05 PM
To: CCHCS Nurse Executive
CCHCS Medical Executive
Subject: Fwd: DLT CIM HRM Transfers Out

FYI, CIM started getting names of people to transfer out at about 1300 leaving tomorrow, creates pressure , room for error and overtime
Just to clear and screen patients. As you can see, some of the test were done in May 1st, way too many days ago. I would think once the list was put together by someone who didn't give much notice, plus tight unnecessary deadlines, did not allow test to be dine prior to moving ( <7 days). seems the risk of transferring patients tested almost one month ago is high for poss covid spread, even if the quarantine then upon arrival, exposure to that receiving institution is still there.

Apparently there will be 691 total, we need to slow down a little and do it right. After all, they have been there since the start of this pandemic.

Not only had the prison failed to recently test the transferring incarcerated persons to ensure they were not infected with COVID-19 at the time of the transfers, but prison health care staff conducted verbal and temperature screenings too early for several incarcerated persons scheduled to transfer to be able to effectively determine whether they had symptoms of COVID-19 when they boarded the buses to Corcoran and San Quentin. Prison health care staff screened 55 of the incarcerated persons the prison transferred at least six hours before the incarcerated persons boarded the buses. Our review of the electronic health records was supported by the incarcerated persons we interviewed. We interviewed 56 of the incarcerated persons who transferred from the California Institution for Men to Corcoran and San Quentin, many of whom could not remember having had their temperature taken before they left the California Institution for Men. Vague directives from CCHCS and the department may have contributed to the early screenings. Although the directives at the time required nursing staff to screen incarcerated persons for symptoms of COVID-19 before they transferred, the procedures did not specify how soon before the time of the transfers that nursing staff should complete them. As a result, some of the incarcerated persons may have been experiencing symptoms consistent with COVID-19 when they left the prison. In fact, some incarcerated persons we interviewed who were included in the transfers stated that some of the individuals were displaying symptoms during the hours-long bus rides to San Quentin.

The rush by CCHCS and the department to transfer 189 medically vulnerable incarcerated persons despite knowing almost all of them had not been tested for COVID-19 for weeks, coupled with staff at the California Institution for Men screening many of them for COVID-19 symptoms too many hours ahead of the time they were scheduled to board the transportation buses unnecessarily risked the health and lives of the transferring incarcerated persons the department was attempting to protect, as well as thousands of other incarcerated persons and staff at San Quentin and Corcoran. As a result of the mismanaged transfer process, CCHCS, the department, and the California Institution for Men had no assurance they were transferring incarcerated persons who were virus-free, nor could they ensure they were not spreading the virus from a prison with an active outbreak to two other prisons that had kept the virus in check before the transfers.

### California Correctional Health Care Services Executives Pressured the California Institution for Men to Rush the Transfers of Incarcerated Persons to San Quentin State Prison and California State Prison, Corcoran

The COVID-19 outbreak at the California Institution for Men was the catalyst for a series of poor decisions by CCHCS executives and departmental management, and the unfortunate events that led to an outbreak at San Quentin. Beginning in early April 2020, the California

Institution for Men experienced one of the department's earliest COVID-19 outbreaks. By April 30, 2020, the California Institution for Men reported 92 total active COVID-19 cases among its incarcerated population and by May 15, 2020, just two weeks later, that number jumped to 476 total active cases.[11] The prison housed many incarcerated persons with conditions such as hypertension and diabetes, which made them especially vulnerable to COVID-19 complications. As the disease surged at the prison, CCHCS executives and the department became increasingly concerned about the medically vulnerable incarcerated persons at the California Institution for Men. In an effort to shield those medically vulnerable persons from the virus, CCHCS and the department decided to transfer many of them to other prisons in the State that were not experiencing COVID-19 outbreaks at that time.

In an effort to remove those medically vulnerable incarcerated persons from the prison, CCHCS and the department locked themselves into a tight deadline for beginning the transfers. In fact, the federal receiver and a CCHCS director intended to proceed with the transfers of incarcerated persons between prisons by the end of May 2020. In a Joint Case Management Conference Statement filed May 27, 2020, in conjunction with the ongoing litigation in *Plata* v. *Newsom*, the department even committed to the court that the transfers would take place around the end of that month. Faced with this self-imposed deadline, CCHCS executives and management from the department's headquarters pressured staff at the California Institution for Men to take whatever action was needed to identify and prepare incarcerated persons for transfer within the expected time frame.

Although staff at the California Institution for Men were notified on May 11, 2020, that some incarcerated persons would need to be transferred from the prison, CCHCS executives and the department did not advise prison management concerning when the transfers would take place—that information would come much later. Not until Wednesday, May 27, 2020, only one day before the anticipated transfers began, did the department inform staff at the California Institution for Men of the need to quickly prepare the incarcerated persons for transfer. Even under ideal circumstances, such short notice would not have provided prison staff with enough time to reasonably prepare. Combined with the added complications spawned by the COVID-19 pandemic, the rushed nature of the transfers forced prison staff to scramble to make the men ready to travel.

The short notice of the transfers put undue pressure on the staff at the California Institution for Men, which in turn caused them to feel apprehension over whether they could complete the transfers within the requested time frame, as well as concern over whether rushing the transfer process was even safe. Some staff members alerted

---

11. Data from the department's Population COVID-19 Tracker found on its website at **https://www.cdcr.ca.gov/covid19/population-status-tracking/**.

Return to Contents

the department to the possibility of the transferees infecting other incarcerated persons at other institutions. Others raised concerns over whether a sufficient number of staff at the California Institution for Men would be available to complete the transfer process. One manager integral to that prison's process specifically alerted the prison's warden of the need to discuss challenges in preparing for the transfers with health care staff, advising the warden that CCHCS executives and the federal receiver decided to move the incarcerated persons from the California Institution for Men "as soon as possible."

Knowing the difficulties and risks involved in rushing the transfer process, staff at the California Institution for Men made it clear to management at the department's headquarters that the short time frame could pose problems. In the email message, dated May 27, 2020, at 7:14 p.m., in response to a request from a departmental headquarters manager involved in coordinating the transfers of the need to add two incarcerated persons to "fill up that bus," a California Institution for Men manager involved in the transfer process responded:

> **From:** California Institution for Men Manager
> **Sent:** Wednesday, May 27, 2020 7:14 PM
> **To:** Departmental Headquarters Manager
> **Subject:** Re: DLT CIM HRM Transfers Out
>
> It's difficult to get things right when there is a rush. We have a lot to consider with this whole COVID issue. I'm surprised HQ wants to move our inmates right now. But we have to make sure we are not infecting another institution.
>
> Just like when they had us move 120 level II inmates to our RC, many of those guys came up positive two weeks later and we contaminated the RC.

Staff at the California Institution for Men scrambled to assemble a sufficient number of health care staff to prepare the incarcerated persons for transfer. According to emails exchanged between numerous prison staff, nursing management at the California Institution for Men even considered hiring at least four registered nurses, two to three licensed vocational nurses, and three medical assistants or certified nursing assistants just to administer any necessary medications to the incarcerated persons and to take their vital signs before the preboarding process scheduled for the next morning. Nursing staff also wondered whether health care staff from other prisons would need to be brought in to assist so the prison staff at the California Institution for Men could comply with the tight deadline.

Multiple communications among prison and CCHCS staff illustrate that these concerns were not isolated. An email message on May 28, 2020, at 7:57 p.m., from a California Institution for Men supervising nurse to

Case 5:20-cv-06326-EJD   Document 17-26   Filed 01/06/22   Page 34 of 70

CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020   |   25

a nurse executive at the prison raised a red flag about the short notice to complete the transfers and the risks related thereto. The supervising nurse even asked the nurse executive to "put something in writing to our chain of command about the last-minute transfers at CIM [California Institution for Men] yesterday." She also noted the pressure to add incarcerated persons "to fill the seats" of the buses, further imploring, "What about Patient [sic] safety? What about COVID precautions?"

While staff at Corcoran also raised concerns, those concerns were met with very clear pushback from a manager at the department's headquarters, confirming the department intended to continue with the transfers as quickly as possible despite the concerns. When a manager at Corcoran who was involved in the transfer process sent an email message regarding the rushed transfer process to a departmental headquarters manager who was involved in coordinating the transfers, the latter responded on May 28, 2020, with the following message:

| | |
|---|---|
| **From:** | Departmental Headquarters Manager |
| **Sent:** | Thursday, May 28, 2020 8:09 AM |
| **To:** | Corcoran Manager |
| **Subject:** | FW: Complete list of Inmate transfer |

Hi First Name ,

CCHCS Director is the Director of  a department  at CCHCS and he blessed these inmates to move. If your healthcare staff have issues with this directive, they should move it up their chain of command. We are under orders to move them right away. Thank you and your staff for all of your patience and hard work.

In addition to the pressure to ensure the availability of sufficient staff to effectuate the transfers on short notice, prison staff faced pressure to identify a sufficient number of incarcerated persons to fill each transportation bus. During the process of identifying incarcerated persons who met the criteria of being high risk and who had a negative COVID-19 test or no COVID-19 symptoms, as events unfolded, prison staff removed and added incarcerated persons from the transfer list for various reasons on numerous occasions to meet expectations to fill the buses. For example, staff determined that some of the incarcerated persons previously identified for transfer required a continuity of medical care at the California Institution for Men. In other cases, staff found the incarcerated persons initially identified as meeting the criteria did not actually meet the criteria for being high risk, and others were on quarantine status, which prevented their transfer. As staff removed persons from the list, the departmental headquarters manager pressured staff at the California Institution for Men to identify other high-risk persons as quickly as possible to fill the transportation buses.

Return to Contents

In response to an email in which California Institution for Men staff provided a list of five additional incarcerated persons needed to fill a transportation bus, the departmental headquarters manager involved in coordinating the transfers replied, "CCHCS said **MOVE THEM NOW** and we are trying to comply" (emphasis in original; see message below).

| | |
|---|---|
| **From:** | Departmental Headquarters Manager |
| **Sent:** | Thursday, May 28, 2020 7:56 AM |
| **To:** | Corcoran Manager |
| **Subject:** | RE: DLT CIM HRM Transfers Out |

Yes, saw your email and we are aware. This is a very difficult time for everyone. CCHCS said MOVE THEM NOW and we are trying to comply. We will have an answer back to you this morning regarding the testing.

Thank you and your staff...

**From:** Corcoran Manager
**Sent:** Thursday, May 28, 2020 7:55 AM
**To:** Departmental Headquarters Manager
**Subject:** RE: DLT CIM HRM Transfers Out

Yes, received the names from CIM last night and sent to our R&R/Medical last night as well.  Standing by for tomorrow's names.  Also, not sure if you have had a chance to look at my email regarding our concern with the time lapse in testing.  Some of the inmates we are receiving today tested over two weeks ago.

Adding to the challenges prison staff faced, CCHCS executives made a last-minute decision to increase the number of incarcerated persons to be placed on each transportation bus from 19 persons to 25 persons. Records show that CCHCS executives were aware as early as May 27, 2020, at 1:21 p.m., of the decision to increase the number of incarcerated persons on each bus. At that time, a CCHCS director informed the department of a CCHCS medical executive's decision to increase the number of persons per bus, and, as previously directed, prison staff began transferring incarcerated persons out of the prison on May 28, 2020. For unknown reasons, the department did not appear to inform California Institution of Men staff of the decision until May 29, 2020, the same day additional transfers occurred, thereby allowing little time for staff to identify other incarcerated persons for transfer and ensure they met the transfer criteria.

San Quentin staff was also provided little notice of the impending transfers to the prison. A manager at San Quentin informed the prison's warden on May 28, 2020, at 11:14 a.m. that she had just received information from the department's headquarters that 125 incarcerated persons would be transferred to San Quentin from the California Institution for Men on May 30, 2020, just two days later. The notice failed to include an estimated time of arrival and, as such, the incarcerated

persons could have been arriving at San Quentin in fewer than 48 hours. The lack of timely notice to a prison that anticipated receiving a large number of incarcerated persons in a single transfer in the midst of a deadly pandemic further demonstrated the department's poor planning.

While departmental management and CCHCS executives were clearly aware of the difficulties and risks involved in completing the transfers of medically vulnerable incarcerated persons from the California Institution for Men, they nonetheless proceeded with the transfers despite short notice to staff at all three of the involved prisons. Based on the tenor of the communications among staff at the involved prisons, it appears CCHCS executives were determined to begin the transfers by the end of May 2020, regardless of the pressure they placed on departmental staff and the potential for adverse consequences. It also appears CCHCS and the department did not fully consider the ramifications of providing insufficient notice to those responsible for the transfers, especially California Institution for Men staff, who not only required time to properly identify incarcerated persons to be transferred, but also to conduct screening to ensure the transfers did not pose a risk to other medically vulnerable persons.

### Despite Knowing COVID-19 Test Results Were Outdated, California Correctional Health Care Services Executives Pressured the California Institution for Men to Transfer Medically Vulnerable Incarcerated Persons to San Quentin State Prison and California State Prison, Corcoran

In early May, when CCHCS and the department began identifying medically vulnerable incarcerated persons to transfer from the California Institution for Men, a health care executive at the prison worked with health care staff at CCHCS and identified 1,115 such persons for COVID-19 testing and possible transfer. The prison conducted testing on those incarcerated persons identified for transfer. However, the tests were ordered in early May, weeks before the transfers, which began on May 28, 2020. Once the prison narrowed the list and identified the 189 incarcerated persons it would eventually transfer to Corcoran and San Quentin, it never reordered COVID-19 testing to more accurately determine whether any of the incarcerated persons had contracted COVID-19 in the weeks following their prior tests. As a result, as shown in Figure 2 on the following page, most of the incarcerated persons whom the California Institution for Men transferred had not been tested for COVID-19 for at least two weeks prior to the transfers.

CCHCS executives and management from the department's headquarters continued to exert pressure on prison staff to complete the transfers with little notice. That pressure, coupled with unclear policy and directives, likely contributed to reliance on COVID-19 testing that many knew was outdated. As a result, the California Institution for Men conducted COVID-19 testing within seven days of transfer for only one of

Return to Contents

**Figure 2. Time Line of COVID-19 Testing of Incarcerated Persons Transferred From the California Institution for Men on May 28, 29, and 30, 2020**



Test Collection Dates at the California Institution for Men

Source: The California Correctional Health Care Services' electronic health record system and the California Department of Corrections and Rehabilitation's transportation logs.

the 189 men transferred. COVID-19 tests for almost all of the 122 men who were transferred to San Quentin were more than two weeks old by the time of transfer. Due to outdated COVID-19 testing, the prison, CCHCS, and the department had no way of knowing whether they were transferring incarcerated persons infected with COVID-19 to prisons with little or no confirmed cases.

The rushed process to coordinate the transfers impeded California Institution for Men staff's ability to conduct timely COVID-19 testing prior to transfer. On May 18, 2020, the department announced it intended to resume transferring incarcerated persons from reception centers to other prisons over the next few weeks. According to the email notification from CCHCS, the department was to test all persons endorsed for transfer for COVID-19 before transport, and those who tested positive would not be transferred. Three days later, on May 21, 2020, a CCHCS director notified all prison health care executive officers that CCHCS management wanted testing to occur four to six days prior to transfer.

Despite the direction to conduct COVID-19 testing within four to six days of transferring incarcerated persons, CCHCS afforded staff at the California Institution for Men only one day to screen, test, and prepare the incarcerated persons for transfer. Because laboratory testing for COVID-19 most likely could not be completed in just one day, this short notice made it nearly impossible for the California Institution for Men to comply with the CCHCS director's guidance. Instead of delaying the transfers so that the prison could retest the transferring incarcerated persons for COVID-19, the California Institution for Men pushed forward with preparing for the transfers.

Failures by the prison to conduct timely testing of the transferring incarcerated persons was not simply an oversight. Instead, it was an overt decision made by the California Institution for Men's top health care executive. As part of the prison's process to identify incarcerated persons for transfer, the prison's health care staff reviewed incarcerated persons' electronic health records, including the most recent COVID-19 test results. According to emails the OIG obtained, upon review of the medical records, a nurse at the California Institution for Men became aware of the outdated test results for many of the incarcerated persons who were to be transferred. The nurse sent an email to one of the prison's top health care executives, alerting him of the outdated test results. As shown in the email exchange below, in response to the nurse's email, and just one day before the prison began transferring the incarcerated persons, the health care executive explicitly ordered the nurse to *not* retest the incarcerated persons prior to transfer.

| | |
|---|---|
| **From:** | California Institution for Men Medical Executive |
| **Sent:** | Wednesday, May 27, 2020 8:23 PM |
| **To:** | California Institution for Men Supervising Nurse |
| **Cc:** | California Institution for Men Physician and Nurse Executive |
| **Subject:** | Re: DLT CIM HRM Transfers Out |

No reswabing.

California Institution for Men Medical Executive
[Official Title]
CIM

On May 27, 2020, at 8:12 PM,  California Institution for Men Supervising Nurse  wrote:

Good Evening Medical Executive and Physician Some of the test dates are at the beginning of May 1st week. Does the test dates matter for tomorrow's transfer? Is there a re-swabbing criteria to be met before transfer?

CCHCS nurse executives were also aware of the risks posed by outdated COVID-19 testing and a lack of retesting. For example, a CCHCS chief nurse executive sent the following email to two other nurse executives:

---

**From:** CCHCS Nurse Executive
**Sent:** Wednesday, May 27, 2020 9:05 PM
**To:** CCHCS Nurse Executive
CCHCS Medical Executive
**Subject:** Fwd: DLT CIM HRM Transfers Out

FYI, CIM started getting names of people to transfer out at about 1300 leaving tomorrow, creates pressure , room for error and overtime
Just to clear and screen patients. As you can see, some of the test were done in May 1st, way too many days ago. I would think once the list was put together by someone who didn't give much notice, plus tight unnecessary deadlines, did not allow test to be dine prior to moving ( <7 days). seems the risk of transferring patients tested almost one month ago is high for poss covid spread, even if the quarantine then upon arrival, exposure to that receiving institution is still there.

Apparently there will be 691 total, we need to slow down a little and do it right. After all, they have been there since the start of this pandemic.

---

The CCHCS medical executive, one of the recipients of the email above, forwarded the email to a CCHCS director asking about the transfer plan. Still determined to carry out the transfers, on May 28, 2020, the day the transfers began, the CCHCS director responded with following email:

---

On May 28, 2020, at 8:34 AM,  CCHCS Director                          wrote:

CCHCS Medical Executive
CCHCS (and the Receiver) have been hammering on CDCR (and the Secretary) to get these guys out quickly.  This is also a topic of discussion with Judge Tigar every Thursday (including today).   I lost us a day of productivity when you sent me the list on Thursday and I missed it.  These patients will be moving today, tomorrow, and next week.

CDCR is doing a heavy lift to accommodate our need to get these patients out fast.  They are doing Non-committee endorsements and adjusting bus schedules as we have indicated this is our #1 priority for patient/inmate movement.  In some cases, the only places they can go our basic institutions.  Although not preferred, certainly allowable in our Med Class process.

Unless Mr. Kelso instructs me otherwise, we are proceeding with the moves as indicated.

---

The morning of May 28, 2020, as part of the same email conversation, a CCHCS nurse executive emailed multiple CCHCS and departmental executives alerting them of the outdated tests. Specifically, the CCHCS nurse executive's email stated, in part, "I agree it seems counterproductive to use testing data from a month ago. Especially given they are coming from CIM [California Institution for Men]."

Case 5:20-cv-06326-EJD     Document 17-26     Filed 01/06/22     Page 40 of 70

CDCR and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020     |     31

The CCHCS nurse executive emailed this message to two CCHCS medical executives, a CCHCS director, a departmental director, a departmental deputy director, and a departmental associate director, among others. The CCHCS medical executive subsequently forwarded this email to multiple CCHCS and departmental executives, including another CCHCS medical executive, a CCHCS nurse executive, a departmental director, a departmental deputy director, and a departmental associate director. A CCHCS director replied to the same group, stating that nothing precluded the receiving prisons from retesting or quarantining the incarcerated persons upon arrival.

Just as CCHCS executives dismissed concerns regarding the rushed nature of the transfers, departmental management also dismissed concerns regarding outdated COVID-19 tests and planned to proceed with the transfers anyway. During our review, we found that departmental executives and management were well aware of the concerns raised and alarms sounded regarding the outdated testing, but instead chose to focus on their goal to effectuate the transfers during the last week of May 2020. The following email exchange of May 28, 2020, between a departmental headquarters manager involved in coordinating the transfers further highlights the concerns raised and that the department clearly intended to proceed with the transfers regardless of the outdated test results:

| | |
|---|---|
| **From:** | Departmental Headquarters Manager |
| **Sent:** | Thursday, May 28, 2020 7:56 AM |
| **To:** | Corcoran Manager |
| **Subject:** | RE: DLT CIM HRM Transfers Out |

Yes, saw your email and we are aware. This is a very difficult time for everyone. CCHCS said MOVE THEM NOW and we are trying to comply. We will have an answer back to you this morning regarding the testing.

Thank you and your staff...

| | |
|---|---|
| **From:** | Corcoran Manager |
| **Sent:** | Thursday, May 28, 2020 7:55 AM |
| **To:** | Departmental Headquarters Manager |
| **Subject:** | RE: DLT CIM HRM Transfers Out |

Yes, received the names from CIM last night and sent to our R&R/Medical last night as well. Standing by for tomorrow's names. Also, not sure if you have had a chance to look at my email regarding our concern with the time lapse in testing. Some of the inmates we are receiving today tested over two weeks ago.

Even with the knowledge that much of the COVID-19 testing was stale and, therefore, no longer relevant, the department proceeded with the transfers, which led to outbreaks at the two receiving prisons. As planned, the department transferred 67 persons from the California

Return to Contents

Institution for Men to Corcoran on May 28, and May 29, 2020, and on May 30, 2020, the department transferred 122 incarcerated persons from California Institution for Men to San Quentin.

Even if CCHCS and the department had provided the California Institution for Men with sufficient time to properly test the incarcerated persons, it may not have mattered because overnight, CCHCS changed its guidance for testing incarcerated persons prior to transfer. On May 21, 2020, a CCHCS director advised chief executive officers at all prisons that a CCHCS medical executive recommended testing be completed four to six days before transfer. The next day, on May 22, 2020, CCHCS and the department jointly issued a memorandum that required prisons to offer testing before transferring incarcerated persons to another prison; however, again, the memorandum did not provide a time frame in which testing should be offered before the transfers.

Following the transfers, CCHCS updated screening and testing requirements on August 19, 2020, then again on January 12, 2021. The January 12, 2021, memorandum that CCHCS and the department issued to prisons statewide included direction to test transferring incarcerated persons within specific time frames before the transfers. Specifically, the directives required prisons to conduct COVID-19 testing five days prior to the transfer of the incarcerated person and, if the results of that person's test are negative, the prison is to use a rapid test to retest that person again on the day of the scheduled transfer. If the results of both tests are negative, the incarcerated person is eligible for transfer within one day of the rapid test. While CCHCS and the department now appear to recognize the importance of testing incarcerated persons for COVID-19 shortly before transferring them, had the same recognition been in practice in May 2020, the spread of the virus between prisons likely could have been avoided or at least mitigated.

### Lacking Guidance, the California Institution for Men Likely Screened Incarcerated Persons for Symptoms of COVID-19 Too Soon Before Their Transfers to Properly Identify Symptomatic Individuals

To prevent transferring incarcerated persons potentially infected with COVID-19, CCHCS and the department jointly implemented procedures requiring that prison staff screen incarcerated persons before transferring them. As Figure 3 on the next page shows, the screenings are required to include verbal queries for signs and symptoms of COVID-19, and temperature checks. However, due to the pressure exerted by CCHCS executives to promptly transfer the medically vulnerable incarcerated persons, California Institution for Men health care staff likely did not have time to screen all incarcerated persons close enough in time before their departure to San Quentin. Consequently, although the prison's health care staff recorded that they conducted screening and temperature checks before transferring the incarcerated persons to other prisons, they

likely performed the screening and temperature checks too soon and may not have conducted thorough screenings. As a result, some incarcerated persons may have been experiencing symptoms consistent with COVID-19 when they were placed on the buses, potentially endangering the other transferring incarcerated persons and the department's transportation staff.

**Figure 3. The Department's Process for Screening Incarcerated Persons for Signs and Symptoms of COVID-19 Before Transferring to Another Prison**



Source: The Office of the Inspector General's analysis based on information from California Correctional Health Care Services' May 22, 2020, COVID-19 Screening and Testing Matrix Tool for Patient Movement.

Although CCHCS and the department instituted policies, guidance, and directives regarding COVID-19 screening, those policies, guidance, and directives varied depending on the type of movement of incarcerated persons into and out of prisons. To prevent the spread of COVID-19 via transfers of incarcerated persons between facilities, CCHCS and the department issued several memoranda to their staff, establishing specific COVID-19 screening and testing protocols for moving incarcerated persons. For example, a directive issued on May 11, 2020, required prisons to conduct a COVID-19 screening and test before admitting incarcerated persons to the California Department of State Hospitals for mental health care, to place incarcerated persons in protective quarantine while awaiting test results, and to conduct COVID-19 screening again before incarcerated persons left the Department of State Hospitals. However, the department did not apply the same safeguards across all potential scenarios. The May 22, 2020, directive issued jointly by CCHCS and the department included a screening and testing matrix for various transfer scenarios outlining when prisons should screen and test incarcerated persons for COVID-19 and in which scenarios prisons should quarantine incarcerated persons before and after transfer. However, the guidance failed to require protective quarantine for incarcerated persons awaiting test results before or after transfer. The directive also did not identify specific time frames for the transferring prison to conduct COVID-19 testing and screening on incarcerated persons before transferring them between prisons.

The lack of clear screening directives, combined with the previously described pressure from CCHCS executives and departmental management to expedite the transfers, likely caused California Institution for Men health care staff to conduct screenings of incarcerated persons too soon before transfer, or possibly not at all. To obtain information related to the transfer of incarcerated persons from the California Institution for Men to Corcoran and San Quentin, we later interviewed 56 of those incarcerated persons. We asked them several questions, including whether they remembered having their temperature taken before they boarded the bus. Of the 56 incarcerated persons we interviewed, 22 reported that staff did not take their temperatures before they boarded the bus.

Documentation we obtained from the department and from incarcerated persons' electronic health records highlights the risk associated with improper screening before placing incarcerated persons on a bus for transfer. Two of the incarcerated persons transferred had COVID-19 symptoms when they arrived at San Quentin. According to an email from a nurse executive at San Quentin, "there were at least two symptomatic patients on the bus." Entries in the department's electronic health record system for two incarcerated persons support the nurse executive's email. An entry in one incarcerated person's electronic health record from the day he arrived at San Quentin notes, "[Inmate/patient] states he reported to nurse at [California Institution for Men] that he was having muscle aches/pain, fever, and chills but was still sent to [San Quentin] on bus."

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 44 of 70

CDCR and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020    |    35

In addition, an entry in a second incarcerated person's electronic health record indicates he had a temperature of 101.1 degrees F upon arrival at San Quentin. While these two incarcerated persons did not subsequently test positive for COVID-19, the fact that staff may have cleared any incarcerated person for transfer after they reported symptoms related to COVID-19 is troubling.

The June 4, 2020, email message below from a nurse executive at San Quentin records these events:

---

**To:** California Institution for Men Nurse Executives (Multiple Recipients)

**Cc:** CCHCS Nurse Executives (Multiple Recipients)

**Subject: CIM to SQ Transfers**

Hello   First Name/First Name                .

Last Saturday most inmates received from CIM did not have their KOPs. Our pharmacist had to process over 600 prescriptions on a Sunday. In addition, there were at least two symptomatic patients on the bus. They claim they told the RN, but the RN told them to get on the bus anyway (I will be looking into their claim).   A third inmate had a fever. Most COVID testing was well beyond the 7 day mark. I just received notice that we will be receiving 50 more tomorrow.

All inmate property is still in R&R because per custody "it was a mess and we can't figure out what belongs to who". We are having to quarantine/isolate everyone from CIM and test/re-test them.  This is taxing our nursing staff resources.

I can imagine you are having staffing challenges, but anything you can do to mitigate the risk of sending positive inmates will be greatly appreciated. We are still at zero positive COVID cases, and would like to keep it that way.

---

One incarcerated person we interviewed also stated he had symptoms consistent with COVID-19 at the time of transfer consisting of a sore throat and breathing difficulties. Another person told us a person on the bus was obviously sick with coughing, and showed "other symptoms." While the records do not confirm whether the two symptomatic persons are the same persons the nursing executive described in his email, the consistent reports between the nursing executive and the incarcerated persons interviewed indicate that some incarcerated persons were displaying symptoms consistent with COVID-19 when they departed on the buses from the California Institution for Men. This, in turn, placed all other individuals on the buses at risk of infection.

When we reviewed the department's electronic health record system for the incarcerated persons who transferred from the California Institution for Men, we found entries documenting the times at which the prison's health care staff performed screenings on most of the incarcerated persons for symptoms of COVID-19. However, 47 of the entries indicated that the screenings were performed after the transportation buses left the California Institution for Men, which was obviously not possible. As a result, we could not determine when

Return to Contents

health care staff actually performed those screenings. In addition, according to the entries in the incarcerated persons' electronic health records, prison health care staff screened a significant number of the incarcerated persons more than several hours before they transferred. As shown in Figure 4 on the next page, according to entries in the incarcerated persons' electronic health records, California Institution for Men health care staff screened 55 of the transferring incarcerated persons at least six hours before they boarded the transportation buses to San Quentin. In one instance, health care staff documented conducting the screening more than 25 hours before the incarcerated person's transfer. Considering the incarcerated persons were housed in a prison experiencing a significant outbreak of COVID-19 when they transferred, the lag between when health care staff screened the incarcerated persons for symptoms of COVID-19 and when they boarded the buses could have allowed individuals to develop symptoms that were not noted.

The prison's health care staff may have screened the transferring incarcerated persons too soon because CCHCS' and the department's protocols for screening and testing incarcerated persons when moving them between prisons lacked clear instructions. Had CCHCS and the department implemented stronger screening and testing requirements and applied those requirements to all situations, the department could have better controlled the spread of the virus from one prison to another by identifying and preventing the transfer of incarcerated persons who may have been symptomatic or carrying the virus. The COVID-19 virus is introduced into a prison from infected staff or admitted incarcerated persons and, after being introduced into the prison, can easily spread as infected staff or incarcerated persons move from one place to another. Outdated COVID-19 testing results and inadequate screening of incarcerated persons transferred from the California Institution for Men threatened the health of the transferring incarcerated persons, as well as thousands of staff and other incarcerated persons at the receiving prisons.

**Figure 4. Duration of Time Between When California Institution for Men Health Care Staff Screened Transferring Incarcerated Persons for COVID-19 Signs and Symptoms and When the Incarcerated Persons Departed the Prison**



* One entry was 25 hours before departure.

† Screening time recorded in the department's electronic health record system was after the bus departure time recorded on the transportation logs.

Sources: The California Correctional Health Care Services' electronic health record system and the California Department of Corrections and Rehabilitation's transportation logs.

Return to Contents

## The Department Transferred Incarcerated Persons on Buses Without Allowing for the Proper Amount of Physical Distance Between Incarcerated Persons

Beginning in March 2020, as part of its efforts to limit the spread of COVID-19, CCHCS and the department jointly issued guidance regarding physical distancing, including during the transfer of incarcerated persons between prisons. The original March 2020 guidance advised that staff and incarcerated persons maintain six feet of distance between each other when feasible. Consistent with its physical distancing guidance for prisons, in an April 16, 2020, memorandum, the department directed that for emergency transfers from dormitories, no more than 19 incarcerated persons should be placed on each transportation bus. Most of the department's buses allow for up to 38 incarcerated persons to be transported at one time without allowing for physical distancing. Therefore, the limit of 19 incarcerated persons on each bus was approximately half of the buses' usual capacities. The ability to maintain proper physical distance among incarcerated persons on the transportation buses was especially important because the buses' windows do not open, limiting air circulation.

Despite the department's guidance limiting the number of incarcerated persons on each transportation bus, some buses departed from the California Institution for Men with more than 19 incarcerated persons. According to emails obtained by the OIG, department headquarters staff initially provided direction consistent with the above-mentioned guidance to limit the number of incarcerated persons allowed on each bus. On May 27, 2020, just one day before the first transfer, a departmental headquarters manager told a manager at the California Institution for Men to place no more than 19 incarcerated persons on each bus to Corcoran. According to the department's transportation logs, on May 28, 2020, the department complied with this direction and transported 19 incarcerated persons on the first bus to Corcoran. However, in an effort to expedite the transfers, other executives increased the limitation on the number of incarcerated persons allowed on each bus. On May 27, 2020, a CCHCS director asked a CCHCS medical executive for approval to transfer incarcerated persons in groups of more than 19 if those persons were from the same dormitory and tested negative for COVID-19. The CCHCS medical executive approved the request, deciding that the benefit of increasing the number of incarcerated persons allowed on a single bus at a time outweighed the potential risks. The following is the email exchange between the two executives.

---

**From:** CCHCS Medical Executive
**Sent:** Wednesday, May 27, 2020 1:20 PM
**To:** CCHCS Director
**Subject:** RE: 114 CIM inmates to COR 03B

Are the group all going to the same place? If so we would be ok with a larger group with face coverings. The benefit of a more rapid move in this specific situation appears to outweigh the risks

Initial

> **From:** CCHCS Director
> **Sent:** Wednesday, May 27, 2020 1:12 PM
> **To:** CCHCS Medical Executive
> **Subject:** FW: 114 CIM inmates to COR 03B
>
> First Name
>
> See below.  If DAI can move of our CIM HR inmates in groups larger than 19 (those housed in the same dorm), would you be opposed to upping the number of patients on the buses, knowing they're negative and have been housed together?

---

It is unclear whether the CCHCS medical executive who approved the increased bus capacity knew at the time that many of the incarcerated persons' most recent negative COVID-19 test results were weeks old; however, as a result of that executive's approval, the department increased the maximum number of incarcerated persons placed on each transportation bus to 25. Based on our review of the department's transportation logs, on May 29, 2020, one bus to Corcoran transported 25 incarcerated persons and a second transported 23 incarcerated persons. On May 30, 2020, three of the buses to San Quentin each held 25 incarcerated persons, a fourth bus transported 24, and a fifth bus transported 23. The incarcerated persons were on the overcrowded buses to San Quentin for 10 to 11 hours. Other than possible brief stops to allow for comfort and meal breaks, all passengers were kept in the close confines of the bus the entire time, increasing the probability that anyone already infected with COVID-19 would spread the virus to others.

According to the incarcerated persons' electronic health records and emails from San Quentin staff after the transfer, it is likely some of the incarcerated persons were already infected with COVID-19 when they boarded the bus, and others likely became infected during transit. Upon learning of the potentially symptomatic persons, San Quentin health care staff promptly ordered COVID-19 testing for all the arriving incarcerated persons, and all specimens were collected within four days of the transfer. Fifteen of the 122 incoming incarcerated persons tested positive for COVID-19. Nine of those 15 incarcerated persons had been transported to San Quentin on the same bus.

Return to Contents

The mismanaged transfers also jeopardized the health of the department's transportation staff, as multiple staff shared the same cramped space and air as the incarcerated persons. On June 15, 2020, a little more than two weeks after the department transferred the incarcerated persons to San Quentin, two of the department's staff who transported the incarcerated persons also reported testing positive for COVID-19. The two staff members worked on separate buses that each transported multiple incarcerated persons who tested positive for COVID-19 shortly after arriving at San Quentin. Although we could not directly link the staff members' infections to their duties transporting the incarcerated persons to San Quentin, CCHCS' failure to properly test and screen the incarcerated persons prior to transfer, combined with the crowded conditions on the buses, the lack of physical distancing, and the long journey to the receiving prisons, undoubtedly raised the risk of infection for both the incarcerated persons and the staff on the buses.

Since the pandemic began, public health officials have issued multiple directives for businesses to operate at limited or zero capacity and have required or encouraged individuals to maintain sufficient distance to prevent the spread of the virus. In light of all these efforts, we find it irresponsible for the department to have placed incarcerated persons in a confined space at nearly 65 percent capacity for a significant duration of time.

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 50 of 70

CDCR and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020   |   41

## San Quentin State Prison Was Not Equipped to Properly Quarantine or Isolate Incarcerated Persons With Suspected and Confirmed Cases of COVID-19, and the Prison Failed to Take Actions That Could Have Mitigated the Resulting Widespread Outbreak

Once the incarcerated persons arrived at San Quentin, staff quickly became concerned. San Quentin nursing staff immediately noted two of the incarcerated persons had symptoms consistent with COVID-19; one of them had a fever of 101.1 degrees F. In response to the concerns, the prison's health care staff promptly ordered COVID-19 tests for all 122 of the incoming incarcerated persons. In addition, the prison housed the two symptomatic persons in its adjustment center facility,[12] the prison's only housing unit containing cells with solid doors. However, even though the prison's health care staff suspected the arriving incarcerated persons may have been exposed to COVID-19, the prison still chose to house the other 119 persons from the California Institution for Men in a housing unit without solid doors, which allowed air to flow in and out of the cells. By the time the COVID-19 test results were available, 14 of the transferred incarcerated persons infected with COVID-19 had been housed in this unit for at least six days, and 15 transferred incarcerated persons had tested positive for COVID-19 within two weeks of arriving at San Quentin. Likely because the unit did not allow for the proper quarantining of those incarcerated persons, the virus spread quickly, both to the other incarcerated persons who transferred from the California Institution for Men, as well as to the 202 other incarcerated persons housed in the same unit. Within 26 days of the date the incarcerated persons arrived from the California Institution for Men, 88 became infected with the virus. In addition, three tested positive in July 2020, for a total of 91 of the 122 transferred persons, or 75 percent. Moreover, by August 6, 2020, an additional 86 of the persons already housed in the housing unit when transferred persons arrived also contracted the virus. Of the 122 medically vulnerable incarcerated persons whom the department transferred from the California Institution for Men to San Quentin in an effort to protect them from the virus, 91 ultimately tested positive, and two died from complications from COVID-19.

Unfortunately, the outbreak was not limited to one San Quentin housing unit. The prison's inability to properly quarantine and isolate incarcerated persons exposed to or infected with COVID-19, along with its practice of allowing staff to work throughout the prison during shifts or on different days, likely caused the virus to spread to multiple areas of the prison. Although many prison staff have assigned posts at

---

12.  The prison placed a third incarcerated person in the adjustment center; however, health records show no evidence that this person was symptomatic.

Return to Contents

which they work on a daily basis, many prison staff do not spend all their work hours in one location. Some prison staff, such as nurses, may visit multiple housing areas the same day as part of their regular duties. In addition, some staff may work shifts in different areas of the prison each day for various reasons; for example, some staff are dedicated to relieving sick or vacationing staff members throughout the prison. Despite recommendations from the Centers for Disease Control to limit staff movement throughout the facility to the extent possible, San Quentin continued to allow this practice, which may have facilitated the spread of the virus throughout the prison. According to data the department provided to support its COVID-19 population tracker, by the end of August 2020, 2,237 incarcerated persons and 277 staff members at San Quentin became infected with the virus. In total, 28 incarcerated persons and one staff member died as a result of complications from COVID-19.

That Corcoran experienced a less extensive outbreak after the transfers demonstrates the inadequacy of San Quentin's infrastructure for controlling the spread of an airborne virus. Compared with San Quentin, Corcoran is a modern prison with a design better suited for quarantining and isolating incarcerated persons. Because the prison's housing predominantly consists of cells with solid doors, Corcoran was able to place all arriving incarcerated persons in cells with solid doors. Doing so likely significantly reduced the spread of the virus at the prison, as only two of the 67 incarcerated persons who transferred from the California Institution for Men contracted the virus after the transfer. As the virus spread at San Quentin, the department reported a much smaller outbreak at Corcoran. Between May 30, 2020, and July 31, 2020, the department reported that the largest number of active cases at Corcoran at any given time was 153 on June 17, 2020. An animated graphic displaying the progression of the COVID-19 outbreaks coursing through the various housing units at San Quentin and Corcoran after the transfers had been effected can be viewed on our website at **www.oig.ca.gov**.

### COVID-19 Spread Rapidly Among Incarcerated Persons in a San Quentin Housing Unit After the Prison Failed to Properly Quarantine or Isolate All the Arriving Incarcerated Persons Despite Suspecting Some May Have Been Exposed to or Were Already Infected With COVID-19

Quickly after the incarcerated persons arrived at San Quentin, health care staff suspected some of them may have been exposed to or were already infected with COVID-19. According to emails from a San Quentin nurse executive and the department's electronic health record system, two of the incarcerated persons may have had COVID-19 symptoms when they arrived at San Quentin. In one incarcerated person's electronic health record, the screening entries from the evening the person arrived at San Quentin note symptoms: "[Inmate/patient] states he reported to nurse at [California Institution for Men] that he

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 52 of 70
CDCR and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020   |   43
Return to Contents

was having muscle aches/pain, fever, and chills but was still sent to [San Quentin] on bus." The second person with COVID-19 symptoms had a temperature of 101.1 degrees F upon arrival to San Quentin in addition to reporting other signs and symptoms. In a June 4, 2020, email, a San Quentin nurse executive confirmed "there were at least two symptomatic patients on the bus."

At the time of the transfer, the Centers for Disease Control provided guidance on transferring incarcerated persons between facilities. Specifically, the Centers for Disease Control's *Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities* recommends the "[r]estrict[ion of] transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding." However, the guidance also provides "[i]f the transfer must still occur, ensure that the receiving facility has capacity to properly isolate the individual upon arrival."



Photo 1. Prison cell door: adjustment center. (Photo taken by OIG staff on September 22, 2020, at San Quentin State Prison.)

While San Quentin did, in fact, place the two incarcerated persons with symptoms consistent with COVID-19 in cells with solid doors and ordered COVID-19 testing for all 122 of the arriving incarcerated persons, San Quentin's physical structure generally did not allow for proper isolation of persons potentially infected with an airborne virus. San Quentin is the department's oldest prison, established in 1852, with an antiquated infrastructure not conducive to preventing the spread of infectious disease. Most of the prison's buildings date to their original construction. In contrast to the department's newer prisons, most of San Quentin's housing unit cells do not have solid doors. Instead, most of San Quentin's incarcerated population is housed in either communal, dormitory-style housing units, or in cells without solid doors, which allow air to flow in and out.

CCHCS and the department clearly did not plan for a large outbreak when it transferred medically vulnerable incarcerated persons to San Quentin. The prison's adjustment center housing unit, where it housed the two incarcerated persons who arrived with symptoms, is a three-tier unit with 102 single cells, each with a solid door. At the time, this facility was the designated area for suspected or confirmed cases of COVID-19. When the incarcerated persons arrived from the California Institution for Men, the adjustment center had only 71 unoccupied cells, not nearly enough to house all 122 persons.

Due to the prison's lack of proper quarantine and isolation space, San Quentin placed many of the persons it suspected had been exposed to COVID-19 in cells without solid doors, jeopardizing the health of both those persons and those already housed in the unit. Although 120 of the incarcerated persons did not display symptoms of COVID-19 when they arrived, San Quentin staff knew the persons arrived from a prison with an active COVID-19 outbreak and had just been transported on crowded buses for more than 10 hours. In addition, according to our review of email messages sent by a San Quentin nurse executive, the nurse executive also knew that most of the arriving incarcerated persons had not been tested for COVID-19 for at least seven days. Nevertheless, the prison housed the arriving incarcerated persons in a housing unit in its south block facility, a five-tier housing unit with approximately 100 cells on each tier, where each cell is enclosed with open grills, through which air can easily pass. At the time the transferred incarcerated persons arrived, more than 200 incarcerated persons were already housed on the unit's first three tiers, and none of them had tested positive for the virus at the time the transferred persons arrived.



Photo 2. Hallway, adjustment center. (Photo taken by OIG staff on September 22, 2020, at San Quentin State Prison.)

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 54 of 70

Return to Contents

CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020    |    45

Even though the prison's health care staff suspected the arriving incarcerated persons may have been exposed to COVID-19, the prison kept those persons in the south block facility's housing unit, known as the Badger unit, for several days without benefit of recent COVID-19 testing results, during which time they could have carried the virus and exposed those persons already living in the housing unit. While the prison promptly ordered COVID-19 testing when the incarcerated persons arrived on May 30, 2020, the prison did not begin collecting specimens for testing until June 1, 2020. When one incarcerated person reported symptoms on June 1, 2020, the prison moved him into isolation in its adjustment center facility. However, the prison left the remaining incarcerated persons housed in the Badger housing unit's cells with open grills for multiple days pending COVID-19 testing. When the prison received the results for the transferred incarcerated persons remaining in its Badger housing unit, 15 tested positive for COVID-19.

While we can only be certain someone carried the virus the day their specimen was collected, it is likely some of these incarcerated persons already carried the virus when they boarded the buses at the California Institution for Men and when they were placed in San Quentin's south block facility's Badger housing unit; thus, it is likely they exposed others on the transportation buses and those already housed in the Badger housing unit to the virus. As Table 1 on the next page shows, 14 of the incarcerated persons who were confirmed to have the virus remained housed in the prison's south block facility's Badger housing unit for six or more days after they arrived at the prison.



Photo 3. Prison cell door, Badger housing unit. (Photo taken by OIG staff on September 22, 2020, at San Quentin State Prison.)

Return to Contents

**Table 1. San Quentin Housed Multiple Incarcerated Persons With COVID-19 in Its South Block Facility's Badger Housing Unit for Multiple Days**

| Number of Transferred Incarcerated Persons Confirmed to Have COVID-19 Within a Week of Arrival | Number of Days Housed in Cells Without Solid Doors Before Being Isolated |
|:---:|:---:|
| 1 | 2 |
| 13 | 6 |
| 1 | 8 |

Source: The California Department of Corrections and Rehabilitation's Strategic Offender Management System and the California Correctional Health Care Services' electronic health record system.

COVID-19 quickly spread throughout all tiers of the south block facility's Badger housing unit. According to guidance from the Centers for Disease Control, COVID-19 spreads primarily through the transmission of respiratory droplets over short distances, such as less than six feet, during a period of 15 minutes or more. In some instances, the virus can spread over longer distances if there is enough of the virus present in an infectious person producing the droplets in an enclosed space without adequate ventilation. The virus is considered highly infectious, as even asymptomatic persons can transmit it. Considering these factors, the transferred incarcerated persons likely spread the virus to many of those already housed in the unit. Within 26 days of the date the incarcerated persons arrived from the California Institution for Men, 88 of the transferred persons became infected with the virus. In addition, three tested positive in July 2020, for a total of 91 of the 122 transferred persons, or 75 percent. Moreover, by August 6, 2020, an additional 86 of the persons already housed in the south block facility's Badger housing unit when the transferred persons arrived also contracted the virus. On the next page, as Figure 5 shows, of the 321 incarcerated persons housed in this unit on May 31, 2020, 177 of them tested positive for COVID-19 by August 6, 2020.

Medical experts from outside the department also noted concerns with the outdated architecture at San Quentin. In response to a request from the federal receiver, shortly after the transfer and during the prison's outbreak, a team of medical experts issued an "Urgent Memo" dated June 15, 2020, outlining guidance for containing the COVID-19 outbreak. These medical experts noted the lack of adequate options at San Quentin to prevent infected persons from infecting other persons in the prison.

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 56 of 70

Return to Contents

CDCR's and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020 | 47



## Figure 5. Test Results for Incarcerated Persons Housed in San Quentin's South Block Facility's Badger Housing Unit on May 31, 2020, Who Tested Positive for COVID-19 Between May 31, 2020, and August 6, 2020

*N = 321*

P = Positive
N = Not Positive

|        | Transferred | | Not Transferred | |
|--------|-----|-----|-----|-----|
|        | **P** | **N** | **P** | **N** |
| Tier 5 | **53** | 17 | 0 | 0 |
| Tier 4 | **38** | 9 | 0 | 0 |
| Tier 3 | 0 | 0 | **30** | 40 |
| Tier 2 | 0 | 0 | **27** | 43 |
| Tier 1 | 0 | 2 | **29** | 33 |

*Photograph by the Office of the Inspector General.*

Note: Of the incarcerated persons who transferred from the California Institution for Men to San Quentin, 119 were housed on tiers 1, 4, and 5 in the prison facility's Badger housing unit along with 202 incarcerated persons who were already housed in the unit.

Source: Unaudited data provided by the California Department of Corrections and Rehabilitation to support its COVID-19 population tracker and housing data from the Strategic Offender Management System.



Return to Contents

> "Given the unique architecture and age of San Quentin (built in the mid 1800s and early 1900s), there is exceedingly poor ventilation, extraordinarily close living quarters, and inadequate sanitation."
>
> "North Block and West Block have cells with open-grills, and are each 5-tier buildings with a capacity of 800 persons. Ventilation is poor—windows have been welded shut and the fan system does not appear to have been turned on for years; heat on the far side of the building can be stifling."
>
> "Given San Quentin's antiquated facilities, poor ventilation, and overcrowding, it is hard to identify any options at San Quentin where it is advisable to house high-risk people with multiple COVID-19 risk factors for serious morbidity or mortality. Again, for these reasons it will be exceedingly hard for medical staff to keep people safe from contracting COVID-19 at San Quentin and, once infected, it will be very hard to ensure that they do not pass the infection on to others with high health risks or experience rapid health declines themselves."
>
> Source: Medical experts' urgent memorandum dated June 15, 2020, issued to the California Department of Corrections and Rehabilitation in response to the COVID-19 outbreak at San Quentin.

In contrast to the situation San Quentin faced with its antiquated infrastructure and limited physical resources, Corcoran did not experience such a mass outbreak. Despite the issues surrounding the transfers, Corcoran managed to limit the spread of COVID-19, likely because its infrastructure is better suited for quarantining incarcerated individuals. During the OIG's visit to Corcoran, staff informed us the transfer went smoothly and that before the transferred incarcerated persons arrived, staff prepared the housing areas where they were to be placed.

These areas have solid cell doors more suitable for proper quarantine as recommended by public health guidance. Only two of the 67 persons who transferred to Corcoran from the California Institution for Men had confirmed cases of the virus. The transfers to Corcoran occurred over a period of two days, with half the number of persons San Quentin received in a single day.

The length of time that was allowed for the transfer process to take place, combined with fewer individuals in the receiving and release unit of the prison, most likely enabled better preparation and organization in receiving the transferred persons.

Return to Contents

CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020 | 49

Given the clearly antiquated design of San Quentin's housing units as well as the prison's history, the decision by CCHCS and the department to transfer 122 medically vulnerable incarcerated persons to San Quentin is especially puzzling. San Quentin had one of the first documented disease outbreaks in a prison during the worldwide influenza pandemic of 1918, which was no doubt primarily attributable to the prison's infrastructure and to incarcerated persons being forced into close contact. According to the journal *Public Health Reports* in an article titled "Influenza at San Quentin Prison, California," published in May 1919, the outbreak of the "Spanish flu" at the prison occurred at the same time the respiratory disease impacted almost every part of the world.[13] San Quentin experienced three spikes of the influenza virus during the pandemic, which was well-documented in 1918. The report concluded that each epidemic was introduced by recently infected entrants, and that close contact in crowded and poorly ventilated rooms likely exacerbated the spread of the virus. This assessment is strikingly similar to the recent mass outbreak of COVID-19 at San Quentin State Prison.

Following the transfers from the California Institution for Men and the subsequent outbreak of COVID-19 at San Quentin, and at the instruction of the Federal Court in *Plata* v. *Newsom*, the department made efforts to identify and designate sufficient space at each institution to follow public health guidance on isolating and quarantining patients in the event of a future COVID-19



Photo 4. Prison section entryway; solid prison cell doors shown. (Photo taken by OIG staff on October 8, 2020, at California State Prison, Corcoran.)

---

13.  L. L. Stanley, "Influenza at San Quentin Prison, California," *Public Health Reports* (1896–1970), 34, no. 19 (May 9, 1919): 996–1008; published by Sage Publications, Inc., in collaboration with JSTOR as **a digital publication** available on the internet.



Photo 5. Solid prison cell door. (Photo taken by OIG staff on October 8, 2020, at California State Prison, Corcoran.)

outbreak. On July 31, 2020, the department submitted maps of 31 institutions in which space had been set aside for isolation and quarantine. We did not review the department's updated plans and related actions since the San Quentin outbreak, but the tragedy at San Quentin highlights the importance of prisons promptly quarantining and isolating incarcerated persons exposed to and infected with the virus.

### San Quentin Took Inadequate Precautions to Limit the Spread of COVID-19 Throughout the Prison

San Quentin's COVID-19 outbreak was not limited to its south block facility's Badger housing unit; the virus spread quickly throughout the prison. Despite precautions a prison may take to control the spread of infection among the incarcerated population, prison staff also become vectors for spreading the virus. While the outbreak at San Quentin likely began with the arrival of incarcerated persons from the California Institution of Men, the disease quickly coursed throughout the prison grounds. San Quentin's east block facility, where it houses condemned incarcerated persons, was the next facility to experience a widespread outbreak, and other housing areas followed shortly thereafter. Because San Quentin's condemned incarcerated persons rarely have contact with incarcerated persons from other areas of the prison, it is unlikely the incarcerated persons transferred from the California Institution for Men directly spread the virus to the east block facility. It is more likely the virus spread via other vectors, such as the prison's staff or incarcerated workers who performed duties in various areas of the prison.

Although many prison staff have assigned posts at which they work on a daily basis, many do not spend all their work hours in one location. Some prison staff, such as nurses, may visit multiple housing areas the same day as part of their regular duties. In addition, some staff may work shifts in different areas of the prison each day for various reasons; for example, some are dedicated to relieving sick or vacationing staff members throughout the prison. As a result, a staff member may work eight hours in the Badger housing unit in San Quentin's south block facility one day, coming into contact with multiple incarcerated persons and staff, then work in another San Quentin housing unit the next day, spending

Case 5:20-cv-06326-EJD    Document 17-26    Filed 01/06/22    Page 60 of 70

CDCR and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020    |    51

hours near the incarcerated persons living and staff working in that unit. The prison also routinely allows staff to exchange shifts because many commute long distances. Due to the shift exchanges, staff do not always work in the same place, but instead work at various locations throughout the prison.

Although the Centers for Disease Control recommended that custody staff limit their movement throughout the facility to the extent possible, San Quentin continued to allow its staff to work shifts across the prison. During our visit to San Quentin, an officer who contracted the virus told us he believed he likely contracted it when he worked a shift in the prison's south block facility, where several incarcerated persons were coughing and exhibiting symptoms of COVID-19. The officer also informed us he was later told that several of the incarcerated persons had tested positive for the virus. In addition, the officer said he had only a cloth face covering, which is not recognized as appropriate PPE; N95 respirators offer greater protection for the mouth and nose, and thus are more appropriate to wear when coming into contact with individuals confirmed to have COVID-19. He also stated that the prison frequently moved incarcerated persons after they arrived at the prison's south block facility, which likely also contributed to the spread of the disease. As early as March 2020, the Centers for Disease Control's interim guidance recommended correctional institutions organize staff assignments so that the same staff would work in the same locations over time to reduce the risk of transmission through staff movements.

This officer's attestation corroborates the conclusion of medical experts that prison staff likely were vectors for spreading the virus. According to prison records, we found that two prison staff who contracted the virus at the end of June 2020, had worked in San Quentin's south block Badger housing unit and also had assignments in the prison's east block facility in early June. Other staff who contracted the virus at the onset of the outbreak in June worked in the adjustment center facility or south block Badger housing unit, but also worked at several other locations.

It is also plausible that staff did not take precautions in wearing masks and maintaining physical distancing to contain the virus. In *Part Two* of our COVID-19 review series, we discussed in detail how prison staff and incarcerated persons frequently failed to adhere to departmental requirements to properly wear face coverings and practice physical distancing while on prison grounds. We concluded that unless the department clearly communicated and enforced face covering guidelines, it subjected its staff and the incarcerated population to risk of additional, preventable infections of COVID-19.

> "Prisons are epicentres for infectious diseases because of the higher background prevalence of infection, the higher levels of risk factors for infection, the unavoidable close contact in often overcrowded, poorly ventilated, and unsanitary facilities, and the poor access to healthcare services relative to that in community settings. Infections can be transmitted between prisoners, staff and visitors, between prisons through transfers and staff cross-deployment, and to and from the community."
>
> Source: *The Lancet.*

Return to Contents

Similarly, the department's June 15, 2020, urgent memorandum reported:

> In particular, we witnessed alarmingly suboptimal mask use by staff, and three "medical pass nurses" sitting in a work room without masks. Moreover, custody work stations are not set up to physically distance, no additional workstations appear to have been built yet. (Page 8 of the memorandum)

> At present work shift plans are inadequate from a public health perspective. For example, we learned about staff who were working in the Medical Isolation Unit (Adjustment Center) during the shift and were scheduled to work the next shift in the dorms. This is an enormous risk for the spread of COVID-19 between units. (Page 8 of the memorandum)

> Of note, because testing time is so slow, little to no contact tracing can happen. Furthermore, people incarcerated at San Quentin cannot be appropriately transferred within the prison based on test results if results are returned 6 days later and new exposure may have occurred in the interim. As a result, entire units are put on lockdown status for the span of a quarantine. (Page 5 of the memorandum)

The continued movement among staff throughout the prison and the lack of compliance with basic COVID-19 safety protocols likely contributed to the virus's rapid spread beyond San Quentin's south block Badger housing unit. On May 30, 2020, when the department transferred 122 incarcerated persons from the California Institution for Men to San Quentin, San Quentin reported zero COVID-19 cases. However, on June 1, 2020, the first incarcerated person at San Quentin tested positive; he had transferred from the California Institution for Men. On June 11, 2020, the prison reported 11 confirmed cases of COVID-19, and by June 14, 2020, the number of active cases had risen to 49. Just one day later, on June 15, 2020, that number jumped to 198 active cases. The prison's reported COVID-19 cases continued to increase exponentially thereafter, and by June 24, 2020, the prison had more than 1,000 reported active cases. The outbreak peaked the first week of July 2020, with the department reporting more than 1,600 active cases among the more than 3,300 incarcerated persons housed at San Quentin. A significant number of San Quentin staff also became infected during the outbreak.

> "Custody staff should be designated to monitor these individuals exclusively where possible. These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation and should limit their own movement between different parts of the facility to the extent possible."
>
> Source: The Centers for Disease Control's *Interim Guidance* as of March 23, 2020.

As Figure 6 shows, overall, by the end of August 2020, 2,237 incarcerated persons and 277 staff members at San Quentin had contracted COVID-19. The large number of COVID-19 cases resulted in numerous hospitalizations as well as deaths among San Quentin's incarcerated population and staff. Of the 122 medically vulnerable incarcerated persons transferred to San Quentin, two subsequently died. In total, according to the department's COVID-19 tracker, 28 incarcerated persons, and one staff member at San Quentin died.

**Figure 6. Cumulative Cases of COVID-19 Among Both the Incarcerated Population and Departmental Staff at San Quentin State Prison From May 31, 2020, Through August 31, 2020**



Note: **Confirmed Date** is the earliest collection date of a *positive* or *detected* COVID-19 test.

Source: Unaudited data provided by the California Department of Corrections and Rehabilitation to support its population and staff COVID-19 trackers.

## After Confirming Cases of COVID-19, Both San Quentin State Prison and California State Prison, Corcoran, Failed to Properly Conduct Contact-Tracing Investigations, Risking Further Spread of COVID-19

According to the Mayo Clinic, contact tracing can help slow the spread of infectious diseases, such as COVID-19.[14] The sooner health officials identify and alert close contacts of any persons infected with COVID-19, notifying them of potential exposure to the virus, the lower the risk of the virus spreading further. At the onset of the pandemic, CCHCS and the department issued two notable policies for health care and public health providers on matters related to COVID-19, including contact tracing:

1.  In a March 2020 memorandum, CCHCS and the department jointly advised health care providers concerning guidance received from various public health agencies. Included in the memorandum was the requirement for prisons to immediately report laboratory confirmed cases of COVID-19 to the institution's public health nurse, who would conduct a contact investigation and institute quarantine for those exposed.

2.  The guidance titled *COVID-19: Interim Guidance for Health Care and Public Health Providers* also included information on prevention strategies, including infection control, testing and treatment, and outbreak management strategies (see footnote 4 for the source of the guidance). This document provided that in response to a COVID-19 outbreak when one or more laboratory confirmed cases of COVID-19 were reported, surveillance should be conducted throughout the institution to identify contacts. A standardized approach to stop COVID-19 transmission is necessary by identifying people who have been exposed to a person with a laboratory-confirmed COVID-19 test. The interim guidance also outlined steps to perform contact tracing, which included but were not limited to, determining when other incarcerated persons or prison staff may have been exposed during a person's infectious period and identifying all close contacts. The steps also included identifying all activities and locations where exposure may have occurred, such as the infected person's movement history, cell and bed assignments, and transfers to and from other prisons or outside facilities, and identifying close contacts associated with each activity and movement. Staff were also to determine the last date of exposure of each of the contacts for the purpose of placing them in

---

14.  **Contact Tracing and COVID-19: What Is It and How Does It Work?** Mayo Foundation for Medical Education and Research, Rochester, Minnesota.

Case 5:20-cv-06326-EJD     Document 17-26     Filed 01/06/22     Page 64 of 70

CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020     |     55

Return to Contents

quarantine for a full incubation period (14 days) and isolating any contact who develops symptoms consistent with COVID-19.

Despite the policies and the confirmed positive cases of COVID-19 among the incarcerated persons who transferred from the California Institution for Men to San Quentin, staff at San Quentin did not follow the guidance and failed to conduct contact tracing to identify others who may have been exposed. On June 4, 2020, San Quentin received news of the first positive case of COVID-19 among its incarcerated population, and in the next three days, received test results for a total of 15 confirmed cases of COVID-19. All 15 of the confirmed positive COVID-19 cases were incarcerated persons who had transferred from the California Institution for Men. Laboratory results confirmed that those persons had the virus as early as June 1, 2020, the earliest date the prison had collected the test specimens. While San Quentin notified the California Institution for Men after learning of the first positive cases, its prison staff did not conduct any contact tracing to determine what, if any, interactions those persons may have had with other incarcerated persons or prison staff. In response to our request for contact tracing documentation, San Quentin essentially responded there were too many positive cases over a short period of time to conduct the contact tracing. Below is a quotation from San Quentin's response:

> All of the names listed in the attached chart are the inmates that transferred from [California Institution for Men] to San Quentin. Once the inmates resulted positive [*sic*], all of the inmates in the housing unit were tested. Per SQ's Public Health Nurse, individual contact tracing was not conducted due to the number of positives that resulted in a short time period. However, if an inmate were to result positive [*sic*] at this time, SQ is able to and is prepared to conduct contact tracing.

While Corcoran used the contact investigation tool as recommended in the guidance above, it appears the prison did not make a strong effort to identify all close contacts. In response to our request for documentation of all its pertinent contact tracing efforts, Corcoran provided two completed "Patient Contact Investigation Tool" documents, one document for each of two incarcerated persons transferred from the California Institution for Men who subsequently tested positive for COVID-19. One of the tools pertained to a positive test result received on June 3, 2020, the first positive test result of the persons transferred from the California Institution for Men. Laboratory results confirmed this incarcerated person had the virus as early as June 1, 2020, the date the prison obtained the test specimen.

On the investigation tool, prison staff only recorded the close contact housing and bed numbers of four adjacent cells, in which other persons who had transferred from the California Institution from Men were

Return to Contents

housed. The document also noted the department placed the infected incarcerated person in quarantine upon arrival at Corcoran. Because the department transported this person on the same bus as 24 other incarcerated persons and three transportation staff on May 29, 2020, we expected Corcoran staff to identify and trace those other individuals who may have been exposed. However, the investigation tool did not identify any staff or other incarcerated persons besides those living in the four adjacent cells.

The second contact investigation document Corcoran provided was similar to the first. It pertained to an incarcerated person who was tested for COVID-19 on June 10, 2020, and who received a positive test result the next day, on June 11, 2020. However, the document only identified six close contacts who had "beds/bunks within 6 feet" of the infected person. The document did not identify any staff members, nor did it identify any contacts at the California Institution for Men. Despite the OIG's request for complete contact-tracing documentation, Corcoran did not provide any other documentation showing it made further efforts to identify exposure.

If San Quentin and Corcoran staff had followed the department's policies and the Centers for Disease Control's guidance by properly tracing the contacts of the first confirmed cases, they may have reduced the spread of the infection to other incarcerated persons, prison staff, and transportation staff, and, in turn, reduced transmission from the prison into the community. San Quentin's assertion that its inadequate contact tracing was due to too many positive cases in a short period of time defies public health recommendations as well as the department's own policies, and we consider its incomplete investigations to be irresponsible. Contact tracing is a necessary step in curbing the spread of the virus, regardless of the number of positive cases present in a population. Had CCHCS and the department followed through with the recommended contact tracing, the number of individuals, both among the incarcerated population and the prison's own staff, who tested positive for COVID-19 may have been considerably reduced.

Case 5:20-cv-06326-EJD Document 17-26 Filed 01/06/22 Page 66 of 70
CCHCS and the Department Caused a Public Health Disaster at San Quentin State Prison During the COVID-19 Pandemic of 2020 | 57
Return to Contents

# Response to the OIG's Report

January 26, 2021

Roy W. Wesley, Inspector General
Office of the Inspector General
10111 Old Placerville Road, Suite 110
Sacramento, CA 95827

Dear Mr. Wesley,

California Correctional Health Care Services (CCHCS) and California Department of Corrections and Rehabilitation (CDCR) have reviewed the draft report titled *COVID-19 Review Series, Part Three: California Correctional Health Care Services and the California Department of Corrections and Rehabilitation Caused a Public Health Disaster at San Quentin State Prison When They Transferred Medically Vulnerable Incarcerated Persons From the California Institution for Men Without Taking Proper Safeguards*.

CCHCS and CDCR do not agree with all of the Office of Inspector General's information as presented, the conclusions drawn, and interpretation of the events in May 2020 to transfer medically vulnerable patients from California Institution for Men.



Sincerely,

J. CLARK KELSO
Receiver

KATHLEEN ALLISON
Secretary
CDCR

cc:     Richard Kirkland, Chief Deputy Receiver, CCHCS
        Diana Toche, D.D.S., Undersecretary, Health Care Services, CDCR
        Jeffrey Macomber, Undersecretary, Operations, CDCR
        Jennifer Barretto, Undersecretary, Administration, CDCR
        Roscoe Barrow, Chief Counsel, CCHCS Office of Legal Affairs
        Lara Saich, Director, Health Care Policy and Administration, CCHCS
        Joseph Bick, M.D., Director, Health Care Services, CCHCS
        Lisa Heintz, Director, Special Projects, CCHCS
        Tammy Foss, Director, Corrections Services, CCHCS
        Connie Gipson, Director, Division of Adult Institutions, CDCR
        Jackie Clark, Deputy Director (A), Institution Operations, CCHCS
        DeAnna Gouldy, Deputy Director (A), Policy and Risk Management Services,
          CCHCS
        Elizabeth Gransee, Deputy Director, Communications, CCHCS
        Renee Kanan, M.D., Deputy Director, Medical Services, CCHCS
        Barbara Barney-Knox, R.N., Deputy Director (A), Nursing Services, CCHCS
        Annette Lambert, Deputy Director, Quality Management, CCHCS



Return to Contents

*(This page left blank for reproduction purposes.)*

# The OIG's Comments Concerning the Response Received From California Correctional Health Care Services and the California Department of Corrections and Rehabilitation

Notwithstanding the disagreement expressed by CCHCS and the department in their response, we stand behind the results of our work. In fact, after we provided each of the entities with a draft of this report, we spoke with the receiver and made several edits in response to his feedback. We were not made aware of any other areas of disagreement.

*(This page left blank for reproduction purposes.)*

Office *of the* Inspector General, State of California

# COVID-19 REVIEW SERIES

## *Part Three*

**California Correctional Health Care Services and
the California Department of Corrections
and Rehabilitation Caused a Public Health
Disaster at San Quentin State Prison When
They Transferred Medically Vulnerable Incarcerated
Persons From the California Institution for Men
Without Taking Proper Safeguards**

## OFFICE *of the* INSPECTOR GENERAL

*Roy W. Wesley*
Inspector General

*Bryan B. Beyer*
Chief Deputy Inspector General

STATE *of* CALIFORNIA
February 2021

OIG