1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11

12

|  |  |
|---|---|
| **MICHAEL V. NICKERSON,** | No. 5:20-cv-06326-EJD (PR) |
| Plaintiff, | **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT** |
| **v.** | |
| **RON BROOMFIELD, et al.,** | |
| Defendants. | |

18

19          Plaintiff Michael V. Nickerson, a state prisoner housed at San Quentin State Prison, filed

20   this civil rights action under 42 U.S.C. § 1983, against Defendants Allison, Broomfield, and

21   Clark. Nickerson alleges that Defendants violated his Eighth Amendment rights when other

22   inmates were transferred from California Institution for Men (CIM) to San Quentin on May 30,

23   2020, allegedly causing him to contract COVID-19.

24          The Court has construed Nickerson's allegations as asserting an Eighth Amendment

25   deliberate indifference claim against Defendants for unsafe conditions at San Quentin.

26   Defendants moved to dismiss and for summary judgment, arguing that: (1) Nickerson did not

27   exhaust administrative remedies prior to filing this lawsuit; (2) Defendants are entitled to

28   qualified immunity; (3) Defendants are immune under the Public Readiness and Emergency

1

[Proposed] Order Granting Defs.' Mot. to Dismiss and for Summ. J. (5:20-cv-06326-EJD (PR))

1  Preparedness (PREP) Act, 42 U.S.C. § 247d-6d, *et seq.*; and (4) the operative complaint fails to

2  state a claim for deliberate indifference to safety. Defendants also requested the Court take

3  judicial notice of court records, official CDCR and CCHCS records, official United States Health

4  and Human Services records, and other official state and federal government records. Upon

5  reviewing the pleadings, for good cause appearing, the Court GRANTS Defendants' request for

6  judicial notice and their motion to dismiss and for summary judgment.

7  **BACKGROUND**

8  **I.    PLAINTIFF'S ALLEGATIONS AND CLAIMS**

9        Plaintiff Nickerson alleges that Defendants violated his Eighth Amendment rights by being

10  deliberately indifferent to unsafe conditions at San Quentin. Specifically, Nickerson alleges that

11  on May 31, 2020, Defendants improperly transferred 121 inmates from CIM to San Quentin.

12  (ECF No. 9 at 4.) Nickerson states that some of these transferred inmates were known to be

13  positive for COVID by both prisoners and medical staff. (*Id.*) Nickerson also alleged that

14  Defendants "were aware of the dangers and San Quentin being inadequate to keep inmates safe

15  due to old unventilated buildings, no PPE and room for social distance, no testing protocols in

16  place, and overcrowding." (*Id.*) Nickerson further alleges that "prison officials did not act until

17  inmates started dying," and that his requests for "PPE" and release from prison were denied. (*Id.*

18  at 4.) Nickerson alleges that he eventually tested positive for COVID after experiencing

19  headaches, problems breathing and sleeping, sore joints, and swollen legs. (*Id.*)

20  **II.    CDCR'S HEALTH CARE SYSTEM IS IN FEDERAL RECEIVERSHIP.**

21        In 2006, the court in *Plata v. Davis*, N.D. Cal. No. 01-cv-01351, appointed a federal

22  Receiver, and conferred on the Receiver "all the powers vested by law in the Secretary of the

23  [CDCR] as they relate to the administration, control, management, operation, and financing of the

24  California prison medical health care system," and suspended CDCR's exercise of those powers.

25  *Hines v. Youseff*, 914 F.3d 1218, 1223 (9th Cir. 2019); *see also Plata v. Schwarzenegger*, 603

26  F.3d 1088 (9th Cir. 2010); (Defs.' Req. Judicial Notice (RJN), Ex. A). Therefore, since 2006,

27  state officials have made decisions about prison medical care while under the supervision of the

28  federal Receiver, who was appointed to ensure compliance with the Eighth Amendment. *Id.*

2

1  **III.    CDCR's COVID-19 Response and the Transfer of Inmates from CIM to**
2  **San Quentin.**

3      CDCR began its COVID-19 policy development in late February 2020, when it became

4  apparent that the virus had spread into the United States and could pose a risk to CDCR inmates.

5  *Plata v. Newsom*, 445 F. Supp. 3d 557, 562 (N.D. Cal. Apr. 17, 2020.). The *Plata* Receiver and

6  CDCR implemented several measures intended to mitigate the risks associated with COVID-19

7  within the prisons, including reducing the inmate population, transferring inmates out of

8  dormitory housing to less crowded spaces, restricting movement, eliminating mixing of inmates

9  from different housing units, canceling visitation, distributing informational materials to inmates,

10  ordering additional hand sanitizing stations, and placing six-foot markers in communal areas.

11  *Plata*, 445 F. Supp. 3d at 562, 567. CDCR also activated "a centrally-located command center

12  where CDCR and the Receiver's experts monitor information, prepare for known and unknown

13  events, and exchange information centrally" to quickly make decisions and provide guidance. *Id.*

14  As the pandemic evolved, CDCR also suspended transfers between facilities and screened all

15  individuals entering prisons for known COVID-19 symptoms. *Id.*

16      Additionally, on April 10, 2020, the Receiver issued "Guidelines for Achieving and

17  Maintaining Social Distancing in California Prisons." *Plata*, 445 F. Supp. 3d at 565; (RJN Ex. C).

18  The guidelines required that inter-institution transfers be approved by the "Health Care Placement

19  Oversight Program (HCPOP) in consultation with the CCHCS[1] public health team" because such

20  transfers "risk carrying the virus from one institution to another." *Plata*, 445 F. Supp. 3d 557,

21  565; (RJN Ex. C). Two days later, the Receiver issued a supplemental memo clarifying that his

22  April 10 directive was not intended "to affect any inter-institution transfers that are to address

23  either medical, mental health, or dental treatment needs that are not available at the sending

24  institution, such as to provide a higher level of care or to reduce or prevent morbidity or mortality,

25  or a safety or security issue that cannot be managed by the sending institution." *Plata*, 445 F.

26  Supp. 3d at 565; (RJN Ex. D). Under these guidelines, hundreds of inmates were moved out of

27

28      [1] The Receiver heads CCHCS. *See* https://cchcs.ca.gov/wp-content/uploads/sites/60/NR/execOrgchart.pdf
(last visited on December 22, 2021.)

3

1   dormitory housing to available spaces in other prisons to achieve greater physical distancing.

2   *Plata*, 445 F. Supp. 3d at 563. Furthermore, by mid-April 2020, California's Prison Industry

3   Authority was producing cloth barrier masks for inmates and staff at a rate of approximately

4   22,000 per day. *Plata*, 445 F. Supp. 3d 567.

5       Throughout all of this, the *Plata* court monitored CDCR's COVID-19 response at frequent

6   Case Management Conferences. *See generally Plata v. Newsom,* 01-CV-01351-JST (N.D. Cal.

7   2001); *Plata*, 445 F. Supp. 3d at 569.

8       Despite CDCR's efforts, the first inmate tested positive for COVID-19 on March 20, 2020.

9   (RJN, Ex. E at 58-59.) CIM was the first CDCR institution to experience a large outbreak. (RJN,

10  Ex. F at 11-12.) CIM's outbreak posed significant risks to the inmate population there because

11  most, if not all, of CIM inmates were housed in dormitories. (*Id.*) According to the *Plata*

12  Plaintiffs, "[c]rowded indoor rooms, such as dormitories with poor ventilation, are prime

13  environments for the spread of the infection," which in early- to mid-2020 they believed "spread

14  through droplet transmission." (RJN, Ex. I at 2.) At that time, it "was not yet clear that the virus

15  could survive and spread in an aerosolized form." (RJN, Ex. F at 12.) Initially, the outbreak at

16  CIM remained confined to a few dorm facilities, and the *Plata* court believed CDCR's strategy of

17  sheltering inmates in place at CIM was working. *Plata*, 445 F. Supp. 3d at 563. But the *Plata*

18  plaintiffs still demanded to transfer more inmates out of dorm settings. *Id.*

19      Then, the outbreak spread to "a previously unaffected dorm housing a large number of

20  older, COVID-19 high-risk patients." (RJN, Ex. F at 12.) The question facing the Receiver at that

21  point was **"whether to leave those patients where they were—even though they were at an**

22  **increasing risk of contracting COVID-19—or to transfer those patients to a safer**

23  **institution."** (*Id.* (emphasis added).) The *Plata* plaintiffs demanded that CDCR transfer these

24  inmates out of CIM. (RJN Ex. G at 4, 10; Ex. H at 10–11, 14; and Ex. I at 2–3.)

25      On May 23, 2020, faced with a growing outbreak that had spread to every housing unit at

26  CIM, and pressure from the *Plata* plaintiffs, "the Receiver, in consultation with the Secretary,

27  directed that high-risk inmates at CIM who test negative for COVID-19 be transferred to facilities

28  in institutions that remained COVID-19 free." (RJN, Ex. E at 60:11-61:16, Ex. I.) The decision

4

1    "involved a balancing of the growing risks to the CIM patients against the risks of any large scale

2    transfer." (RJN, Ex. E at 59.) The Receiver "notified CDCR that 691 high-risk inmates at CIM

3    tested negative for COVID-19 and should be transferred out." (RJN, Ex. I at 14.) At the time,

4    CCHCS's protocols for inmate transfers stated: "COVID screen and test if patient is to transfer.

5    May transfer if COVID screen and test negative." (RJN, Ex. F at 12.) But the protocol did not

6    specify how soon inmates needed to be tested before a transfer. (*See id.*) That was consistent with

7    guidance from the U.S. Centers for Disease Control and Prevention, which likewise had no pre-

8    transfer testing timeline. (RJN, Exs. B, N.) The Centers recommended "perform[ing] verbal

9    screening and a temperature check" in case of necessary inmate transfers. (*Id.*) But the Centers'

10   guidance did not recommend testing immediately before a transfer, nor did it recommend that the

11   verbal or temperature screening occur within a set period of time before the transfer. (*Id.*)

12        Accordingly, 122 medically-vulnerable inmates were transferred from CIM to San Quentin

13   on May 30, 2020. (ECF No. 30 at 7.) All of the inmates had a negative COVID-19 test, but

14   "many of the inmates who were transferred from CIM had tests that were two, three, and even

15   four weeks old" because, as noted above, the existing protocols did not require testing within a

16   specific amount of time. (RJN, Ex. F at 13, Ex. E at 60, Ex. J at 9, n.5.)

17        Because of the emergent outbreak, CCHCS also approved an increase in the number of

18   inmates who could be put in each bus for this transfer. (RJN, Ex. L (OIG Report)). Though each

19   bus could accommodate up to 38 inmates, to improve social distancing, CDCR had limited the

20   number of inmates per bus to 19. (*Id.* at 38-39.) For this transfer, however, CCHCS approved

21   increasing that number to 25 (still only 65% capacity), so long as the CIM inmates were from the

22   same dorm and tested negative for COVID-19 before the transfer. (*Id.*) CCHCS's guidance from

23   May 22, 2020, also did not require protective quarantine for inmates awaiting test results before

24   or after the transfer. (*Id.* at 34.)

25        About a week after the transfer of the 122 inmates from CIM to San Quentin, the Receiver

26   issued a new "testing and transfer strategy" dictating that "a patient should not transfer if the date

27   of their negative test was seven or more days prior to the date of transfer. (RJN Ex. K at 11-14.)

28

**IV.**    **THE PUBLIC READINESS AND EMERGENCY PREPAREDNESS (PREP) ACT PROVIDES IMMUNITY DURING PUBLIC HEALTH EMERGENCIES.**

Fifteen years before COVID-19 emerged, Congress enacted the PREP Act. Under the PREP Act, the Secretary of the U.S. Department of Health and Human Services (HHS) may issue a Declaration in response to a public health emergency, which immunizes certain individuals and entities from suit under federal and state law for all claims of loss "caused by, arising out of, relating to, or resulting from" the administration of a "covered countermeasure" during the public health emergency. 42 U.S.C. § 247d-6d(a)(1) & (b); *see also Garcia v. Welltower OpCo Grp. LLC*, 522 F. Supp. 3d 734 (C.D. Cal. Feb. 10, 2021.).

In March 2020, the HHS Secretary issued a declaration invoking this broad immunity for covered persons tasked with the administration of COVID-19 screening and testing, PPE, mechanical ventilation, and other countermeasures necessary to treat and mitigate the spread of COVID-19. *See Decl. Under the PREP Act for Medical Countermeasures Against COVID-19,* 85 Fed. Reg. 15198-01. The HHS Secretary has since amended the Declaration seven times, and the HHS's Office of General Counsel has issued advisory opinions, elaborating on the PREP Act's immunity to program planners who must make managerial and operational decisions about the use of COVID-19 countermeasures. *See* 85 Fed. Reg. 79191; 86 Fed. Reg. 14462; (RJN Ex. M).

**V.**    **EXHAUSTION OF ADMINISTRATIVE REMEDIES.**

**A.**    **The California Inmate-Grievance Process.**

Under title 15, section 3481(a), of the California Code of Regulations, an inmate may appeal any departmental decision, action, condition, or policy that has a material adverse effect on the inmate's health, safety, or welfare. Cal. Code Regs., tit. 15 § 3481(a) (2020); (Decl. Bell Supp. Defs.' Mot. Summ. J. (Bell Decl.) ¶ 4.) To initiate the grievance process, an inmate must submit an Inmate/Parolee Appeal Form, commonly known as a 602 inmate grievance, within thirty calendar days of the event or decision being appealed. Cal. Code Regs., tit. 15, §§ 3482(b)–(d). In the original CDCR Form 602, the inmate must specify each claim and the relief requested, and name all involved staff members and describe their alleged conduct. *Id.* at § 3482(c)(2).

6

1    The grievance process in 2020—the timeframe relevant to Nickerson's complaint—

2    consisted of two levels of review: (1) the institutional-level review conducted by the Institutional

3    Office of Grievances (no officer ranking lower than a Chief Deputy Warden); and (2) the

4    director's-level review conducted by the Office of Appeals in Sacramento, California (no officer

5    ranking lower than the Associate Director of Appeals). Cal. Code Regs. tit. 15, §§ 3481(a)–(b).

6    (Bell Decl. ¶ 5.) A substantive decision by the Office of Appeal exhausts all available

7    administrative remedies. Cal. Code Regs. tit. 15, §§ 3483(m), 3485. (Bell Decl. ¶ 6.) A grievance

8    that is not pursued through the final level of review does not exhaust administrative remedies, *id.*

9    § 3486(m), unless the issue under appeal was fully resolved at a lower level of review, *id.*

10    § 3483(m)(2). (Bell Decl. ¶ 6.)

11    **B.    Nickerson Identified One Grievances Regarding His Claims.**

12    Nickerson alleges that he submitted inmate grievance log number 08563 regarding his

13    claims, but the grievance was "never answered by the Office of Appeals." (Pl.'s Am. Compl.,

14    ECF 9, at 1–2.) Nickerson contends that he did not finish the exhaustion process because of "staff

15    not answering appeals in a timely fashion." (*Id.* at 2.) In his original complaint, Nickerson stated

16    that he submitted grievances log number 08563, on June 25, 2020, and he was notified by the

17    Office of Grievances that he would be given a response by August 25, 2020. (ECF No. 1 at 1, 4.)

18    Nickerson insists that, under the prison's regulations, his grievance should have been responded

19    to within 30 working days; and, based on that assumption, Nickerson surmised that the grievance

20    process was unavailable to him. (*Id.*) Under the regulations, however, the Office of Grievances

21    has 60 calendar days, after receipt of the grievance, to provide written response. *See* Cal. Code

22    Regs. tit. 15, §§ 3483(i).

23    **C.    Nickerson's Grievance Number 08563.**

24    Nickerson submitted grievance number 08563 for institutional-level review on June 25,

25    2020. (Bell Decl. ¶ 19.) In this grievance, Nickerson complained that his health and safety was

26    endangered because of the transfer of inmates from CIM to San Quentin, and also because of the

27    lack of social distancing, lack of protective equipment, and lack of programming. (Bell Decl.

28    ¶ 19, Ex. C.) He also complained that "the mere fact [he was] being held in a confined space in a

7

1   national pandemic with communal feeding [was] harm caused by CDCR." (*Id.*) Nickerson further

2   complained that inmates who tested positive for COVID-19 were sent to administrative

3   segregation, rather than being sent to the hospital or given other care. (*Id.*) For relief, Nickerson

4   requested "to be given adequate protective gear . . ., some form of outside recreation, a reduction

5   of the population to adequately social distance, a better way of handling those who test positive,

6   or have high temperature, and a release from the prison industrial complex." (*Id.*)

7       The same day, on June 25, 2020, the Office of Grievances at San Quentin sent Nickerson a

8   letter acknowledging receipt of his grievance. (ECF No. 1 at 4; Bell Decl. ¶ 19.) In the letter,

9   Nickerson was advised that the Office of Grievances will complete its review of the grievance no

10  later than August 25, 2020. (*Id.*) On August 20, 2020, the Office of Grievances at San Quentin

11  disapproved the grievance. (Bell Decl. ¶ 19, Ex. C.) On August 21, 2020, the Office of

12  Grievances' decision was sent to Nickerson, and Nickerson was advised that he may appeal the

13  decision to the Office of Appeals, if dissatisfied. (*Id.*) Nickerson did not appeal the Office of

14  Grievances' decision to the final level of review. (ECF No. 9 at 2; Moseley Decl. ¶¶ 7–10.)

15  Instead, he filed this lawsuit.

16                                   **DISCUSSION**

17  **I.    LEGAL STANDARD FOR DISMISSAL UNDER RULE 12(B)(6).**

18      Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for failure to

19  state a claim where: (1) the plaintiff fails to state a cognizable legal theory, or (2) the plaintiff

20  alleges insufficient facts under a cognizable legal theory. *Somers v. Apple, Inc.*, 729 F.3d 953,

21  959 (9th Cir. 2013). In ruling on a Rule 12(b)(6) motion, a court's review is limited to the

22  contents of the complaint, including documents attached to the complaint, or documents the

23  complaint necessarily relies on and whose authenticity is not contested. *Lee v. City of Los*

24  *Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). In addition, the court may take judicial notice of facts

25  that are not subject to reasonable to dispute. *Id.* at 688–689 (discussing Fed. R. Evid. 201(b)).

26  **II.   LEGAL STANDARD FOR SUMMARY JUDGMENT BASED ON EXHAUSTION.**

27      Summary judgment is appropriate "where there is no genuine issue as to any material fact,

28  and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The PLRA

                                         8

1  requires inmates to exhaust available administrative remedies before filing § 1983 lawsuits. 42

2  U.S.C. § 1997e(a). Unexhausted claims cannot be considered and must be dismissed. *McKinney*

3  *v. Carey*, 311 F.3d 1198, 1200 (9th Cir. 2002) (per curiam); *Jones v. Bock*, 549 U.S. 199, 219-20

4  (2007). The exhaustion defense may be brought in a motion for summary judgment, and should

5  be decided before reaching the merits of an inmate's claim. *Albino v. Baca*, 747 F.3d 1162, 1168,

6  1170 (9th Cir. 2014) (en banc). Defendants bear the burden of demonstrating that there was an

7  available administrative remedy that the inmate did not exhaust. *Id.* at 1172. The plaintiff then has

8  the burden of producing evidence showing that there is something in his particular case that made

9  administrative remedies unavailable to him. *Id.* (citations omitted). If undisputed evidence shows

10 a failure to exhaust, defendants are entitled to summary judgment. *Id.* at 1166. If the motion for

11 summary judgment is denied because of disputed factual questions relevant to exhaustion, then an

12 *Albino* hearing should be held so that a judge can resolve those questions. *Id.* at 1170–71.

13 **III.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE NICKERSON**
        **FAILED TO EXHAUST HIS CLAIMS AGAINST THEM.**
14

15      Inmates are required to exhaust available administrative remedies before filing lawsuits

16 regarding prison conditions, 42 U.S.C. § 1997e(a), and they must do so in accordance with the

17 prison's grievance requirements, *Jones v. Bock*, 549 U.S. 199, 220 (2007). Proper exhaustion

18 requires "using all steps that the agency holds out, and doing so properly." *Woodford v. Ngo*, 548

19 U.S. 81, 90 (2006). And, as discussed above, pp. 6–7, *supra*, the state provides its prisoners with

20 the right to administratively grieve any departmental decision, action, condition, or policy that has

21 an adverse effect on their welfare. Cal. Code Regs. tit. 15, § 3481(a) (eff. June 1, 2020).

22      It is also required that exhaustion be complete before filing suit: "No action shall be

23 brought with respect to prison conditions under section 1983 of this title, or any other Federal law

24 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). And

25 a complaint is "brought" when the prisoner submits it to the court, at which time a prisoner must

26 have exhausted administrative remedies. *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir.

27 2006). A prisoner cannot exhaust *pendente lite*, or during the pendency of the litigation.

28 *McKinney v. Carey*, 311 F.3d 1198, 1201 (9th Cir. 2002) (affirming dismissal of action for failure

9

1  to exhaust when prisoner is in the process of exhausting administrative remedies when the

2  dismissal motion was filed); *see also Vaden*, 449 F.3d at 1051 ("Because [plaintiff] did not

3  exhaust his administrative remedies prior to sending his complaint to the district court, the district

4  court must dismiss his suit without prejudice.").

5      Here, Nickerson submitted only one inmate grievance (number 08563) that mentioned or

6  complained about the transfer of COVID-positive inmates from CIM to San Quentin and the lack

7  of social distancing, protective equipment, and programs. (ECF No. 1 at 4; ECF No. 9 at 3; Bell

8  Decl. ¶ 19.) But this grievance does not exhaust Nickerson's administrative remedies because it

9  was not presented to the final level of review. (Bell Decl. ¶ 19; Moseley Decl. ¶ 7–10.) Nickerson

10 concedes that this grievance was not exhausted through the final level of review, but he contends

11 that the grievance process was unavailable to him because he did not receive a response to his

12 grievance within 30 working days. (ECF No. 1 at 1; ECF No. 9 at 2.) Specifically, Nickerson

13 states that he "did not go to the last levels due to staff not answering appeals in a timely fashion."

14 (ECF No. 9 at 2.) Nickerson asserts that the institutional-level review to his grievance should

15 have been completed within "30 working days." (ECF No. 1 at 1.)

16     But, as discussed above, Nickerson is incorrect. The relevant regulations provide that the

17 Office of Grievances has 60 calendar days from receipt of a grievance to respond. Cal. Code

18 Regs. tit. 15, §§ 3483(i). Nickerson submitted grievance number 08563 for institutional level

19 review on June 25, 2020. (Bell Decl. ¶ 19.) The same day, the Office of Grievances sent

20 Nickerson a letter acknowledging receipt of the grievance and advising Nickerson that the review

21 of his grievance will be completed no later than August 25, 2020. (ECF No. 1 at 4; Bell Decl. ¶

22 19.) On August 20, 2020, the Office of Grievances at San Quentin disapproved the grievance, and

23 the decision was sent to Nickerson the next day. (Bell Decl. ¶ 19, Ex. C.) Nickerson was also

24 advised that he may appeal the decision to the Office of Appeals, if dissatisfied. (*Id.*) Nickerson,

25 however, abandoned the grievance process and submitted his complaint in this action on August

26 25, 2020, the date that the Office of Grievances stated it would respond to his grievance. (ECF

27 No. 1 at 3, 7); *cf. Huizar v. Carey*, 273 F.3d 1220, 1223 (9th Cir. 2001). Therefore, the Court

28

grants Defendant's summary-judgment motion, and Nickerson's action is DISMISSED without prejudice for failure to exhaust administrative remedies.

## IV. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Even if Nickerson had properly exhausted his claims, however, qualified immunity would bar them. Qualified immunity shields government officials from damages liability unless: (1) they violate a federal statutory or constitutional right; and (2) that right was "clearly established" at the time of the challenged conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). The first prong of the qualified-immunity inquiry is whether a constitutional right would have been violated on the facts alleged. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A determination in the defendants' favor on either question establishes immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Courts may decide which prong of the analysis to address first, *Pearson*, 555 U.S. at 236–39, but are encouraged to begin with the second prong because it can be determined as a matter of law early in a case, *see Morales v. Fry*, 873 F.3d 817, 822–23 (9th Cir. 2017).

A right is "clearly established" only if the law is so clear that, under the particular circumstances the official faced, "every 'reasonable official would understand that what he is doing' is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)); *see Morales*, 873 F.3d at 823 (emphasizing "every" reasonable official—not just "a" reasonable official—would understand the conduct was unlawful). To conduct this analysis, a court first defines the circumstances with which the defendants were confronted, then analyzes existing case law to determine whether controlling authority—or a robust consensus of persuasive authority—found a constitutional violation "under similar circumstances." *Wesby*, 138 S. Ct. at 590–91. Qualified immunity thus "gives government officials breathing room to make reasonable but mistaken judgments" and "protects all but the plainly incompetent or those who knowingly violate the law." *Messerchmidt v. Millender*, 565 U.S. 535, 546-47 (2012).

The plaintiff "bears the burden of showing that the right at issue was clearly established." *Emmons v. City of Escondido*, 921 F.3d 1172, 1184 (9th Cir. 2019). The Ninth Circuit describes this inquiry as "highly contextualized" and "fact-intensive." *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016). Of course, "a plaintiff need not find a case with identical facts in order to

11

1  survive a defense of qualified immunity; …, one can imagine a situation where the officials'

2  conduct is so egregious that no one would defend it, even if there were no prior holding directly

3  on point." *Id.* at 1095. "But it should be equally obvious that the farther afield existing precedent

4  lies from the case under review, the more likely it will be that the officials' acts will fall within

5  the vast zone of conduct that is perhaps regrettable but is at least arguably constitutional." *Id.*

6      Here, Defendants are entitled to qualified immunity under *Saucier*'s first prong because

7  Nickerson has not pled facts that, if true, evidence a constitutional violation. *See Iqbal*, 556 U.S.

8  at 675-684 (defendants entitled to qualified immunity because plaintiff's complaint was based on

9  "bald" and "conclusory" allegations); *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012)

10  (defendants entitled to immunity where complaint did not allege a "*specific* policy implemented

11  by the Defendants or a *specific* event or events instigated by the Defendants"); pp. 18–20, *infra*.

12      The Court also dismisses this action under *Saucier's* second prong because neither binding

13  precedent nor a robust consensus of persuasive authority would have put every reasonable official

14  on notice, in May and June 2020, that a particular COVID-19 response, which was directed by a

15  court-appointed Receiver, would violate the Eighth Amendment. In two analogous cases, *Hines v.

16  Youseff*, 914 F.3d 1218 (9th Cir. 2019) and *Rico v. Ducart*, 980 F.3d 1292 (9th Cir. 2020), the

17  Ninth Circuit found CDCR officials qualifiedly immune.

18      In *Hines v. Youseff,* the Ninth Circuit found CDCR officials qualifiedly immune because

19  not "every reasonable official would [have understood] that exposing inmates to a heightened risk

20  of Valley Fever violated the Eighth Amendment." 914 F.3d at 1229-30. The Ninth Circuit based

21  this decision at least in part on the fact that a "federal Receiver appointed by the federal court to

22  assure Eighth Amendment compliance actively managed the state prison system's response to

23  Valley Fever." *Id.* at 1231. And, because "the Receiver oversaw prison medical care and

24  protective measures regarding Valley Fever, state officials could have reasonably believed that

25  their actions were constitutional so long as they complied with the orders from the Receiver and

26  the *Plata* court." *Id.* The analysis applies equally here.

27      Similarly, in *Rico v. Ducart,* the Ninth Circuit held CDCR officials qualifiedly immune for

28  the alleged improper implementation of Guard One suicide-prevention protocols, which were

12

[Proposed] Order Granting Defs.' Mot. to Dismiss and for Summ. J. (5:20-cv-06326-EJD (PR))

1   implemented as part of the remedial phase of the long-running *Coleman v. Newsom* class action.

2   *Rico*, 930 F.3d at 1301-02. The *Rico* plaintiff alleged that floor officers performed the suicide-

3   prevention checks in a manner that disrupted his sleep: officers caused extra noise by running up

4   and down the metal stairs, using the Guard One equipment more loudly than necessary, and

5   rushing through the checks. *Id.* But because the protocol itself was required by the federally-

6   appointed *Coleman* special master, the Ninth Circuit held that an officer could have reasonably

7   believed that complying with the *Coleman* court's directive, even while making more noise than

8   necessary, would not violate the Eighth Amendment. The court noted the difficult position facing

9   the *Rico* defendants: "A reasonable guard could be uncertain whether it was better to rush to

10  complete checks—making more noise for a shorter period of time—or to more slowly complete

11  checks—making less noise for a longer period time." *Id.* Even if the officers did, in fact, create

12  extra noise in conducting Guard One checks, they were entitled to qualified immunity because

13  their actions fell "within the vast zone of conduct that is perhaps regrettable but is at least

14  arguably constitutional." *Id.* at 1303 (quoting *Hamby*, 821 F.3d 1095).

15      Like in *Hines* and *Rico*, a surrogate of the federal court—here, the *Plata* Receiver, as well

16  as the *Plata* court itself—supervised CDCR's COVID-19 response. The *Plata* court expressed its

17  intention to—and did—continually monitor CDCR's response to COVID-19, convening weekly

18  case management conferences during which the *Plata* plaintiffs reported on the growing outbreak

19  at CIM. *Id.* at 569; (RJN, Exhs. G-K). When the *Plata* court reviewed CDCR's response up

20  through April 17, 2020, it found the response was consistent with the Eighth Amendment. *Plata*,

21  445 F. Supp. 3d at 562. Then, at the urging of the *Plata* plaintiffs, and the direction of the federal

22  Receiver, CDCR moved 122 medically vulnerable inmates from CIM to San Quentin. (RJN,

23  Exhs. Ex. E at 60:11-61:16, F at 13, I at 14.)

24      As in *Hines* and *Rico*, the decision to transfer those inmates, based on negative COVID-19

25  tests from prior weeks, was made under the direction of a federal Receiver. (*Id.*) The Receiver's

26  then-existing protocols did not mandate how far in advance of the transfer the tests must be

27  conducted. (RJN, Ex. F at 13, Ex. E at 60, Ex. J at 9, n.5.) Nor did they require quarantining of

28  the inmates after transfer. (*Id.*) Under these circumstances, one cannot say that every reasonable

1   official would have known that following the directions of the Receiver, who was appointed to

2   ensure compliance with the Eighth Amendment, and transferring medically vulnerable inmates

3   out of CIM to protect them from COVID-19, would violate the Eighth Amendment.

4       Moreover, out-of-circuit authority supports the conclusion that an imperfect response to

5   COVID-19 in correctional settings is not inherently unconstitutional. *See Swain v. Junior*, 961

6   F.3d 1276, 1283-84 (11th Cir. 2020) ("a resulting harm cannot establish a culpable state of mind,"

7   and holding the entirety of the facility's COVID-19 response was reasonable, despite response's

8   failure to mitigate the spread of COVID-19); *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir.

9   2020) (Federal Bureau of Prisons' response to COVID-19 demonstrated officials responded

10  reasonably, despite the fact that six people died).

11      District courts also have not reached a broad consensus about whether the failure to take

12  certain countermeasures, similar to those identified in Nickerson's operative complaint, violate

13  the Eighth Amendment. In *Kesling v. Tewalt*, 476 F. Supp. 3d 1077, 1087-88 (D. Idaho Aug. 4,

14  2020), the district court dismissed a plaintiff's Eighth Amendment claim premised on the failure

15  to issue masks and failure to isolate inmates pending COVID-19 test results, noting that "it would

16  be impossible to isolate every inmate who would be potentially infected." *Id.* In *Young v. Bonner*,

17  No. 2:20-cv-02614-TLP, 2021 WL 4699089, at *1 (W.D. Tenn. Oct. 7, 2021), the district court

18  found no Eighth Amendment claim where prison officials "placed inmates from another facility

19  into the pod without testing them" for COVID-19 in April 2020. Other courts have scrutinized

20  more specific allegations about COVID-19 countermeasures and come to similar conclusions.

21  *Garcia v. Los Angeles County*, No. 2:20-cv-08528-JVS-KES, 2021 WL 4497213, at *4-5 (C.D.

22  Cal. July 7, 2021) (dismissing deliberate indifference claims premised on "refusing to retest

23  inmates who previously tested positive," not providing adequate social distancing, and "not

24  testing inmates coming into MCJ"); *Jones v. Lay*, 4:20-cv-1325-BRW-BD, 2021 WL 687342

25  (E.D. Ark. Jan, 25, 2021) ("reasonable correctional officials would not have known that allowing

26  [plaintiff] to remain in a barracks [with other COVID-19 positive inmates] for six days after his

27  negative test results was a violation of clearly established law"), *R. & R. adopted,* 2021 WL

28  686667 (Feb. 22, 2021); *Adam Lane ADC 155843 v. William Straughn, et al.*, No. 4:20-cv-01067-

14

1   BRW-JTK, 2021 WL 5240179, at *6 (E.D. Ark. Oct. 13, 2021) ("[A]t the time Plaintiff raised his

2   concerns, there was no clearly-established right as to prison ventilation and COVID-19

3   protocols."), *R. & R. adopted*, 2021 WL 5239973 (Nov. 10, 2021); *Freemen v. United States*, No.

4   2:20-13341-KM, 2021 WL 4129479, at *3-4 (D.N.J. Sept. 9, 2021) (inmate with bronchitis and

5   asthma who cleaned COVID-19 transport van with inadequate masks and gloves did not state an

6   Eighth Amendment claim). That these district court opinions address allegations that arose in the

7   early months of the pandemic shows that what constitutes an Eighth Amendment violation is still

8   in the process of "becoming established." *Sorrels*, 290 F.3d at 971. As these opinions show, no

9   existing precedent would have placed Defendants on fair and clear notice, in May 2020, that their

10   conduct might violate the Constitution.

11       Because existing precedent did not recognize the unconstitutionality of this particular

12   response to the COVID-19 pandemic, the allegations fall "within the vast zone of conduct" that is

13   at least arguably constitutional. *Hamby*, 821 F.3d at 1095. Even if more could have been done, the

14   *Plata* court noted in April 2020 that "the Eighth Amendment does not afford litigants and courts

15   an avenue for a *de novo* review of the decisions of prison officials." *Plata v. Newsom*, 445 F.

16   Supp. 3d at 569 (citing *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1132 (N.D. Ill. 2020)). "Nor

17   does the failure to eliminate all risk establish that the Government was deliberately indifferent."

18   *Hope v. Warden, York City Prison*, 972 F.3d 310, 330 (3rd Cir. 2020). In hindsight, additional or

19   heightened measures could have been taken, but no robust consensus of authority would have put

20   Defendants on notice that, in these circumstances, where a burgeoning outbreak threatened the

21   lives of 122 medically vulnerable inmates, the failure to take additional measures violated the

22   Eighth Amendment. Therefore, the Court grants Defendants' motion to dismiss because

23   Defendants are entitled to qualified immunity.

24   **V.    DEFENDANTS ARE ALSO ENTITLED TO IMMUNITY UNDER THE PREP ACT.**

25       The PREP Act authorizes the HHS Secretary to issue a Declaration immunizing certain

26   individuals and entities from suit under federal and state law for all claims of loss "caused by,

27   arising out of, relating to, or resulting from" administration or use of a "covered countermeasure"

28   during a health emergency. 42 U.S.C. § 247d-6d(a)(1) & (b). "Once the [HHS] Secretary has

15

1    issued a declaration, the PREP Act provides sweeping immunity for certain claims against certain

2    individuals." *Garcia*, 522 F. Supp. 3d at 739. Here, Defendants are immune under the PREP Act

3    because Nickerson's allegations show that Defendants are "covered persons" and that his injuries

4    arose out of the administration of "covered countermeasures."

5        **A.    Defendants, as Program Planners, Are "Covered Persons."**

6        A "covered person" is a "program planner" of a covered countermeasure, or "an official,

7    agent, or employee" of a program planner. 42 U.S.C. § 247d-6d(i)(2)(B). A "program planner," in

8    turn, is a state or local government or their employee who supervised or administered a program

9    concerning the administration, dispensing, provision, or use of a countermeasure, and who

10   establishes requirements, provides policy guidance, or supplies technical advice or assistance, or

11   provides a facility to administer or use countermeasures. (RJN Ex. N.)

12       Defendants Allison and Broomfield were allegedly "aware of the [COVID-19] dangers,"

13   but failed to provide "PPE, and . . . testing" to Nickerson. (ECF No. 9 at 3.) Since COVID-19

14   tests and other countermeasures necessary to treat and mitigate the spread of COVID-19, such as

15   PPE, are covered countermeasures under the PREP Act, Defendants' alleged role in providing

16   policy guidance and establishing requirements for COVID-19 testing and PPE distribution

17   establish that Defendants were "program planners," and thus covered persons. *See Decl. Under*

18   *the PREP Act for Medical Countermeasures Against COVID-19,* 85 Fed. Reg. 15198-01.

19       **B.    Plaintiffs' Alleged Loss Arises Out of the Administration of Covered**
         **Countermeasures.**
20

21       Nickerson's loss arose out of Defendants' administration of covered countermeasures. First,

22   countermeasures include items such as COVID-19 testing, PPE, respirators, mechanical

23   ventilation, thermometers, and face shields. 85 Fed. Reg. 15202; *see also* The Coronavirus Aid,

24   Relief and Economic Security Act (CARES) § 3103, Pub. L. No. 116-136 (March 27, 2020).

25       Second, "administration" means either 1) "physical provision of countermeasures";

26   2) "activities and decisions relating to public and private delivery, distribution, and dispensing of

27   the countermeasures to recipients"; or 3) "the management and operation of countermeasure

28   programs or management and operation of locations for purpose of distributing and dispensing

16

1    countermeasures." 85 Fed. Reg. 15201. This last aspect of the definition applies even to claims

2    that do not relate directly to the countermeasure, "such as a slip-and-fall injury or a vehicle

3    collision by a recipient receiving a countermeasure at a retail store serving as an administration or

4    dispensing location that alleges, for example, lax security or chaotic crowd control." *Id.*

5        The immunity also applies in "non-use" situations, such as where there is "prioritization or

6    purposeful allocation of a covered countermeasure, particularly if done in accordance with a

7    public health authority's directive." 85 Fed. Reg. 79197. When program planners decide how to

8    use or allocate available countermeasures (as opposed to simple nonfeasance or the failure to

9    obtain countermeasures *in toto*), they are entitled to immunity. *Id*; (RJN Ex. N ("decision-making

10   that leads to the non-use of covered countermeasures by certain individuals is the grist of program

11   planning, and is expressly covered by the PREP Act")); *Garcia*, 522 F. Supp. 3d. at 745.

12       Nickerson directly connects his injuries to Defendants' administration of countermeasures.

13   (ECF No. 9 at 3.) Nickerson alleges that he did not receive a timely COVID-19 test and PPE,

14   which are covered countermeasures. (*Id.* at 4.) Nickerson also alleges that he contracted COVID-

15   19 after COVID-positive inmates were transferred from CIM to San Quentin. (*Id.*) The CIM-San

16   Quentin transfer implicates the PREP Act's immunity for "non-use" decisions. The transfer was a

17   policy decision by the federal Receiver and CDCR officials in response to an active outbreak at

18   CIM. (RJN, Exh. B.) Although Nickerson's Complaint lacks particularized allegations as to what

19   each Defendant did or failed to do, any decision to transfer the inmates from CIM to San Quentin,

20   any decisions about when and how to test inmates, and prioritizing precautionary measures such

21   as providing PPE for certain people, are exactly the kinds of non-use decisions that the PREP act

22   immunizes. *See* Advisory Opinion 21-01; (RJN, Exh. N). Nickerson's contracting COVID-19

23   arose out of alleged actions that the PREP Act shields from liability. Therefore, the Court grants

24   Defendants' motion to dismiss because Defendants are entitled to PREP Act immunity.

25       **C.    If Defendants Are Not Immune, This Court Lacks Jurisdiction.**

26       The sole exception to the PREP Act's broad immunity is an exclusive federal cause of

27   action for death or serious physical injury caused by willful misconduct. 85 Fed. Reg. 79198. To

28   the extent Nickerson's allegations implicate this narrow exception to the PREP Act's immunity,

17

1   he may not maintain his suit in this Court; he must bring it in the District of Columbia. *See* 42

2   U.S.C § 247d-6(e).

3   **VI.   NICKERSON'S AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR DELIBERATE**
    **INDIFFERENCE TO HIS SAFETY.**

4

5        To assert an Eighth Amendment claim for deliberate indifference to safety or prison

6   condition, a prisoner must satisfy two requirements: one objective and one subjective. *Farmer v.*

7   *Brennan*, 511 U.S. 825, 834 (1994). Under the objective requirement, the prison official's acts or

8   omissions must be "sufficiently serious," *i.e.*, they must deprive the plaintiff of the "minimal

9   civilized measure of life's necessities." *Id.; Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994).

10       Objectively, there is no Eighth Amendment violation so long as the institution "furnishes

11  sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal

12  safety." *Hoptowit v. Ray,* 682 F.2d 1237 (9th Cir. 1982) (internal quotations omitted). "To the

13  extent [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal

14  offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

15  "[E]xtreme deprivations are required" to rise to the level of a constitutional violation. *Hudson v.*

16  *McMillian*, 503 U.S. 1, 8-9 (1992).

17       Here, Nickerson alleges that the "Warden and Director were aware of the [COVID-19]

18  dangers and San Quentin being inadequate to keep inmates safe due to old unventilated buildings,

19  no PPE, and room for social distance, no testing protocols in place, and overcrowding." (ECF No.

20  9 at 3.) Nickerson claims that he tested positive for COVID-19 after "121 inmates were

21  transferred from Chino Prison, and that some were known to be positive for COVID by both

22  prisons [sic] and medical staff." (*Id.* at 4.) Although COVID-19 is a serious health concern,

23  Nickerson does not allege any fact linking the transfer of inmates to San Quentin to his

24  contracting of the virus. (*See generally* ECF No. 9.) Nickerson does not allege that he was housed

25  with any of the transferred inmates, or even spent any time in the same cell, building, or facility

26  as any of them. (*Id.*) Nor does Nickerson allege that any of the Defendants were involved in the

27  decision to transfer the inmates from CIM, or how they were to be housed at San Quentin. (*Id.*)

28  Nickerson also does not allege that any of the Defendants denied him PPE. (*Id.*) Nickerson's

18

1   general allegation that COVID-19 positive inmates were transferred to San Quentin and that his

2   request for PPE was denied, without more, does not show that any Defendant deprived him of the

3   "minimal civilized measure of life's necessities." Thus, Nickerson's allegations in the Amended

4   Complaint do not meet the objective component for cruel and unusual punishment needed to

5   support a claim for deliberate indifference to safety.

6         Besides the objective component, an inmate must also demonstrate that the prison officials

7   had a sufficiently culpable state of mind. *Farmer,* 511 U.S. at 837. "Deliberate indifference is a

8   high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "This is not an easy

9   test [] to satisfy." *Hallett v Morgan*, 296 F.3d 732, 744-45 (9th Cir. 2002). Deliberate indifference

10   exists when a prison official "knows of and disregards an excessive risk to inmate health and

11   safety." *Farmer*, 511 U.S. at 837. "The official must be both aware of facts from which the

12   inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

13   inference." *Id.* "It is *obduracy and wantonness, not inadvertence or error in good faith*, that

14   characterize the conduct prohibited by the" Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294,

15   299 (1991) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)) (italics in original; internal

16   quotations omitted)*; see LeMaire v. Maass*, 12 F.3d 1444, 1452 (9th Cir. 1993). When prison

17   officials confront considerable security constraints, "the 'wantonness' that must be established

18   consists of acting 'maliciously and sadistically for the very purpose of causing harm.'" *LeMaire*,

19   12 F.3d at 1452 (quoting *Whitley,* 475 U.S. at 320–21).

20         Here, Nickerson's Complaint lacks sufficient detail to establish that any Defendant had the

21   requisite culpable mental state. (*See* ECF No. 9.) Nickerson alleges no specific facts against any

22   of these Defendants that would show that any of them knew of and disregarded a substantial risk

23   to Nickerson's safety. (*See* ECF No. 9.) With respect to Defendant Clark, Nickerson alleged

24   absolutely nothing except that he listed her as a defendant and stated that she was a "CEO [at]

25   San Quentin." (*Id*. at 2.) Nickerson's Amended Complaint does not show that Clark acted

26   maliciously and sadistically for the very purpose of causing harm to Nickerson. Similarly,

27   Nickerson's general and conclusory allegations that "121 inmates were transferred from Chino

28   Prison, and that some were known to be positive for COVID by both prisons and medical staff"

19

1   (*id*. at 4), and that Defendants Allison and Broomfield "were aware of the [COVID-19] dangers

2   and San Quentin being inadequate to keep inmates safe due to old unventilated buildings, no PPE,

3   and room for social distance, no testing protocols in place, and overcrowding" (*id*. at 3), do not

4   show that these Defendants were involved in the alleged transfer from CIM to San Quentin or in

5   denying Nickerson PPE, much less that these Defendants acted maliciously and sadistically in

6   connection with the alleged transfer for the very purpose of causing harm to Nickerson. *See*

7   *George v. Diaz,* No. 20-cv-03244-SI, 2020 U.S. Dist. LEXIS 153581, *10 (N.D. Cal. Aug. 24,

8   2020) ("The bare allegations of the existence of a disease and a desire to avoid contracting it

9   simply are not enough to state a claim against any defendant for deliberate indifference.").

10         Nickerson's Amended Complaint makes no effort to explain how each Defendant had the

11   required mental state for deliberate indifference. (*See* ECF No. 9.) Nickerson's action fails to state

12   a claim. *See Robinson v. Broomfield*, No. 21-cv-00972-RMI, 2021 U.S. Dist. LEXIS 61148, *6–7

13   (N.D. Cal. Mar. 30, 2021) (dismissing plaintiff's claim that he was infected with COVID-19 due

14   to a transfer of inmates to San Quentin because plaintiff failed to identify the actions or omissions

15   of any specific defendant); *Fields v. CDCR,* No. 2:21-cv-0548-EFB, 2021 U.S. Dist. LEXIS

16   67830 *4–5 (E.D. Cal. Apr. 7, 2021) (dismissing plaintiff's claim that he was infected with

17   COVID-19 after inmates from San Quentin and other prisons were transferred to High Desert

18   State Prison because it lacks sufficient detail to establish the deliberate indifference of any

19   defendant); *Cooper v. Allison*, No. 20-cv-09415 BLF, 2021 U.S. Dist. LEXIS 83474 *7, 10–12

20   (N.D. Cal. Apr. 28, 2021) (dismissing deliberate indifference claim that inmates transferred from

21   CIM to San Quentin were not tested for COVID prior to transfer because plaintiff only presented

22   conclusory allegations with little support, and failed to identify the actions of each defendant and

23   describe how each violated his constitutional rights). Therefore, the Court grants Defendants'

24   motion to dismiss for failure to state a claim.

25                                    **CONCLUSION**

26         Accordingly, good cause appearing, Defendants' request for judicial notice and their

27   motion to dismiss and for summary judgment are GRANTED in their entirety.  Nickerson's

28   action is hereby dismissed.

1    IT IS SO ORDERED.

2

3    Dated: _____          _____

4                                                    The Honorable Edward J. Davila
                                                     United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28